## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.  04-60279-CR-ZLOCH/SELTZER

-------------------------------------------------------x

UNITED STATES OF AMERICA                     :

                                             :

v.                                           :

                                             :

SAMUEL I. BURSTYN,                           :

                                             :

           Defendant.                       :

                                             :

-------------------------------------------------------x

## SENTENCING MEMORANDUM OF SAMUEL I. BURSTYN

**I.      INTRODUCTION**

Samuel I. Burstyn is a generous, caring and religious man.  He deeply regrets the pain and disruption suffered by his family, as a result of his arrest, seven-month incarceration, and guilty plea before this Court.  The conduct to which Mr. Burstyn pled guilty was an aberration in an otherwise remarkable life and career.

No purpose would be served in sending Mr. Burstyn back to prison.  Mr. Burstyn's well-publicized prosecution undoubtedly has already had a deterrent effect on those lawyers who would be tempted to cross the line.  He has already served more time behind bars than similarly-situated individuals convicted of comparable non-violent obstruction offenses.  He has accepted responsibility for his actions, and he clearly poses no risk of recidivism.

By contrast, if Mr. Burstyn is sent back to prison, the community at large will be deprived of a remarkably well-loved and respected man who has zealously dedicated himself to the support and defense of others.  Mr. Burstyn has gained wisdom and perspective through his

ordeal this past year.  He can contribute to society in a productive way using his formidable talents and boundless energy.

Most importantly, if Mr. Burstyn is sent back to prison, the many children and elderly relatives who depend on his presence in coping with a tragic array of emotional, physical and psychological problems, will be pointlessly victimized, forced again to contend with the trauma of separation and anxiety caused by Sam's incarceration.

For all of these reasons, we respectfully urge the Court to impose a sentence of time served, followed by a reasonable period of supervised release.

## II.     THE OFFENSE

On September 16, 2005, Mr. Burstyn pled guilty to Count Three of the Second Superseding Indictment charging him with conspiring to obstruct justice in violation of 18 U.S.C. § 371, as outlined in Count Three Overt Act F.  The following facts are contained in a stipulated Factual Basis submitted by the parties in connection with the plea.

Mr. Burstyn was a long time friend of Jeffrey and David Tobin.  Starting in April 2003, Mr. Burstyn learned that the Tobins were under investigation by a federal grand jury.  In October 2003, the Tobins and the defendant became aware that the Tobins were about to be indicted on drug and money laundering charges.  At that time, Mr. Burstyn was aware that a substantial portion of the Tobins' funds were drug proceeds that were deposited in financial institutions and could be subject to forfeiture.  Mr. Burstyn and the Tobins agreed that the Tobins would convert drug proceeds to a form that would avoid forfeiture and enable Jeffrey Tobin to become a fugitive. Mr. Burstyn suggested to Jeffrey Tobin that he should purchase diamonds because they were easily transportable and could be sold for cash.

Mr. Burstyn contacted Alan Lipton, an associate, who was owner of Diamond.com, an Internet business involved in the purchase and sale of diamonds. During a conference call among the Tobins, Lipton, and Mr. Burstyn, Mr. Burstyn introduced Jeffrey Tobin to Lipton and informed Lipton that Tobin wanted to invest in diamonds. Mr. Burstyn had no further involvement in and received no financial benefit from the transaction.

Tobin wire transferred $638,700 to Diamond.com for the purpose of purchasing diamonds. However, due to a dispute between Tobin and Lipton over the price, Tobin ultimately purchased only approximately $257,000 in diamonds and received a refund of the remaining funds. Three months later, Tobin was indicted and became a fugitive. During the period that Tobin was a fugitive, he had available the diamonds that he had purchased under the advice and counsel of Mr. Burstyn. As part of Tobin's plea, the diamonds were forfeited to the government.

Mr. Burstyn takes full responsibility for these actions and deeply regrets any harm that he has caused. Mr. Burstyn's conduct constituted a lapse in judgment in an otherwise law-abiding life as an accomplished attorney, patriarch of an extended family, and active member of the community.

## III.    BACKGROUND

### A.    Personal History

Mr. Burstyn's parents, Abram and Lea Burstyn, were Holocaust survivors. During the war they were imprisoned in a concentration camp in Poland. Most of their family members perished. Mr. Burstyn's father led a group of escapees from the concentration camp to fight in the Polish resistance. Eventually, Abram and Lea found refuge in a United States Army camp for displaced persons, where Mr. Burstyn's sister, Sara, was born in 1947.

In 1950, the family emigrated to the United States. Initially they lived on a farm in Massachusetts. Mr. Burstyn's parents eventually left the farm to make a humble living working in factories and maintaining apartment buildings.

Samuel I. Burstyn was born on November 2, 1952 in Boston. The Burstyns later had three more children: Jeremiah (Jerry) in 1954, Gertrude (1960) and Shari (1965). Mr. Burstyn and his siblings were raised in a devout Jewish household.

In 1969, Mr. Burstyn enrolled in the University of Miami on loans and a scholarship, where he was elected Student Body President. After graduating college, Mr. Burstyn attended the University of Miami School of Law, where he received a scholarship and a graduate assistantship position as an intern to the Vice President of Academic Affairs. While in law school, Mr. Burstyn interned with the Dade County Public Defender's Office and worked for a law firm under the direction of William P. Cagney. Mr. Burstyn graduated from law school in 1976, ranked second in his class. He was also a member of the Law Review and a national champion on the moot court team.

In 1983, Mr. Burstyn married Angela Aloma. They had four beautiful children, Daniel (21), Alana (19), Sean (15) and Ava (7). The marriage ended in divorce in 2003, but as set forth in greater detail herein, Mr. Burstyn remained remarkably involved in the lives of his children.

**B.      Legal Career**

After graduating law school, Mr. Burstyn clerked for Judge Tjoflat in what was then the Fifth Circuit Court of Appeals in Jacksonville, Florida. It was during this time that Mr. Burstyn met former Magistrate Judge John R. Farrell, who was to become a valued mentor. As

Judge Farrell's letter to the Court describes, although he was "[o]riginally a mentor to the unusually bright, energetic young lawyer, the association quickly evolved into a close personal and professional relationship." Appendix, Ex. 1 (Letter of Hon. John R. Farrell (Ret.)).[1] Upon completion of his clerkship, Mr. Burstyn was hired by Levine & Fieldstone, now operating as Bilzen Sumberg, as an associate. He worked on a variety of commercial litigation matters, including several successful civil jury trials. Mr. Burstyn also began doing criminal defense work around this time. In 1980, Mr. Burstyn became a partner with the firm. In 1981, he decided to start his own firm, Samuel I. Burstyn P.A., which at its height comprised Mr. Burstyn and three associates.

Mr. Burstyn was a dedicated and zealous advocate for his clients. Indeed, part of the reason that Mr. Burstyn is before the Court in this case is that he was an aggressive and creative lawyer who always sought the best possible outcome for his clients. However, Mr. Burstyn always took care to ensure that his assertiveness on behalf of his clients never compromised his role as an officer of the court, and aside from the instant offense, he never went outside the bounds of ethical conduct in service to his clients. As noted by former United States Magistrate Judge Samuel Smargon, before whom Mr. Burstyn appeared on many occasions:

> While Sam's reputation as an aggressive advocate was absolutely correct, he always showed the utmost respect to the court and his credibility was unquestioned. The cases he cited and the arguments he made before me were always an intellectual challenge that I respected. Sam was an extremely effective advocate for his clients.

Ex. 2 (Letter of Samuel J. Smargon).

---

[1]    All of the letters to the Court on Mr. Burstyn's behalf have been compiled in an Appendix which accompanies this Sentencing Memorandum.

Some of the most prominent attorneys in Miami have submitted letters to the

Court attesting to Mr. Burstyn's legal skills and commitment to his clients.  Thomas Tew, for

example, who has known Mr. Burstyn for over twenty-five years, writes: "At all times, I have

known him to be a principled and diligent advocate for his clients." Ex. 3 (Letter of Thomas

Tew).  Arthur Rice, who has known Mr. Burstyn since their first year of law school, states that

"Sam is undoubtedly one of the brightest and most talented lawyers I have ever known.

Professionally, there are few lawyers that are his equal." Ex. 4 (Letter of Arthur Halsey Rice).

Martin Raskin, a former Assistant United States Attorney, writes:

> I have known Sam Burstyn for approximately 20 years, having
> first met him during the course of several matters we worked on in
> common.  From the beginning, it was apparent to me that Sam was
> a talented lawyer with a keen legal mind.  In all of the matters we
> handled together, Sam was always honest and ethical in his
> dealings with opposing counsel and the court.   The quality of
> Sam's work product was first rate and he always represented his
> clients ably and with passion.   As a result of our professional
> relationship, I became very fond of Sam personally; a fondness
> that -- despite his legal difficulties -- endures today.

Ex. 5 (Letter of Martin R. Raskin).[2]

Mr. Burstyn also served as a mentor for young associates who worked at his firm.

Alexandra Tifford, one of Mr. Burstyn's former associates, recalls:

> Working for Mr. Burstyn was sometimes difficult and
> frustrating, but also challenging and rewarding.  He was truly
> interested in teaching me how to be a more effective advocate.  He
> articulated his criticisms of my work product constructively rather
> than destructively.  He provided me with opportunities that few
> young attorneys experience such as allowing me to (i) make an

---

[2]     Several other former Assistant United States Attorneys have submitted letters on
Mr. Burstyn's behalf, including Jane Moskowitz, Patricia Kyle, Michael Hursey, and Vincent
Briccetti.

opening statement to a jury in a federal, criminal racketeering case and (ii) cross-examine witnesses.  Mr. Burstyn helped me prepare for these responsibilities, and was happy to witness my accomplishments.

Ex. 6 (Letter of Alexandra Tifford).  Another of Mr. Burstyn's former associates, Pamela Weiss, states: "I came to respect Sam a great deal, not only for his obvious mastery of the practice of law, but for his own great respect for the American system of democracy. . . . As any good mentor would, he attempted to impress upon me his ideals, and he earnestly and repeatedly articulated the importance of the role of criminal defense, in maintaining the proper balance of power between government and the individual."  Ex. 7 (Letter of Pamela A. W. Weiss).

While Mr. Burstyn's criminal defense work has perhaps generated the most attention, he had a flourishing practice in other areas as well, including general civil, real estate, and matrimonial law.  One of his real estate clients, Ugo Colombo, also a close friend and godfather to Mr. Burstyn's daughter Ava, writes:

> I consider Sam a friend, but I have also been a client and business associate of his.  In each of these capacities Sam has been diligent, loyal, and totally honest and reliable.  Most of our dealings have been sealed on handshakes, and through good and bad he has always conducted himself with the highest ethical behavior.  Sam also refused to charge me any legal fees for any of the work he has done for me.

Ex. 8 (Letter of Ugo Colombo).

Mr. Burstyn has always been willing to give generously of his time to represent *pro bono* clients.  When a next-door neighbor of his brother Jerry's, Rabbi Naftali Grosz, needed representation, Mr. Burstyn willingly stepped in.  Rabbi Grosz had a practice of making his home available to visiting rabbis and their followers as a place to gather and pray together.  When the City of Miami Beach notified Rabbi Grosz that it considered this a violation of a local zoning ordinance, Mr. Burstyn represented Rabbi Grosz *pro bono* in a successful constitutional

challenge to the ordinance in federal district court.[3]  Mr. Burstyn took on the case because he

believed in the cause, and as his colleague and friend William Cagney writes, "[h]e was a

dedicated crusader when he felt the law wasn't right."  Ex. 9 (Letter of William P. Cagney, III).

Rabbi Grosz's son writes:

> Sam never took any money from us for his extensive and
> brilliant legal work.  He said he was doing this as a matter of
> "principle"; because it was the "right thing" to do -- and offered to
> help us at any time in the future, if need be, free of charge.  This
> should give some indication and insight into Sam's nature -- what
> kind of man he is -- based on what "principles" he values and
> holds dear -- as he so devotedly and diligently helped us pursue our
> noble cause.

Ex. 10 (Letter of Rabbi Rafael Grosz).

### C.      Religious Commitment and Community Involvement

Mr. Burstyn is a deeply religious man who has nurtured the orthodox beliefs of

his niece and nephews by enabling them to continue their religious studies and maintain their

way of life, even after their father's death.

Mr. Burstyn has a long-standing association with many Jewish organizations,

including the Talmudic College of Florida, the Aleph Institute, The Mount Sinai Medical Center,

Hevra Kedusha (a society that arranges for the proper burial of indigent Jews) and the Bikor

Cholim Committee of Miami Beach, which assists individuals in need of medical treatment.  See

Ex. 11 (Letter of Barbara Goren of the Bikor Cholim Committee).   Mr. Burstyn also is a

member of The Shul of Bal Harbor.

---

[3]      The Eleventh Circuit later reversed.  See Grosz v. City of Miami Beach, 721 F.2d
729 (11th Cir. 1983).

Mr. Burstyn's spirituality and dedication to his faith have been noticed by others. On a business trip to Hamburg, Germany, A.J. Barranco, a colleague of Mr. Burstyn's traveling with him, recalled that Mr. Burstyn "sought out and went to the only remaining Jewish Synagogue in the area." Ex. 12 (Letter of A.J. Barranco, Jr.). Mr. Burstyn has also used discussions about faith to comfort others in their time of need. As another friend fondly recalls:

> When my father died, Sam comforted me with reference to a particular Old Testament passage, and told me that once I had figured out the real meaning of the passage, I would truly understand what my father's life meant to me and my family. I spent many hours thinking about and researching that passage. Sam was right. And I will not soon forget his erudition or insight.

Ex. 13 (Letter of Vincent L. Briccetti). Still another friend, Arianne Brown, recalls how Mr. Burstyn helped her deal with a life crisis:

> Over the past 4 years, my mother has been battling with terminal cancer. With Sam's strong sense of family values, he was not just a shoulder to cry on but a leader in sourcing the necessary options and alternatives. My mother passed on with the peace of mind that Sam would always be there to protect us.

Ex. 14 (Letter of Arianne Brown).

Mr. Burstyn has drawn strength from his faith in the difficult time he has faced since his indictment and guilty plea, and certainly, as he approaches sentencing. As Paul Stokes, Mr. Burstyn's estate lawyer and friend, writes:

> He is an observant Jew, with a special sense of the presence and activity of the Deity. From the beginning we fell into deep discussion about his faith and my own. I am a Christian . . . . The God with whom Sam and I are concerned is, without a doubt in my mind, dealing with Sam with special intensity in the matter that brings him before you.

Ex. 15 (Letter of Paul M. Stokes).

In addition to his commitments to his temple and Jewish organizations, Mr. Burstyn is involved in many other community institutions.  He has an intimate connection to The Cushman School in Miami, which all of his children either have attended or currently attend. Mr. Burstyn has lent both his time and generous financial support to the school:

> I know Mr. Burstyn to be a diligent, warm and giving supporter of the Cushman School . . . . My child as well as Mr. Burstyn's children have attended Cushman.  Mr. Burstyn served on Cushman's Board of Trustees and as its Treasurer, a demanding post involving fund raising for the school.  I also know that Mr. Burstyn was very generous in making a mid-five-figure contribution to the school.

Ex. 3 (Letter of Thomas Tew).[4]

Mr. Burstyn is a long-standing resident of Miami Beach, and has been deeply involved in many development-related community issues, either as a member of chair of several important city committees dealing with these issues.  Neisen Kasdin, the former Mayor of Miami Beach, recounts Mr. Burstyn's commitment to community involvement:

> I have known Sam for over 15 years, and I have worked with him on a variety of civic, community and religious causes.  In all of my interactions with Sam, he demonstrated leadership, selflessness, generosity, intelligence and an unwavering commitment to advancing the greater good.
>
> With respect to community involvement, I am reminded of Sam's volunteer service, while I was Mayor, as chairman of the selection committee for the South Beach streetscape project, one of the most important elements of Miami Beach's city-wide capital improvements program.  There were determined attempts to politicize the selection process by certain bidders and their lobbyists.  Sam resolutely protected the integrity of the selection

---

[4]     Dr. Joan Lutton, the Head of Cushman School, is a nationally-renowned educator and a woman of devout religious beliefs.  She has agreed to speak on Mr. Burstyn's behalf to this Court, and will speak of his commitment to the School, as well as his devotion to his children.

> process at the committee level.    Thereafter, Sam remained
> involved through the ultimate award by the City Commission to
> assure the ultimate selection of the most qualified consultant.

Ex. 16 (Letter of Neisen O. Kasdin).

When this case is over,  Mr. Burstyn wants to continue to contribute to society in

a meaningful way.  And as numerous letters from members of the community attest, Mr.

Burstyn's return to society is greatly anticipated.  As Mr. Burstyn's colleague and friend, Robert

Weissler, writes:  "Sam still has a great deal to offer to his family and this community and a

significant prison sentence will deprive both the community and Sam's family of a talented man

who can still do much good."  Ex. 17 (Letter of Robert I. Weissler).  Another colleague and

friend, Philip Bloom, echoes these thoughts: "Mr. Burstyn[,] with his talent, his past charitable

involvement, and caring attitude of helping others, is a very special individual who, I am certain,

will make it back as a productive person of whom we can all be proud."  Ex. 18 (Letter of Philip

Bloom).  Given Mr. Burstyn's lengthy career as a productive member of society and his

outstanding record of service to the community, we respectfully submit that Mr. Burstyn can

give much to the community if he is sentenced to time served.


IV.    SENTENCING ISSUES

A.    Federal Sentencing After *United States v. Booker*

The Supreme Court fundamentally altered the federal sentencing landscape in

United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), by holding that mandatory

application of the Sentencing Guidelines violated a defendant's Sixth Amendment right to a jury

trial.  With this decision, the Court freed sentencing courts from the rigid, formalistic framework

that existed under the Sentencing Guidelines, replacing it with a system that provides judges the

discretion to consider any relevant characteristic of an offense or of the particular defendant.

Under Booker, this Court first performs guidelines analysis as before, including departure

analysis, to determine an advisory guideline range. The Court then has discretion to impose a

sentence that is reasonable, taking into account not only the advisory guidelines, but also the

other factors set forth in 18 U.S.C. § 3553(a). See United States v. Crawford, 407 F.3d 1174,

1178 (11th Cir. 2005); United States v. Davis, 407 F.3d 1269, 1271 (11th Cir. 2005). The

sentence should be "sufficient, but not greater than necessary" to achieve the traditional purposes

of sentencing -- just punishment, adequate deterrence, protection of the public, and rehabilitation.

18 U.S.C. § 3553(a), (a)(2).

Specifically, 18 U.S.C. § 3553(a) provides that in determining the sentence to be

imposed, a court shall consider:

> (1) the nature and circumstances of the offense and the history
> and characteristics of the of the defendant;
>
> (2) the need for the sentence imposed --
> (A) to reflect the seriousness of the offense, to promote
> respect for the law, and to provide just punishment for the
> offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the
> defendant; and
> (D) to provide the defendant with needed educational or
> vocational training, medical care, or other correctional
> treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established
> [by the Sentencing Guidelines] . . .
>
> (5) any pertinent policy statement [in the Sentencing Guidelines]
> . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C.A. § 3553(a) (2000 & Supp. 2005).

In considering the 18 U.S.C. § 3553(a) factors, sentencing courts should give no greater weight to the Guidelines calculation than any of the other factors.  See United States v. Ranum, 353 F. Supp. 2d 984, 985-86 (E.D. Wis. 2005) (giving equal weight to each factor listed in § 3553(a)); United States v. Myers, 353 F. Supp. 2d 1026, 1028 (S.D. Iowa 2005) (holding the Guidelines "should be treated as one factor to be considered in conjunction with other factors that Congress enumerated in § 3553(a)"); United States v. Moreland, 366 F. Supp. 2d 416, 418 (S.D. W. Va. 2005) (holding that the Guidelines do not "carry[ ] greater weight than any of the other § 3553(a) factors").  It is through consideration of all of these relevant sentencing factors that courts ensure they reach a "just punishment" as required by 18 U.S.C. § 3553(a).

### B.    The Applicable Guidelines Range

#### 1.    The Court Should Not Apply A Two-Level Increase For Abuse Of A Position Of Trust Or Use Of Special Skill

The Probation Office incorrectly applied a two-level increase under U.S.S.G. § 3B1.3 because Mr. Burstyn clearly did not abuse a position of public or private trust or use a special skill in connection with the offense.

For the abuse of trust adjustment under U.S.S.G. . § 3B1.3 to apply, the government must establish that the defendant held a place of public or private trust and that he abused that position in a way "'that significantly facilitated the commission or concealment of the offense.'"  United States v. Morris, 286 F.3d 1291, 1295 (11th Cir. 2002) (quoting U.S.S.G. §

3B1.3 (2004)).  "Although attorneys are expected to abide by ethical standards, it is simply not the case that an attorney holds a position of trust with respect to all people with whom he comes into contact solely by virtue of his status as an attorney."  Id. at 1297.  Indeed, the Eleventh Circuit has made clear that "the abuse of trust enhancement applies only where the defendant has abused discretionary authority entrusted to the defendant by the victim."  United States v. Garrison, 133 F.3d 831, 839 (11th Cir. 1998) (citation omitted).

The commentary to § 3B1.3 explains that in the case of an attorney, the adjustment would apply, for instance, when the attorney embezzled a client's funds with which he had been entrusted.  U.S.S.G. § 3B1.3, comment. (n.1).  This is because "[t]he guidelines enhancement requires more than a mere showing that the victim had confidence in the defendant. Something more akin to a fiduciary relationship is required."  United States v. Brunson, 54 F.3d 673, 678 (10th Cir. 1995).

Under the agreed-upon facts at issue here, Mr. Burstyn clearly did not abuse a position of trust.  Jeffrey Tobin approached Mr. Burstyn to inquire about purchasing diamonds. Mr. Burstyn put Tobin in touch with Alan Lipton, a business associate and friend with whom Mr. Burstyn had transacted business in the past.  Thereafter, the two men engaged in an arm's length commercial transaction in which Mr. Burstyn played no further role.  Neither Tobin nor Lipton entrusted Mr. Burstyn with any degree of "discretionary authority," nor could either man plausibly be described as a "victim" of anything.

For the special skill adjustment to apply, the government must establish that the defendant used a special skill "in a manner that significantly facilitated the commission or concealment of the offense."  U.S.S.G. § 3B1.3.  While Mr. Burstyn undoubtedly possesses special skills as the result of his training as a lawyer, "[i]t has generally been recognized that the

'special skill' enhancement provision of section 3B1.3 'applies only if the defendant employed a

'special skill' in the form of a pre-existing, legitimate skill not possessed by the general public to

facilitate the commission or concealment of a crime.'" United States v. Foster, 155 F.3d 1329,

1331 (11th Cir. 1998) (quoting United States v. Young, 932 F.2d 1510, 1513 (D.C. Cir. 1991));

see also U.S.S.G. § 3B1.3, comment. (background) ("This adjustment applies to persons who

abuse . . . their special skills to facilitate significantly the commission of concealment of a

crime.").

   It is clear here that Mr. Burstyn did not use his "special skills" as a lawyer "in a

manner that significantly facilitated the commission or concealment of the offense," as required

under § 3B1.1.  Jeffrey Tobin approached Mr. Burstyn in his capacity as a longtime friend and

asked Mr. Burstyn for help in investing funds.  Although Mr. Burstyn had represented Jeffrey

Tobin, and had dealings with him as an attorney, this was not such an occasion.  Mr. Burstyn

suggested diamonds, and introduced Tobin to Alan Lipton, the owner of a well-known business

called Diamond.com.[5]

   This conduct did not involve any sort of special skill.  Mr. Burstyn's suggestion to

Jeffrey Tobin that he should buy diamonds was not made based on his experience or expertise as

a lawyer.  See United States v. Ferrouillet, No. CRIM.A. 96-198, 1997 WL 266627, at *2 (E.D.

La. May 20, 1997) (defendant in money laundering case did not use special skill as lawyer in

cashing check and depositing it in several banks in different quantities), aff'd sub nom. United

States v. Hemmingson, 157 F.3d 347 (5th Cir. 1998).  Rather, Mr. Burstyn basically put two

---

[5]    Contrary to the government's assertion in its Dec. 14, 2005 letter to the Probation
Office, while Mr. Burstyn did represent Mr. Lipton's company at one point in time, Mr. Lipton
personally was never a client of Mr. Burstyn's.

friends in contact with one another for business purposes.  His conduct thus stands in contrast to

the usual case in which the special skill adjustment is applied, where a defendant who is a lawyer

files court papers or uses his expertise in a particular area of law to facilitate a crime.  See, e.g.,

United States v. Shenberg, 89 F.3d 1461, 1478 (11th Cir. 1996) (court upheld the application of

the special skill adjustment because the defendant, as part of a RICO conspiracy involving case-

fixing, read arrest affidavits, reviewed pleadings, proposed suppression orders, and made

suggestions based upon his experience and education as to the amount of bond and the booking

procedure); United States v. Franklin, 837 F. Supp. 916, 919 (N.D. Ill. 1993) (court noted that

the defendant's special knowledge of bankruptcy law and the legal process in general facilitated

his ability to defraud his client's creditors).

        Mr. Burstyn did not draw upon his legal skills in connection with the offense, and

his conduct did not involve the use of the court system or the preparation or review of any legal

documents.  Accordingly, the Court should decline to apply the two-level adjustment to Mr.

Burstyn's offense level.

### C.    The Court Should Depart Downward On A Number Of Grounds

#### 1.    The Court Should Depart Downward Based On Mr. Burstyn's Extraordinary Family Responsibilities

        Mr. Burstyn provides crucial emotional and financial support for a remarkably

broad extended family of fourteen highly vulnerable dependents suffering from a variety of

physical and psychological ailments.  Without Mr. Burstyn's continued presence, these innocent

family members' lives will be dramatically disrupted.

        A district court has discretion to grant a downward departure based on a

defendant's family responsibilities.  In United States v. Mogel, 956 F.2d 1555, 1561 (11th Cir.

1992), the court held that "the Guidelines do not categorically prohibit a judge from departing on the basis of offender-related characteristics [like family responsibilities], whether enumerated in the Guidelines or not." 956 F.2d at 1561. However, recognizing that the Sentencing Guidelines provide that "family ties and responsibilities . . . are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range," U.S.S.G. § 5H1.6, the Mogel Court outlined the considerations that should guide the judge's discretion in considering such a departure. First, the court must find that the defendant's family circumstances are "present to a degree substantially in excess of that which ordinarily is involved in the offense." 956 F.2d at 1564 (quoting U.S.S.G. § 5K2.0, policy statement) (quotation marks omitted). Second, the court must also conclude that the defendant's family circumstances warrant departure despite the instruction in the Guidelines that they "are not ordinarily relevant." Id. In other words, the defendant's family circumstances must be extraordinary. See, e.g., United States v. Saucedo-Patino, 358 F.3d 790, 794 (11th Cir. 2004); United States v. Allen, 87 F.3d 1224, 1225 (11th Cir. 1996).

A key factor in the consideration of whether a defendant's family circumstances are extraordinary is "the absence or presence of [other] adults who can step in during the defendant's incarceration to assist with caring and providing for the defendant's dependents." United States v. Huerta, 371 F.3d 88, 95 (2d Cir. 2004). Thus, courts have departed downward in cases where a defendant plays a crucial role as a caregiver for his or her emotionally disturbed or disabled children. See, e.g., United States v. Spero, 382 F.3d 803, 804 (8th Cir. 2004) (affirming downward departure where one of defendant's four children suffered from a variety of developmental disorders and defendant was very involved in son's care); United States v. Lopez, 28 F. Supp. 2d 953, 955 (E.D. Pa. 1998) (departing downward on basis of defendant's seven-

- 17 -

year-old child's psychiatric illness and fact that defendant was the only caregiver able to make a difference in her daughter's life); <u>United States v. Feldman</u>, No. 94 Cr. 0278, 1994 WL 525958, at *1 (S.D.N.Y. Sept. 29, 1994) (departing downward to sentence of probation from offense level of 12 where defendant is sole provider for family that included one son with emotional problems and another son with a history of attention deficit disorder and need for psychiatric care).

Courts have also departed in circumstances where a defendant bears the burden of supporting a large number of dependents, especially if some of those dependents are disabled or elderly. <u>See, e.g.</u>, <u>United States v. Jebara</u>, 313 F. Supp. 2d 912, 917-18 (E.D. Wisc. 2004) (downward departure warranted where defendant devoted her life to raising her seven children, all of whom lived with her, and some of whom had children of their own); <u>United States v. Alba</u>, 933 F.2d 1117, 1122 (2d Cir. 1991) (affirming downward departure where defendant lived with and provided for wife, two daughters, disabled father, and paternal grandmother).

Mr. Burstyn is the patriarch of an unusually large and highly vulnerable family network. First, there are Mr. Burstyn's own four children, Daniel, Sean, Alana and Ava. Daniel (21) suffers from several serious medical issues, which are described in detail in paragraphs 79 and 80 of the PSR. Alana (19) also faces several medical issues, as outlined in the PSR at paragraphs 81 and 82. In connection with the incident raised in the government's motion to revoke Mr. Burstyn's bond, Alana has written the following:

> I acted out of hysterical anger which caused me to become somewhat irrational. . . . I acted out of anger and provoked the confrontation and I absolutely believe that my father's intent was to take the medication out of my mouth due to my past history... .I sincerely apologize for and regret the trouble these accusations may have caused. . . . I look to [my father] for support and fatherly advice. Regardless of the ups and downs we have had as a family, I love him and do not want this or anything else to cause him harm.

For most fathers, the issues faced by these two children would be daunting enough.  But  Mr. Burstyn also is responsible for <u>four other children</u> -- nieces and nephews who were left without a viable household following the death of Mr. Burstyn's brother, Jerry.

In March 1998, Jerry died suddenly, leaving a wife and four young children.   Mr. Burstyn assumed full responsibility for his late brother's family, managing the estate and taking on an even more important role as a father figure for his niece and three nephews:  Esther (27), Jacob (24), Joseph (21), and Jonathan (14).

One close friend speaks of the remarkable commitment Sam made to his deceased brother's children:

> When Sam's brother passed away unexpectedly and prematurely, Sam was thrust into a situation where he had to provide for his brother's 4 children.  Not only did Sam support them financially, he made his brother's family his own tirelessly and relentlessly spreading his wings to protect his brother's young children.

Ex. 19 (Letter of Richard A. Berkowitz).

Mr. Burstyn's niece, Esther, describes what Mr. Burstyn has done for her and her brothers:

> Sam took full responsibility of my family, my brothers who were only eight, twelve and sixteen at the time . . . and helped us to pull ourselves together and function productively once again. . . . The most incredible thing my uncle did for us bears no price tag or tangible cost -- it was the gift of acceptance.  My uncle accepted us like his own children [and] never made us feel like just "nieces and nephews."  He made himself available to us whenever we needed him while making us believe we were the most important people he could be dealing with.

Ex. 20 (Letter of Esther Burstyn).

Mr. Burstyn's support  has allowed these children to have happy, fulfilled lives, despite the tragic loss of their father.  Jacob Burstyn recalls:

> I thought my dreams would be no more than just that, dreams.
> There would be many responsibilities that I would need to accept,
> and I felt I had an obligation to my family to do this. If I would be
> able to study more, if I would be able to be a Rabbi, it would be at
> an unknown later date. . . . Divine providence had other ideas. My
> uncle . . . a champion of public needs[,] was there. He was a
> messenger of G-d. He was a savior. I was assured that I needn't
> worry or have to get involved [in any of] father's affairs. There
> would be no family responsibilities or financial burdens. Sam
> would bear it all. The only thing I had to do was study. . . . I have
> never before met a man who has such a sense of responsibility for
> so many people as Sam.

Ex. 21 (Letter of Jacob Burstyn).

Mr. Burstyn also cares for several older relatives. Mr. Burstyn's mother, Lea

Burstyn, now 86 years old, lives in Miami. She suffers from a variety of heart ailments. Mr.

Burstyn's sister Sara (58), who lives with her mother, is disabled due to schizophrenia. See PSR

¶ 72. Because neither woman can drive, the rest of the family, including Mr. Burstyn, attend to

their daily needs. Mr. Burstyn expends approximately $30,000 per year for their care.

Mr. Burstyn also provides financial and emotional support to his sister Shari

Jackowitz (41). Shari, who has two children and lives in North Miami Beach, is partially

disabled due to depression treated with medication and electro-convulsive therapy. Because she

cannot work, Mr. Burstyn contributes approximately $35,000 per year to her household.

Mr. Burstyn's friends have long admired his love and devotion to his children.

Arthur Rice, a friend and colleague, writes of how Mr. Burstyn has always put his family first,

despite having a very demanding professional life:

> I know Sam to be a dedicated family man. His first priority is now
> and has always been as a long as I have known him, his children.
> Unlike some of us who have mistakenly believe[d] that our
> professional lives had to take precedence over our personal lives in
> order for us to advance, Sam Burstyn has never fallen into that
> trap. He spends a lot of time with his children and it is seldom that

> I have ever seen him after work or on weekends without at least
> one of them being with him.

Ex. 4 (Letter of Arthur Halsey Rice).  These thoughts are echoed in many letters submitted to the

Court, including those of Robert D. Hertzberg, Mr. Burstyn's neighbor for fifteen years, and

Miguel de la O, a colleague and friend of Mr. Burstyn's.  <u>See</u> Ex. 22 (Letter of Robert D.

Hertzberg); Ex. 23 (Letter of Miguel de la O).

      In sum, Mr. Burstyn provides support for fourteen family members:  his four

children, his ex-wife, his brother Jerry's four children, his elderly mother, his disabled sister

Sara, and his sister Shari, and her two children.  Many of them would be unable to survive

without his support.  Mr. Burstyn's role extends far beyond financial generosity.  He has devoted

his life to his family, always making time to spend with his children, dutifully checking on his

elderly mother, and fielding numerous phone calls every day from various family members in

need of a listening ear.  As a close friend of Mr. Burstyn's for twenty years, A.J. Barranco,

writes, Mr. Burstyn "has been a source of joy to all of them, and [is] the 'glue' that holds this

extended family together."  Ex. 12 (Letter of A.J. Barranco, Jr.).  Thus, a sentence of

incarceration will deprive his family of the thing they need most from Mr. Burstyn -- his constant

and stabilizing presence in their lives, every day.  All of Mr. Burstyn's relatives, but especially

his children, have already suffered a great deal as a result of Mr. Burstyn's pre-trial detention.

They do not deserve to have their network of support shattered once again.

    **2.**    **The Court Should Depart Downward Based On The Conditions Of**
        **Mr. Burstyn's Pre-Trial Detention**

      We believe the government dramatically overreacted in the manner in which it

prosecuted Mr. Burstyn.  The case began with lurid allegations of witness intimidation and

murder.  Mr. Burstyn was facing the prospect of more than fifty years in prison.  It ended with a

plea to a single count of non-violent obstruction, involving the referral of Jeffrey Tobin to a diamond dealer. In the process, Mr. Burstyn had to endure seven grueling months of pretrial confinement.

The Court should grant a downward departure because the conditions under which Mr. Burstyn was confined pending trial for seven months at the Federal Detention Center in Miami ("FDC Miami") were extraordinarily harsh in comparison to the conditions which a white collar offender such as Mr. Burstyn normally would encounter if sentenced to prison time for a non-violent obstruction crime.[6]

### a.    Factual Background

On October 28, 2004, Mr. Burstyn was indicted on a single count of conspiring to commit money laundering in connection with making a $500,000 loan of indisputably clean money to Rodney Fund of Auto Fund of Georgia which was secured by collateral provided by narcotics dealer Jeffrey Tobin.

On February 22, 2005, the government obtained a seven-count Superseding Indictment charging Mr. Burstyn with additional conspiracy and obstruction charges based on allegations that he (1) coached and persuaded various witnesses to lie before the grand jury; (2) persuaded Jeffrey Tobin to become a fugitive; and (3) caused David Tobin to convey his residence to Burstyn in an effort to prevent the Government from forfeiting the property.

---

[6]    In addition, Mr. Burstyn was arrested at his home in front of his family at six o'clock in the morning without any prior notice as would normally be provided to a white collar target.

During the pretrial detention hearing, the government asserted that Mr. Burstyn posed both a risk of flight and a danger to the community.  We believe the government misled the Court on these issues.  On the flight risk issue, the government argued that Mr. Burstyn (a thirty-six-year resident of South Florida with remarkably deep roots in the community) had substantial "international ties" and foreign clients which would undoubtedly facilitate his flight. As it turned out, Mr. Burstyn's "international ties" consisted of a handful of depositions he had conducted in Germany related to civil litigation pending in the United States.[7]

More salaciously, on the dangerousness issue, the government proffered information supposedly obtained from a cooperating witness named Arias who was represented by Mr. Burstyn in the infamous Miami River Cops case.  The government asserted that in 1987, Arias told investigators that he had been involved in a conspiracy to murder a potential government witness named Alejo Cosio.  Specifically, the government advised the Court:

> Cosio had relevant and strong information against the Miami River Cops.  The Miami River Cops discussed the fact that they intended to kill Cosio in front of Burstyn.

> Burstyn not only implicitly, explicitly approved of this murder conspiracy and, indeed, undertook efforts to enable it to occur.

Transcript of Feb. 28, 2004 Hearing ("Hrg. Tr.") at 42.  The government asserted that Arias would testify that at one point Mr. Burstyn said, "You know, you guys are punks.  When I represent people like Jorge Ochoa, their witnesses end up dead."  Id. at 43-44.  The government

---

[7]     The government would later reiterate this claim before the Eleventh Circuit, asserting that Mr. Burstyn had "the resources and international contacts to easily flee from the United States and seek refuge in a country from which extradition would be virtually impossible." Opp'n to Defendant's Appeal at 16-17.

further claimed that in meeting with the River Cops defendants after the case ended in a mistrial,

Burstyn made a gesture in which he drew his finger from one side of his neck to the other,

indicating cutting his throat, and then said "that's the only way you guys are going to win this."

Id. at 44.  The government succeeded in having Mr. Burstyn detained, and he spent the next

seven months at the Federal Detention Center in Miami.

It soon became apparent that the government would not be able to prove any of

the sensational allegations which had been used to justify Mr. Burstyn's detention.  On July 1,

2005, for example, Mr. Burstyn moved in limine to exclude reference to the Miami River Cops

case under Federal Rules of Evidence 404(b) and 403.  On August 1, 2005, the government

simply abandoned the allegations, declaring that, in contrast to its previous position, it did not

intend to present evidence relating to the River Cops case in its case-in-chief.

On August 2, 2005, the government obtained a twelve-count Second Superseding

Indictment against Mr. Burstyn which included additional money laundering and obstruction

charges relating to Mr. Burstyn's interactions with Jeffrey Tobin.

On September 16, 2005, Mr. Burstyn accepted a plea agreement from the

government in which he was permitted to plead guilty to a single count of obstruction in

connection with having introduced Jeffrey Tobin to Alan Lipton.  Under the plea agreement, the

government agreed to drop all of the other charges.  Mr. Burstyn now faced a statutory maximum

of five years' imprisonment, in contrast to the twenty years or more that the government

maintained Mr. Burstyn was facing at his pretrial detention hearing.  After the plea, the Court sua

sponte ordered Mr. Burstyn released on bond.  Later that day, Mr. Burstyn was released after

having spent nearly seven months in jail.

b.      Discussion

It is well established that courts may consider harsh conditions of pre-sentence detention in making sentencing decisions.  In <u>United States v. Pressley</u>, 345 F.3d 1205, 1208 (11th Cir. 2003), for example, the Eleventh Circuit stated that where the conditions of "presentence confinement were extraordinarily harsh" a district court may "exercise its discretion as to whether to depart on the basis of presentence confinement." <u>Id.</u> at 1208.  <u>See also</u> <u>United States v. Carty</u>, 264 F.3d 191,196 (2d Cir. 2001) ("pre-sentence confinement conditions may in appropriate cases be a basis for downward departures"); <u>United States v. Francis</u>, 129 F. Supp. 2d 612, 614-20 (S.D.N.Y. 2001) (departure appropriate where defendant experienced weight loss, stress, depression, inadequate hygiene, visitation restrictions, a lack of programs or work opportunities and other problems); <u>United States v. Hernandez-Santiago</u>, 92 F.3d 97, 101 n.2 (2d Cir. 1996) (noting that the district court granted a downward departure of three levels based on federal defendant's twenty-two months incarceration in a state facility, which was a "'harsher incarceration'" and that this departure was not challenged on appeal); <u>United States v. Torres</u>, No. 01 CR. 1078, 2005 WL 2087818, at *1 (S.D.N.Y. Aug. 30, 2005) (granting downward departure based on recognition that defendant's incarceration in Colombia was under harsher conditions than he would have experienced if incarcerated in the United States.).

Mr. Burstyn was detained at FDC Miami from February 23, 2005 until his release on bail on September 16, 2005.  FDC Miami is classified by the Bureau of Prisons ("BOP") as an administrative facility capable of holding pretrial detainees in every security category.  Given the limited purpose of a pretrial detention facility, of course, it is not feasible for the BOP to segregate detainee housing by separate categories, aside from a small group of high-security

detainees housed in the Special Housing Unit ("SHU").  As a consequence, FDC Miami, like any

other federal detention center, imposes certain general conditions of confinement (such as use of

cells, limited visitation rights, frequent searches) for all of the pretrial detainees even though

such procedures would normally be applied, in a post-sentence setting, only to medium or high

security inmates.  While incarcerated at FDC Miami, Mr. Burstyn was subjected to strip searches

at least five days per week, sometimes as often as four to six times per day, depending on the

number of times he entered the visitors center.  Mr. Burstyn was only allowed visits with

immediate family members or counsel, and was restricted to a maximum of ten minutes per day

spent on phone calls.  Because of the restrictions on visitors, Mr. Burstyn saw his children no

more than one or two times per month for about forty-five minutes at a time during the nearly

seven months he was detained.

In addition, while incarcerated at FDC Miami, Mr. Burstyn was placed in the

SHU for a week in September based solely on the fact that the BOP was unable to accommodate

Mr. Burstyn in general population given the large number of separatees who were either already

housed in the facility or who were writted in by the government in anticipation of his trial.

Given the extraordinary hardships experienced by inmates in the SHU, several courts have held

that reduced sentences are warranted when defendants are subjected to solitary confinement and

particularly, as in Mr. Burstyn's case, where such confinement was the result of security needs

and not misconduct by the defendant.  See, e.g., United States v. Noriega, 40 F. Supp. 2d 1378,

1379 (S.D. Fla. 1999) (in reducing defendant's sentence, court explained that "[t]here is little

question that this [solitary] is a more difficult ('harder') type of confinement than in general

population" and "the consequences of such deprivation can be serious"); McClary v. Kelly, 4 F.

Supp. 2d 195 (W.D.N.Y. 1998) (describing the harm caused to inmates by confinement in the

SHU); <u>United States v. Blarek</u>, 7 F. Supp. 2d 192 (E.D.N.Y. 1998) (finding downward departure warranted because security concerns were likely to require defendant's placement in solitary confinement); <u>United States v. Jones</u>, 724 F. Supp. 423 (M.D. La. 1989) (finding defendant's time in solitary confinement was a factor warranting sentence reduction).

Had Mr. Burstyn been granted bail at the outset of the case, and then subsequently been convicted and sentenced to a prison term, he likely would be eligible under BOP regulations for assignment to a minimum security Federal Prison Camp, given the nature of the offense and his lack of any criminal history.  In a camp, he would have been subject to fairly unrestrictive conditions, such as dormitory-style housing, desirable work programs, a relatively low staff-to-inmate ratio, and limited or no perimeter fencing.

We respectfully submit that not only has Mr. Burstyn already served a substantial jail term in relation to the severity of his offense conduct, but indeed he has truly done "hard time" that he otherwise would never have faced.  Accordingly, a downward departure from the applicable guidelines range is warranted.

### D.      Consideration Of The Additional 18 U.S.C. § 3553(a) Factors Strongly Supports A Non-Guidelines Sentence Below The Guidelines Range

After evaluating the Sentencing Guidelines and calculating a potentially applicable Guidelines range, a sentencing court must consider the remaining § 3553(a) factors in order to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" by Congress.  18 U.S.C. § 3553(a).  Sentencing courts now have the obligation to consider factors that were discouraged under the pre-<u>Booker</u> mandatory Guidelines regime, such as the history and characteristics of the defendant, the nature of the offense, the need for deterrence, the likelihood of recidivism, and the public's need for protection.

1.      **The Nature and Circumstances Of The Offense**

Section 3553(a)(1) requires the Court to consider the "nature and circumstances of the offense" in determining an appropriate sentence.   Mr. Burstyn has pled guilty to an obstruction in connection with introducing Jeffrey Tobin to Alan Lipton for the purpose of purchasing diamonds which could be used in the event Tobin became a fugitive.

Despite the limited nature of the offense conduct at issue, the Probation Office calculated Mr. Burstyn's offense level to be a Level 30.  This is not typical for a non-violent obstruction case, nor does it fairly reflect the nature of Mr. Burstyn's conduct.

The single biggest factor increasing Mr. Burstyn's Guidelines exposure was the use of a "cross reference" provision in the obstruction guideline (U.S.S.G. § 2J1.2).  The cross reference essentially directs the Court to look to the underlying offense in determining the applicable offense level for obstruction.  In this case, the PSR determined that the underlying offense was drug trafficking.  The PSR determined that the offense level should be based on the fact that the Tobins were involved in the distribution of at least 10,000 kilograms of marijuana.

While we do not contest the legal application of the cross reference, in imposing sentence under section 3553(a) this Court should at least take into account the fact that under the cross reference, Mr. Burstyn is being held accountable not just for his obstruction crime but also for the entire scope of the Tobin narcotics organization.

Specifically, the 10,000 kilogram figure comes from Jeffrey Tobin's plea and cooperation agreement.  Tobin pled guilty to Count One of the First Superseding Indictment (No. 04-60006-CR-COHN) which charged him with participating in a racketeering conspiracy beginning in or about 1991 and continuing until May 2004.  Under the terms of his plea, he was held responsible for trafficking in at least 10,000 kilograms of marijuana and approximately 50

kilograms of cocaine.  PSR ¶ 10.  As the Court is well aware, the government in such situations

often demands that a cooperating witness "own up" to all possible criminal conduct, and plead to

the "top count" so as to inoculate the cooperator from cross examination intended to establish

that he had received excessive leniency from the government.

The cross reference as applied to Mr. Burstyn's results in a disproportionate level

of punishment.  Much of the drug trafficking activity for which he is being held responsible dates

back to the early 1990s, well before Mr. Burstyn is alleged in the indictment to have become

associated with the Tobins.  Mr. Burstyn was not charged with drug trafficking.  His crime was

putting Tobin in contact with Lipton and thereby obstructing justice.  Accordingly, the Court

should take into account the anomalous result created by application of the cross reference and

sentence Mr. Burstyn in proportion to sentences normally imposed in non-violent obstruction

cases.

### 2.     Similarly Situated Defendants

Under 18 U.S.C. § 3553(a)(6), the court must consider the "need to avoid

unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct."  Accordingly, the court should consider the fact that in many cases

involving individuals charged with similar offenses, courts have routinely imposed probationary

sentences.

First, there are many cases in this District involving prosecutions of defense

lawyers, like Mr. Burstyn, who unfortunately became too close to their criminal clients.   In

many of these cases, the courts declined to impose jail time.

In 1999, for instance, Florida criminal defense attorney and former Assistant

United States Attorney Donald Ferguson was charged with accepting $566,400 in drug proceeds

from notorious drug trafficker Salvador Magluta as payment to represent another individual who was facing state murder charges. See United States v. Ferguson, 142 F. Supp. 2d 1350, 1351, 1356 (S.D. Fla. 2000). Ferguson subsequently pled guilty to one count of money laundering and was sentenced to five years' probation. See United States v. Ferguson, No. 99-CR-116 (S.D. Fla. 1999). See also United States v. Alvarez, No. 99-CR-916-2 (S.D. Fla. 1999) (former Assistant United States Attorney Neil Taylor pled guilty to filing a fraudulent tax return and was sentenced to one year probation); Florida Bar v. Dachs, No. SC01-251 (Table), 828 So.2d 390 (Fla. 2002) (attorney Leonard Dachs pled guilty to obstruction of justice and was sentenced to six months imprisonment and two years supervised release); United States v. Magluta, No. 99 CR-583-3 (S.D. Fla. 1999) (attorney Richard Martinez pled guilty to obstruction of justice and was sentenced to six months imprisonment and two years probation).

Second, although Mr. Burstyn has pled to obstruction, the gravamen of the offense in Count Three is that he facilitated Jeffrey Tobin in becoming a fugitive. In that sense, his crime bears most similarity to the offense of harboring a fugitive. In such cases, courts have routinely declined to impose jail time. See, e.g., United States v. Miles, 2001 WL 1081197, at *1, 18 Fed. Appx. 197 (4th Cir. Sept. 17, 2001) (defendant convicted of harboring fugitive sentenced to three years' probation); United States v. Hill, 279 F.3d 731 (9th Cir. 2002) (defendant convicted of harboring fugitive husband sentenced to three years' probation); United States v. Hash, 688 F.2d 49 (8th Cir. 1982) (defendant convicted of harboring fugitive given suspended sentence and 18 months probation); United States v. Bissonette, 586 F.2d 73 (8th Cir. 1978) (defendant convicted of being an accessory after the fact and harboring jail escapee received a suspended sentence and two years' probation).

Third, the Court should take into account the sentence imposed on Ronald Tobin, the defendant in the <u>Tobin</u> case whose conduct most closely resembles that of Mr. Burstyn. Ronald Tobin was originally charged with conspiring to obstruct justice and obstruction of justice in violation of 18 U.S.C. § 1503 by assisting Jeffrey Tobin and Cecil Rowell in becoming fugitives. <u>See</u> First Superseding Indictment, No. 04-60006-CR-COHN. However, Ronald Tobin was allowed to plead guilty to misprison of a felony, in violation of 18 U.S.C. § 4. Misprison carries a maximum sentence of three years, whereas Mr. Burstyn faces a maximum of five years. Under the Sentencing Guidelines, the maximum base offense level for misprison is Level 19, <u>see</u> U.S.S.G. § 2X4.1, whereas the PSR calculates Mr. Burstyn's base offense level at Level 30, <u>see</u> PSR ¶ 54. Ronald Tobin was initially sentenced to twenty-four months imprisonment, which was later reduced to a three year term of probation. We submit that to sentence Mr. Burstyn to an additional period of incarceration, when he has already served nearly seven months under unusually harsh conditions, would be patently unfair in light of the sentence given to Ronald Tobin for a substantially similar offense.

In sum, in arriving at a fair sentence for Mr. Burstyn, the Court should consider those sentences imposed on similarly situated defendants and sentence Mr. Burstyn to time served.

### 3.    Mr. Burstyn's History And Characteristics, Including Strong Family Ties, Warrant A Non-Custodial Sentence

Mr. Burstyn enjoys extraordinary support from his family members. As the letters to the Court illustrate, Mr. Burstyn has a close and loving relationship with not only his own children, but his late brother's children, his sisters, and his elderly mother. Under § 3553(a), a sentencing court <u>must</u> consider "the history and characteristics of the defendant"

when imposing a sentence.  18 U.S.C. § 3553(a)(1) (2000).  This is a wide-ranging factor,

permitting sentencing courts to consider many features of the defendant's life when fashioning a

fair and just sentence.

Courts should evaluate the level of support a defendant enjoys from his family

when determining whether to impose a non-Guidelines sentence.  See United States v. Simon,

361 F. Supp. 2d 35, 42 (E.D.N.Y. 2005) (sentencing defendant convicted of conspiracy to

distribute crack and using a firearm to a lower non-Guidelines sentence in part because defendant

"had been a caring father"); United States v. Nellum, No. 2:04-CR-30-PS, 2005 WL 300073, at

*4 (N.D. Ind. Feb. 3, 2005) (sentencing defendant guilty of crack distribution to a lower non-

Guidelines sentence in part due to his good relationship with his children).  Letters of support

written by family members, as well as their presence in the courtroom, are indicators of the

strong family ties enjoyed by a defendant.  Nellum, 2005 WL 300073, at *5.

Present before the Court at sentencing will be numerous family members, all

gathered to demonstrate their love and support for Mr. Burstyn.  This remarkable outpouring of

affection should be taken into account by the Court in considering the sentence to be imposed.  A

sentence of time served would  allow Mr. Burstyn to maintain his strong family ties and to

continue to lend assistance to his family members who are in need.

**4.      The Prosecution of Mr. Burstyn Has Already Had An Adequate
         Deterrent Effect**

The court must consider the need for the sentence imposed to "afford adequate

deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B) (2000).  Mr. Burstyn has already

served seven months in a pretrial detention facility.  He has been publicly humiliated.  As a

condition of his plea, he has been disbarred.  We respectfully submit that the prosecution has

more than sufficiently achieved its goal of deterrence.  The imposition of further incarceration would achieve no additional deterrent effect.

### a.    Mr. Burstyn Has Been Publicly Humiliated

For an individual like Mr. Burstyn, the public humiliation and shame accompanying his arrest and guilty plea have been exceedingly difficult to endure.  No one reading the newspaper articles mocking Mr. Burstyn's fall from grace would ever want to risk being placed in the same position.  Such articles document how this "high profile lawyer with a list of celebrity clients" was "rustled . . . out of bed to [get] busted."  Jay Weaver, Top Attorney Admits Guilt in Prison Conspiracy, Miami Herald, Sept. 16, 2005.  They describe Mr. Burstyn as a formerly "charismatic and brash" lawyer now pleading guilty "in crumpled prison grab" while admitting to an alcohol and pain killer addiction.  Sara Olkon, From Lawyer to Convict: Burstyn Faces Sentence, Miami Herald, Sept. 17, 2005.  One article even recounts the hardships endured by another Miami resident also named (coincidentally) Samuel Burstyn and how awful it is for him just to be mistaken for the defendant.  See Developer Finds He Has Double Trouble, South Florida Business Journal, Apr. 1, 2005.  Clearly, the public humiliation suffered by Mr. Burstyn has been substantial and has provided a considerable deterrent.

As attested to by Mr. Burstyn's friend and colleague, Martin Raskin, the conduct giving rise to Mr. Burstyn's eventual guilty plea in this case was the result of a one-time lapse in judgment:

> [B]ased on everything I know about Sam, this lapse was an aberration -- one that never will be repeated.  Sam has been shamed by this incident and his reputation badly damaged.  He necessarily will lose his license to practice law.  But, although he strayed in this case, Sam remains a good, decent, and tremendously talented man who has much to contribute to the community.

Ex. 5 (Letter of Martin R. Raskin).

Simply put, Mr. Burstyn's punishment already extends far beyond the seven

months spent at the FDC.   His conviction is a mark of shame he must bear for the rest of his life.

### b.    Mr. Burstyn Has Lost His License to Practice Law

After being a well-regarded member of the Miami legal community for more than

twenty years, Mr. Burstyn has relinquished his license to practice law.  Mr. Burstyn has been

forced to abandon a profession which has defined him for decades, and which is an integral part

of his life and personality.  Mr. Burstyn's accountant and friend, Richard Berkowitz writes about

what this means to Mr. Burstyn:

> The punishment that has been exacted of Sam in losing his license,
> the acute embarrassment that he has suffered publicly, the burden
> that his actions have placed on his family are material and
> substantive reminders of what he did wrong.   I believe the
> punishment he has suffered already achieved its purpose -- he is
> contrite, he has apologized and he understands the nature of his
> transgression.

Ex. 19 (Letter of Richard A. Berkowitz).

Courts have repeatedly recognized that the loss of a professional license is an

extreme hardship and one that may reduce the need for other forms of punishment.  Before the

Sentencing Guidelines were mandatory, courts repeatedly granted sentence reductions based on

the loss of a professional license and acknowledged that the loss of one's livelihood is a

substantial deterrent.  See United States v. Rosner, 549 F.2d 259, 263 (2d Cir. 1977) (affirming

district court's decision reducing defendant's sentence based on the fact that he would lose his

law license); United States v. Doe, 53 F.R.D. 361, 363-64 (S.D.N.Y. 1971) (reducing

defendant's sentence based on the court's recognition that the loss of defendant's CPA license

would "invariably produce[] a crushing effect on him"); <u>United States v. Haley</u>, 689 F. Supp.

717, 721 (E.D. Mich. 1988) (finding sufficient deterrent based on fact defendant "lost his

judgeship and would lose his law license"); <u>United States v. Murphy</u>, 108 F.R.D. 437, 439

(E.D.N.Y. 1985) (stating that for most white collar crimes lengthy prison terms are unnecessary

because "disgrace and loss of license to practice professions will help deter").

Because the Guidelines are no longer mandatory, this Court should follow the

examples above and take the loss of Mr. Burstyn's professional license into consideration at his

sentencing.

**5.      Mr. Burstyn's Need For Medical Care Warrants A Non-Guidelines Sentence**

Mr. Burstyn plans to begin a year-long course of treatment for Hepatitis C in the

next few months, which would be interrupted by a custodial sentence.  Sentencing courts must

consider the defendant's need for "medical care" when imposing a sentence.  18 U.S.C.

§ 3553(a)(2)(D) (2000).  Here, Mr. Burstyn's need for this year-long course of treatment weighs

in favor of imposing a sentence of time served.[8]

Sentencing courts must "impose sentences that . . . effectively provide the

defendant with needed . . . medical care."  <u>Booker</u>, 543 U.S. at --, 125 S. Ct. at 765 (citing

§ 3553(a)(2)).  In <u>United States v. Carmona-Rodriguez</u>, No. 04 CR 667, 2005 WL 840464, at *1

(S.D.N.Y. Apr. 11, 2005), the court imposed a non-Guidelines sentence well below the

---

[8]      Mr. Burstyn also seeks a downward departure on the basis of his need for medical treatment.  Under the Guidelines, courts have the discretion to grant a downward departure based on a defendant's serious medical condition.  U.S.S.G. § 5H1.4.  <u>See also</u> <u>United States v. Bravo</u>, 203 F.3d 778, 781 (11th Cir. 2000) (affirming sentence reduction in light of the defendant's serious medical condition and age).

Guidelines range, in part because the defendant would require "ongoing medical monitoring and treatment" due to her high blood pressure, diabetes and treatment for anxiety and depression. 2005 WL 840464, at *4. See also United States v.Hernandez, No. 03 CR. 1257, 2005 WL 1242344, at *6 (S.D.N.Y. May 24, 2005) (imposing lower non-Guidelines sentence in part due to defendant's need for ongoing medical treatment who suffered from Hepatitis B, high blood pressure, high cholesterol, and a hematoma in his chest); Nellum, 2005 WL 300073, at *4 (citing defendant's heart attack, high blood pressure and blocked prostate as a basis for a reduced, non-Guidelines sentence).

Under the pre-Booker Guidelines regime, a defendant's health problems would only be a relevant factor if they constituted an "extraordinary physical impairment." U.S.S.G. § 5H1.4.  However, post-Booker, a sentencing court may now reduce a sentence if the defendant's "health is substantially more impaired than most defendants." Simon v. United States, 361 F. Supp. 2d 35, 42 (E.D.N.Y. 2005).  A defendant who suffers from a serious health problem is "a greater burden on the federal prison system, and incarceration a greater burden on [the defendant]." Id. (citing the defendant's vision problems, recurring pain from previous injuries and colitis in sentencing him to non-Guidelines sentence). See also United States v. Seiber, No. 4:04-CR-28, 2005 WL 1801614, at *4 (E.D. Tenn. July 29, 2005) (sentencing defendant, a 69 year-old woman suffering from degenerative disc disease and chronic pulmonary disease to a sentence of probation based on the recognition that post-Booker, a court could take these factors into account).

Mr. Burstyn has suffered from Hepatitis C for many years.  Hepatitis C causes inflammation of the liver, usually producing swelling and possibly permanent damage to liver tissues.  In the fall of 2005, Mr. Burstyn had a blood test that showed elevated enzyme levels,

indicating extensive damage to his liver tissues.  His doctor therefore recommended that he have

a liver sonogram and biopsy.  The biopsy showed that Mr. Burstyn's liver has suffered extensive

tissue damage.  The course of treatment for Mr. Burstyn's condition is a year-long drug regime

on Interferon.  If Mr. Burstyn were unable to maintain his year-long treatment, it is possible that

the effect on his liver could be quite severe.  In sum, Mr. Burstyn's medical condition and need

for ongoing treatment is another factor that weighs in favor of a non-Guidelines sentence.

## V.     CONCLUSION

Mr. Burstyn is a generous, good, and honorable man who is well-loved and

enthusiastically supported by his family, friends, and the community.  He deeply regrets the pain

and disruption suffered by his family as a result of his arrest, seven-month incarceration, and

guilty plea before this Court.  The conduct to which he pled guilty represents an unfortunate

lapse in judgment and an aberration from an otherwise law-abiding life and career.

An additional term of imprisonment would serve no purpose in this case.  Mr.

Burstyn's prosecution has been widely publicized and undoubtedly has already had a deterrent

effect.  He has already spent more time behind bars than similarly-situated defendants.  He has

accepted responsibility for his actions, and he clearly poses no risk of recidivism.

Mr. Burstyn's family will suffer most if he is sent back to prison.  The children

and elderly family members who depend on his presence will be needlessly traumatized by

another forced separation.  The community will also lose an ardent supporter who has always

done all he can to make a difference in others' lives.

The past year has given Mr. Burstyn ample time to reflect on his wrongdoing, and he has gained much insight through the experience.  He stands ready to rejoin society and once again find a way to contribute in a productive manner.

For all of these reasons, we respectfully urge the Court to impose a sentence of time served, followed by a reasonable period of supervised release.

Respectfully submitted,

*Evan T. Barr/k*

Reid H. Weingarten
Evan T. Barr
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
Tel: (202) 429-3000
Fax: (202) 429-3902

- and -

750 Seventh Avenue, Suite 1900
New York, NY  10019
Tel: (212) 506-3900
Fax: (212) 506-3950

Fred Haddad (Florida Bar No. 180891)
One Financial Plaza, Suite 2612
Fort Lauderdale, FL  33394
Tel: (954) 467-6767
Fax: (954) 760-4421

Counsel for Defendant Samuel I. Burstyn

Dated:  February 1, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of February, 2006, I caused the foregoing

Sentencing Memorandum of Samuel I. Burstyn, and the accompanying Appendix, to be served

by U.S. mail on the following:

J. Brian McCormick, Esq.
Michael J. Dittoe, Esq.
Assistant United States Attorneys
United States Attorney's Office
  for the Southern District of Florida
500 East Broward Blvd., Suite 700
Fort Lauderdale, FL  33394


Kathryn A. Gomez
U.S. Probation Officer
299 East Broward Blvd., Suite 409
Fort Lauderdale, FL  33301


_____
Evan T. Barr
Counsel for Samuel I. Burstyn

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.  04-60279-CR-ZLOCH/SNOW

-------------------------------------------------------x
                                                       :
UNITED STATES OF AMERICA,                              :
                                                       :
                 v.                                    :
                                                       :
SAMUEL I. BURSTYN,                                     :
                                                       :
                 Defendant.                            :
                                                       :
-------------------------------------------------------x

### APPENDIX TO SENTENCING MEMORANDUM OF SAMUEL I. BURSTYN

## Index to Letters Submitted in Support of Samuel I. Burstyn

Exhibit 1       Letter of Hon. John R. Farrell (Ret.)

Exhibit 2       Letter of Samuel J. Smargon

Exhibit 3       Letter of Thomas Tew

Exhibit 4       Letter of Arthur Halsey Rice

Exhibit 5       Letter of Martin R. Raskin

Exhibit 6       Letter of Alexandra Tifford

Exhibit 7       Letter of Pamela A. W. Weiss

Exhibit 8       Letter of Ugo Colombo

Exhibit 9       Letter of William P. Cagney, III

Exhibit 10      Letter of Rabbi Rafael Grosz

Exhibit 11      Letter of Barbara Goren of the Bikor Cholim Committee

Exhibit 12      Letter of A.J. Barranco, Jr.

Exhibit 13      Letter of Vincent L. Briccetti

Exhibit 14      Letter of Arianne Brown

Exhibit 15      Letter of Paul M. Stokes

Exhibit 16      Letter of Neisen O. Kasdin

Exhibit 17      Letter of Robert I. Weissler

Exhibit 18      Letter of Philip Bloom

Exhibit 19      Letter of Richard A. Berkowitz

Exhibit 20      Letter of Esther Burstyn

Exhibit 21      Letter of Jacob Burstyn

Exhibit 22      Letter of Robert D. Hertzberg

Exhibit 23     Letter of Miguel de la O

Exhibit 24     Letters of Mr. Burstyn's Family Members

Exhibit 25     Letters of Mr. Burstyn's Friends and Business Associates

Exhibit 26     Letters of Mr. Burstyn's Former Colleagues

Exhibit 27     Letter of Mr. Burstyn's Chiropractor

Exhibit 28     Letters of Members of the Community

# Exhibit 1

JOHN R. FARRELL, P. A.

ATTORNEY AT LAW

2825 SOUTH MIAMI AVENUE
MIAMI, FLORIDA 33129
TELEPHONE (305) 854-7000

524 SOUTH ANDREWS AVENUE
SUITE 302 NORTH WING
FT. LAUDERDALE, FLORIDA 33301
TELEPHONE (305) 525-8200

Reply To: Miami Office

December 2, 2005

The Honorable William J. Zloch
Chief Judge
United States District Court
Southern District of Florida

Re: Samuel I. Burstyn

Dear Chief Judge Zloch:

This letter is respectfully submitted as my personal plea for leniency on behalf of decades-long friend and colleague, Sam Burstyn. As well, it is submitted to offer the Court some personal insight into the quality and character of this fine person whom I know well.

I recently retired from the Eleventh Judicial Circuit Court where I was the sole Civil General Magistrate since 1988. My 1948 forward C. V. includes: U.S. Navy Lt. Cmdr. carrier pilot (Act./Res.); Ole Miss '56; Yale Law '58; Law Professor, University of Florida '58-'65; Associate Law Professor, U. of Miami '73-'75; Assistant Dade County Attorney, '65-'67; private practice with former 11th Judicial Circuit Chief Judge Gerald Wetherington, and solo, '68-88.

I met Sam Burstyn more than twenty-five (25) years ago, shortly after his legal career began as Clerk to 11th Circuit Appeals Judge Gerald Tjoflat. Originally a mentor to the unusually bright, energetic young lawyer, the association quickly evolved into a close personal and professional relationship. I am godfather to Sam's eldest son, pride and joy, Daniel.

Although I never formally appeared with Sam in active litigation, countless occasions arose, of every sort, where Sam sought my advice or counsel before finally resolving delicate or complex civil situations. Those occasions uniformly demonstrated

Sam's high regard for square dealing with both personal and professional adversaries as well as the many civil courts in which he appeared.

Over the years I've had frequent occasion to be well-apprised of Sam Burstyn's reputation. His reputation for candor, competence and fairness in matters civic and philanthropic is well established in this community as is his reputation as a fine, if sometimes aggressive, attorney. His dedication to his profession, the arts, to the health and welfare of Miami Beach, to his faith and his family all are extremely well known and highly regarded throughout the community. My own assessment and belief in Sam's sound personal character is mirrored by all who have spoken of him.

These accolades notwithstanding, Sam acknowledges publicly and privately, that his conduct in the matters pending before your Honor have brought great shame to not only his fine reputation but his family's as well. He fully understands that a penalty is both inevitable and proper; and, completely repentant, he stands before the Court to receive the same.

It is my hope that your Honor may find that leniency is warranted in imposing sentence upon him. Sam has penitently and fully expressed remorse, morally and legally, recognizing the grievous failure in his recent conduct, for which I am certain that his contrition is boundless.

Very respectfully,

John R. Farrell

JRF/phl

# Exhibit 2

# FEDERAL PUBLIC DEFENDER
## Southern District of Florida

**Kathleen M. Williams**
**Federal Public Defender**

Location:   Fort Lauderdale

**Reuben Camper Cahn**
**Chief Assistant Federal Public Defender**

Miami:

Stewart G. Abrams
Mary R. Barzee
Ricardo J. Bascuas
Henry P. Bell
Miguel Caridad
Michael Caruso
Timothy Cone
Chantel R. Doakes
Orlando do Campo
Vincent P. Farina
Hector L. Flores
Margaret Y. Foldes
Peter J. Fucci
Luis I. Guerra
Krista A. Halla
Celeste Siblesz Higgins
Richard C. Klugh, Jr.
Paul M. Korchin
Richard J. Lautenbach
Anne Lyons
T. Omar Malone
David O. Markus
Joaquin Mendez
Faith Mesnekoff
Teresa M. Miguel
Donnal S. Mixon
Paul M. Rashkind
Jacqueline E. Shapiro
William L. Thomas
Helen C. Trainor
John W. Wylie

Ft. Lauderdale:

Janice Bergmann
Robert N. Berube
Brenda G. Bryn
Timothy M. Day
Robin Farnsworth
Patrick M. Hunt
Bernardo Lopez
Samuel J. Smargon
Daryl E. Wilcox

West Palm Beach:

Robert E. Adler
Lori E. Barrist
Martin J. Bidwill
Peter Birch
Dave Lee Brannon
Robin C. Rosen-Evans

Ft. Pierce:

Leon Daniel Watts

January 10, 2006

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re: Samuel I. Burstyn

Dear Judge Zloch:

I have known Sam Bustyn for over 20 years. Sam appeared before me on numerous occasions while I was a United States Magistrate Judge. While Sam's reputation as an aggressive advocate was absolutely correct, he always showed the utmost respect to the court and his credibility was unquestioned. The cases he cited and the arguments he made before me were always an intellectual challenge that I respected. Sam was an extremely effective advocate for his clients.

After I resigned as a United States Magistrate Judge in 1989, I got to know Sam on a more personal basis. I know he takes care of his nieces and nephews, both financially and emotionally, as well as his own children. Family is the most important aspect of his life and this matter makes it even more difficult because of the effect on his family.

Please give every consideration to Sam Burstyn. If you have any questions, please contact my office at (954) 356-7436.

Very truly yours,

Samuel J. Smargon
Assistant Federal Public Defender

SJS/

| Miami | Ft. Lauderdale | West Palm Beach | Ft. Pierce |
|---|---|---|---|
| 150 West Flagler Street | One East Broward Boulevard | 400 Australian Avenue North | 200 South Indian River Drive |
| Suite 1500 | Suite 1100 | Suite 300 | Suite 207 |
| Miami, FL 33130-1555 | Ft. Lauderdale, FL 33301 | West Palm Beach, FL 33401-5040 | Ft. Pierce, FL 34950 |
| Tel: (305) 536-6900 | Tel: (954) 356-7436 | Tel: (561) 833-6288 | Tel: (561) 461-9435 |
| Fax: (305) 530-7120 | Fax: (954) 356-7556 | Fax: (561) 833-0368 | Fax: (561) 461-9474 |

# Exhibit 3



TEW · CARDENAS LLP
A T T O R N E Y S   A T   L A W
MIAMI · TALLAHASSEE · WASHINGTON DC

FOUR SEASONS TOWER
15TH FLOOR
1441 BRICKELL AVENUE
MIAMI, FLORIDA 33131-3407
T 305.536.1112
F 305.536.1116
WWW.TEWLAW.COM

November 14, 2005

Honorable William J. Zloch
Chief United States District Judge
United States District Court,
    Southern District of Florida
299 East Broward Boulevard
Fort Lauderdale, FL  33301

    Re:    Samuel I. Burstyn

Dear Judge Zloch:

    I write to respectfully request leniency from this Court in the sentencing of Samuel I. Burstyn. I have known Sam as a lawyer, colleague and citizen of Miami-Dade County for over 25 years.

    As a member of the legal community, I have been co-counsel with Mr. Burstyn as well as opposing counsel. At all times I have known him to be a principled and diligent advocate for his clients. Approximately 20 years ago, Mr. Burstyn and another local lawyer represented a principal defendant in a major Securities and Exchange Commission receivership of a Fort Lauderdale government securities dealer (ESM Government Securities ["ESM"]). I served as Receiver and ultimately as U.S. Bankruptcy Trustee. The assistance of Mr. Burstyn's client as guided by Mr. Burstyn was a principal factor in my ability to obtain a substantial recovery for ESM's customers. The fraud at the firm was disclosed when Mr. Burstyn's client, an ESM officer, authorized me to report the fraud to the United States Securities and Exchange Commission. This permitted the Government to promptly close down the firm.

    More recently, Mr. Burstyn and I represented a State Receiver in several complex financial transactions. At all times Mr. Burstyn worked diligently for his client and I was pleased to work with him on these matters.

Honorable William I. Zloch
Chief United States District Judge
Page 2
November 14, 2005

On the personal front, I know Mr. Burstyn to be a diligent, warm and giving supporter of the Cushman School, an elementary school that I personally attended in 1952. My child as well as Mr. Burstyn's children have attended Cushman. Mr. Burstyn served on Cushman's Board of Trustees and as its Treasurer, a demanding post involving fund raising for the school. I also know that Mr. Burstyn was very generous in making a mid-five-figure contribution to the school. The school's head has confirmed these facts and has advised me that at all times Mr. Burstyn conducted himself with the utmost integrity in dealing with the school.

In closing, I repeat my request for leniency for Mr. Burstyn in his sentencing. He was a talented lawyer and has made a substantial contribution to this community.

Very truly yours,

Thomas Tew

TT:cjn

@PFDesktop\::ODMA/MHODMA/DMS_NT;MIAMI;449442;1

# Exhibit 4

# RICE PUGATCH ROBINSON & SCHILLER, P.A.

101 N.E. THIRD AVENUE, SUITE 1800
FORT LAUDERDALE, FLORIDA 33301
TELEPHONE: (954) 462-8000
FACSIMILE: (954) 462-4300

www.rprslaw.com

**MIAMI**
848 BRICKELL AVENUE
SUITE 1100
MIAMI, FLORIDA 33131
TELEPHONE: (305) 379-3121
FACSIMILE: (305) 379-4119

OF COUNSEL
BROWNING & SIRECI, P.A.
KEY WEST, FLORIDA

PLEASE RESPOND TO: **BROWARD**

December 20, 2005

Honorable William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida
299 E. Broward Blvd., Room 202B
Fort Lauderdale, FL 33301

      *Re:*    *Samuel I. Burstyn*

Dear Honorable Sir:

      I met Samuel Burstyn in 1973 when we both started law school together at the University of Miami. We were in the same section and in fact lived next door to each other in the old married student housing facilities across the street from University Inn.

      Prior to my opening my own firm, Sam and I practiced law together in 1980 and 1981 in a firm then known as FieldStone, Oliver, Kluger, Sumberg and Mondre. Sam and I worked together on various matters and in a particular case that I recall acted as co-counsel to a group of Orthodox Jews who city officials in Miami Beach were attempting to prevent from meeting as group based upon zoning laws. Sam undertook the engagement knowing that if we did not prevail our firm would not be paid. He conducted the trial brilliantly and struck a blow for religious freedom that I know I could not have done alone. Sam is undoubtedly one of the brightest and most talented lawyers I have ever known. Professionally, there are few lawyers that are his equal.

      I know Sam to be a dedicated family man. His first priority is now and has always been as long as I have known him, his children. Unlike some of us who have mistakenly believe that our professional lives had to take precedence over our personal lives in order for us to advance, Sam Burstyn has never fallen into that trap. He spends a lot of time with his children and it is seldom that I have ever seen him after work or on weekends without at least one of them being with him.

      Sam is also active in the synagogue where he is a member. While I am not personally a member of that synagogue I have a good client who is and who talks about Sam's generosity and good works that were especially important when the facility was first being build in a community

Honorable William J. Zloch
December 20, 2005
Page 2

that was initially founded on the principal that it was perfectly acceptable to discriminate based upon religious beliefs.

      Everything I have set forth above does not detract one wit from Sam's guilt.   Sam acknowledges that guilt and will continue to live with the shame and humiliation that it has brought upon both him and his family for the rest of his life.   However, I do hope that you take what I have set forth above into consideration when considering Sam's sentence.   Put simply, I hope that you are able to show Sam mercy and recognize that this lapse of judgment by Sam is not indicative of his character.

                    Yours truly,

                    RICE PUGATCH ROBINSON & SCHILLER, P.A.

                    Arthur Halsey Rice
                    For the Firm

AHR/et
G:\Wpdocs\OFFICE\PERSONNEL\Arthur\Correspondence\Letter to Judge William J. Zloch 121905.doc

RICE PUGATCH ROBINSON & SCHILLER, P.A.

MIAMI                                       FT. LAUDERDALE

# Exhibit 5



RASKIN & RASKIN
*Attorneys at Law*

MARTIN R. RASKIN
*mraskin@raskinlaw.com*

November 14, 2005

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re:   Samuel I. Burstyn

Dear Judge Zloch:

I have been a member of the bar of this court since 1978. Prior to going into private practice in 1982, I held various positions within the United States Department of Justice, including Assistant U.S. Attorney for the District of New Jersey; Special Attorney with the Organized Crime and Racketeering Section assigned to the Miami Strike Force; and Chief of the Criminal Division for the U.S. Attorney's Office for the Southern District of Florida.

I have known Sam Burstyn for approximately 20 years, having first met him during the course of several matters we worked on in common. From the beginning, it was apparent to me that Sam was a talented lawyer with a keen legal mind. In all of the matters we handled together, Sam was always honest and ethical in his dealings with opposing counsel and the court. The quality of Sam's work product was first rate and he always represented his clients ably and with passion. As a result of our professional relationship, I became very fond of Sam personally; a fondness that – despite his legal difficulties – endures today.

I am aware of the charges to which Sam pled guilty. While I do not defend Sam's actions in this matter and recognize, as he does, the monumental lack of good judgment he showed, based on everything I know about Sam, this lapse was an aberration – one that never will be repeated. Sam has been shamed by this incident and his reputation badly damaged. He necessarily will lose his licence to practice law. But, although he strayed in this case, Sam remains a good, decent, and tremendously talented man who has much to contribute to the community.

Hon. William J. Zloch
November 14, 2005
Page 2

I know that the sentencing function is probably the most difficult faced by any judge and that this court strives to achieve fairness in each case before it.   I would submit that a fair sentence in this case need not include a lengthy period of incarceration. Given the collateral consequences Sam has suffered – and will continue to suffer – as a result of this case, a lengthy term of incarceration simply is not necessary.

Sincerely yours,

MARTIN R. RASKIN

# Exhibit 6

October 31, 2005

Hon. William J. Zloch
Chief United States District Judge
United States District Court
299 E. Broward Blvd., Rm. 202B
Ft. Lauderdale, Florida 33301

Re:   Samuel I. Burstyn

Dear Judge Zloch:

My name is Alexandra L. Tifford, and I am writing to this court on Mr. Burstyn's behalf.

I am native Miamian, and a graduate of the University of Miami School of Law.  I am a member of the Florida Bar, the Court of Appeals for the Eleventh Circuit, the United States District Courts for the Southern, Middle and Northern District Courts of Florida, and the District Court for the District of Colorado.  I have known Mr. Burstyn for four years during most of which time I was employed by him as an associate attorney.  Mr. Burstyn also was my first client.

Mr. Burstyn represented to me that he could mentor me and help me grow as a young attorney.  Those representations and others prompted me to accept his offer of employment.  Mr. Burstyn satisfied his promises.

Working for Mr. Burstyn was sometimes difficult and frustrating, but also challenging and rewarding.  He was truly interested in teaching me how to be a more effective advocate.  He articulated his criticisms of my work product constructively rather than destructively.  He provided me with opportunities that few young attorneys experience such as allowing me to (i) make an opening statement to a jury in a federal, criminal racketeering case and (ii) cross-examine witnesses.  Mr. Burstyn helped me prepare for these responsibilities, and was happy to witness my accomplishments.

On the personal side, Mr. Burstyn was interested in my maintaining a properly balanced life by keeping me and my family's well being a priority, and a regular point of inquiry.

Letter to the Hon. William J. Zloch
Re:  Samuel I. Burstyn
October 31, 2005
Page 2 of 2

   Mr. Burstyn has a good heart.   I respectfully ask you
to consider and impose a lenient sentence.

                    Respectfully submitted,

                    Alexandra L. Tifford

# Exhibit 7

**Pamela W. Weiss**
Attorney At Law
3400 Sheridan Avenue
Miami Beach, FL  33140
(305) 538-2395

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re:    Samuel I. Burstyn

Dear Judge Zloch:

     I am a member in good standing of the Florid Bar, and have been so, for 25 years. One of my first legal work experiences, was as an associate of Samuel I. Burstyn, P.A., for approximately 5 years.

     During that period, I came to respect Sam a great deal, not only for his obvious mastery of the practice of law, but for his own great respect for the American system of democracy.  My understanding is that Sam left home at a very young age, and it appeared that in some sense, he had "adopted" himself to the Founding Fathers and their principles as set forth in the Constitution and Bill of Rights.  As any good mentor would, he attempted to impress upon me his ideals, and he earnestly and repeatedly articulated the importance of the role of criminal defense, in maintaining the proper balance of power between government and the individual.

     One lesson Sam taught me which I have drawn on throughout the years with much gratitude, is the importance of discerning between fact, on the one hand, and rumor and innuendo, on the other.  The imperative of drawing a careful distinction between these two, certainly may make the difference between false conviction and due acquittal; it also has provided an invaluable tool in making the various personal and business judgments my life has presented.

     I am certain that Sam is no public threat, but rather, still has a great deal to contribute.  Isolating him further in a correctional facility would be only to the detriment of society.  I respectfully suggest that a far more productive path would be to have him put his multi-talented personality to the service of his community. I know there is good cause to, and I hope Your Honor will, rule on the side of leniency.

Very truly yours,

Pamela A. W. Weiss

# Exhibit 8

ugo colombo

November 3, 2005

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

**Reference: Samuel I. Burstyn**

Dear Judge Zloch:

My name is Ugo Colombo and I am writing on behalf of Sam Burstyn, who is scheduled to be sentenced before this Court. I have lived in Miami since 1983 and I am a real estate developer and the owners of several other businesses.

I have known Sam for approximately 17 years, since 1988. I met Sam through our involvement in a real estate deal on Miami Beach. I am the godfather of Sam's youngest daughter Ava.

I consider Sam a friend, but I have also been a client and business associate of his. In each of these capacities Sam has been diligent, loyal, and totally honest and reliable. Most of our dealings have been sealed on handshakes, and through good and bad he has always conducted himself with the highest ethical behavior. Sam also refused to charge me any legal fees for any of the work he has done for me.

After Sam's father and brother passed away, he was greatly distressed and focused almost entirely on the care and protection of his brother's family and his mother, as well as his own children. Since his divorce in 2003, he has been overwhelmed and under great stress. His health has deteriorated but not his love of family and friends.

After Sam's arrest, he communicated with me several times by letter, as I was not permitted to visit or call him. On each occasion he reiterated his faith in God and asked only that I help look after his children from time to time.

I ask this Court to show leniency in sentencing Sam.

Sincerely,

Ugo Colombo

# Exhibit 9

WILLIAM P. CAGNEY, III, P.A.
ATTORNEY AT LAW

WILLIAM P. CAGNEY, III
TRIAL PRACTICE
APPELLATE PRACTICE
GENERAL PRACTICE
(ALSO ADMITTED ILLINOIS BAR)

151 N.W. FIRST AVENUE
DELRAY BEACH, FLORIDA 33444
TELEPHONE (561) 278-0325
FACSIMILE (561) 278-1675

January 10, 2006

Honorable William J. Zloch
Chief Judge
United States District Court
Southern District of Florida
299 East Broward Boulevard
Fort Lauderdale, Florida 33301

        Re:    Samuel I. Burstyn

Dear Chief Judge Zloch:

        Sam Burstyn came into my life while he was studying law at the University of Miami. I just counted the years and realized I have known Sam as a person for over thirty-two years.

        I hired Sam as a law clerk for two years and covered the gap after graduation until he could begin his clerkship with Judge Tjoflat who was then with the Fifth Circuit.

        From his clerking days until I moved from Miami with my family in 1998, Sam and I continued to work on court cases together and watch our children grow up at Cushman School.

        I realize that times change as do people, but I recall one incident which I believe best exemplifies what is at the core of Samuel I. Burstyn. Somewhere back in the seventies, Sam's now deceased brother, a Rabbi, came to Sam and told him that a conservative religious group was being denied the right to congregate and pray in a parishioner's home on Saturday due to a Miami Beach ordinance. Sam took the civil rights case (I believe it fell before Judge Eaton) and successfully pursued the declaratory action through the Fifth (now Eleventh) Circuit. If my memory serves

Honorable William J. Zloch
January 10, 2006
Page two


me, this was before President Ford signed into law the attorney fee provision for
Section 1983 cases. It mattered not to Sam. He was a dedicated crusader when he
felt the law wasn't right.

Sam now stands before you to be sentenced on what I understand to be a five
year maximum count. I do not envy you in having to balance the societal needs
contained in the sentencing statutes with the need for human compassion. I merely
request your final thoughts reflect man's frailty and his ability to accept justice,
hopefully tempered.

Very truly yours,

WILLIAM P. CAGNEY, III

WPC:ja

# Exhibit 10

RAFAEL GROSZ   Tel (1-305) 673-4272 776-4857
Rabbi

CONGREGATION BETH YESHAVE

1401 PRAIRIE AVE.   MIAMI BEACH FLA. 33140

בס"ד

בי"קל"צ
בית ישעי דקערעסטיר ——— בערבמשט
מיט בן ישעי מרן ר' נאטי אולחור
איר מער ר' הומ נשי רבע שוחי

December 28, 2005

Dear Judge Zloch:

My name is Rafael (Armin) Grosz. I reside in Miami Beach, where I am the rabbi of a congregation called "Bais Yeshaya of Keresztier", named for my great-grandfather, Rabbi Yeshaya of Keresztier – which was a city in Hungary where he lived. He was a prominent sage and spiritual leader of his time. In fact, I am the fourth generation in a direct line of ancestry of this great rabbinical dynasty.

My elderly parents, Malka (Margarit) & Naftoli Grosz, of blessed memory, moved to Miami Beach in the late 1970's from New York, for health reasons. My wife Sara and I likewise moved here – to take care of them – which was both an honor and a privilege for us. My parents were Holocaust survivors who vividly recalled the horrors of Nazi persecution. They nevertheless preserved and maintained their Jewish faith and convictions throughout their lives, passing this legacy along to their children.

Of central importance to my elderly father was desire to pray three times daily, as is required of an Orthodox Jewish male. Each prayer session must be in the presence of ten men, which is called a "min yan". Being that my father was of advanced age and in failing health, it became necessary for him to pray at home. People gradually started to come to the house to join him at prayer time, thereby enabling him to fulfill the obligation of assembling in prayer with the required quorum of ten men. This pleased my father greatly,

Unfortunately, the neighbors on our block did not share this joyful sentiment, and they persuaded the city of Miami Beach to threaten criminal action against us for allegedly violating a vague zoning ordinance. Indeed, the city attorney ordered my father to cease threat of criminal prosecution and threatened to seize the Torah and prayer books as criminal evidence.

This is where our dear friend and community member Samuel Burstyn, came in to help. Remarkably, after ten days of preparing voluminous research and legal papers, Sam applied for and received from Judge Joe Eaton a very difficult federal injuction against state criminal prosecution. Sam took on our case with the city of Miami Beach, and fought tirelessly and selflessly on our behalf and on behalf of religious freedom. For years, he took on this case because of his deep religious convictions, and to enable us to carry on the

tradition and legacy of our Jewish heritage. Sam's parents also being Holocaust survivors, he could relate on a personal level as to why it was so vital to allow our father the opportunity to have his prayer sessions – being that <u>both</u> our parents had encountered and endured religious persecution.

As a result of Sam's efforts on our behalf, we were able to re-establish in America that which had been lost to us in Europe during World War II. Because of Sam, our home prayer meetings to this day continue to flourish, and our home has now become a positive landmark in our neighborhood and community. It offers a place for people to pray, and seek spiritual support and guidance.

Sam never took any money from us for his extensive and brilliant legal work. He said he was doing this as a matter of "principle"; because it was the "right thing" to do – and offered to help us at any time in the future, if need be, free of charge. This should give some indication and insight into Sam's nature – what kind of man he is – based on what "principles" he values and holds dear – as he so devotedly and diligently helped us pursue our noble cause. After knowing Sam for over twenty years, I can attest to the fact that this man has a heart of gold, and is of sterling character. Sam may be compared to a student who does all the work and seeks none of the credit. Sadly, it seems that his misguided loyalty to criminals whom he knew as innocent children has been taken advantage of.

Sam will always have a special place in my heart he is a unique individual with a rare and sensitive soul. He is a person of noble character, as is obvious by all that has been stated above. We owe him more than just a debt of gratitude for all that he has done for us – we feel that he is entitled to the actual merits that our prayers bring, for we would not have them were it not for Sam. How can one out a price on that?

We have many religious doctrines and quotes in our faith. One of them is: "Thou shall pursue justice; justice shall thou pursue". This is what Sam did for us. There is also a Biblical quote from the Old Testament which states with regard to prayer: "At every place in which you mention My Name, I will come to you, and I will bless you," indicating the sanctity and significance of mentioning G-d's name (i.e. during prayer) and thereby inviting G-d's presence in one's midst. This is what Sam enabled us to do.

If you need any further information with regard to any of the information in this letter, or any further details about my years of experience in working with Sam, please contact me – I will be most willing to discuss these matters with you. I can be reached at (305) 673-4272.

Sincerely,

Rabbi Rafael (Armin) Grosz

# Exhibit 11

Box 3032

Miami Beach, Florida 33140

December 27, 2005

Dear Honorable Judge Zloch:

I write this letter on behalf of Samuel Burstyn.  I am the director of an organiza[tion in] Miami Beach whose purpose is to assist individuals who are in need of medical [tre]atment.  Our efforts to assist go beyond helping these individuals obtain the ap[propriate] medical treatment and care – which we do by making referrals to the appropriate [doc]tors and help to set up appointments.  We are also instrumental in assisting [in the] arrangement of housing, accommodations, and meals for these persons, and [some]times their visiting families, as is often the case when they are seeking medical [at]tention from out of town.  Often the people requiring our services are elderly, [inf]irm, and indigent, and/or have no family to depend upon and from whom to s[eek] [su]pport.  We arrange, free of charge, transportation to doctors and treatment cen[ters.]

[Obv]iously, the success of our organization is dependent on a number of factors. [Fu]nding is crucial to our survival.  Individuals make generous monetary [con]tributions.  Others offer freely of their time, or services, as needed, and when [as]ked, they open up their homes to accommodate people in their hour of need.

[Mr.] Burstyn has, in addition to generously donating funds to our organization, [pro]vides another uniquely vital service to us.  By virtue of Mr. Burstyn's promin[ence in] the community, and his ties with certain well known medical establishments, [a un]ique position to facilitate the oftentimes lengthy process of getting appointme[nts with] [do]ctors – usually specialists who are otherwise inaccessible to the average perso[n.] [Thi]s greatly helps to expedite the medical care that these individuals receive.

[Ple]ase be assured that detaining a person such as Mr. Burstyn would be to the [det]riment and not in the best interests of our community, and to people who are [in di]re medical need.  We depend desperately upon the generosity and compassion o[f] [per]sons such as he – and we respectfully request that you treat him now with bo[th] [gen]erosity and compassion.

[Ver]y Truly Yours,

[Bikur] Cholim Committee of Miami Beach

# Exhibit 12

LAW OFFICES

# BARRANCO, KIRCHER & VOGELSANG, P.A.

A.J. BARRANCO, JR.
MARIANNE L. KIRCHER
BETH T. VOGELSANG
MELISSA A. ACOSTA
JED R. FRIEDMAN

SUITE 1400, MUSEUM TOWER
150 WEST FLAGLER STREET
MIAMI, FLORIDA 33130-1527

TELEPHONE (305) 371-8575
FACSIMILE (305) 371-7021

January 5, 2005

*VIA US MAIL*
Hon. William J. Zloch
Chief United States District Judge
United States District Court
299 E. Broward Boulevard, Room 202 B
Ft. Lauderdale, Florida 33130

Re:    Samuel I. Burstyn

Dear Judge Zloch:

I write to this Court on Sam Burstyn's behalf.

I have practiced law in Miami-Dade County, Florida, since 1967. I have served the Florida Bar as President of its Young Lawyers Section, as a member of the Board of Governors for two (2) separate terms, and as a member of the Florida Bar Executive committee. Also, I have served as President of the Dade County Bar Association and as President of the Dade County Trial Lawyers Association.

I have known Sam for twenty (20) years. Sam was my client during his divorce proceedings in 2003/2004. Sam was co-counsel in a multi-billion dollar divorce matter in 2004.

As a lawyer and co-counsel, Sam was a tireless and unrelenting advocate for our mutual client. We represented a young Wife with an infant child against a mega-wealthy, powerful Husband, who retained several law firms dedicated to defeating his Wife's entitlement to her fair share of property and support. Within the legal and ethical boundaries, Sam's unfailing advocacy and strategic decisions forced a settlement, despite the overwhelming odds.

We were in constant contact in the period beginning October 2002, through his incarceration in 2005. I observed him on a frequent and regular basis. I observed the effects of the pressure of his practice especially his four months of commuting to New York to vigorously defend a client at trial and retrial following mistrial. His subsequent hospitalization for pneumonia and his "scorched-earth" divorce as well as extraordinary family pressures caused him to drink to excess and take percocet to relieve the extreme

stress. Emotionally, he was out of control.   I worried about his physical and mental health during that period.

He has great responsibility for his aging mother, his dependent sister, and the children of his deceased brother.  He has been a source of joy to all of them, and the "glue" that holds this extended family together.   I have been to the temple with him and his family, and have observed their need for his spiritual wisdom and guidance.

As a client, during his own divorce proceedings, Sam showed me another side, that of a deeply devoted father. He was involved in every aspect of his children's lives, including their education.  To that extent, he served on the board of trustees of the Cushman School where his children attended.   Frequently, he would interrupt intense meetings with several lawyers to take calls from his children.  Many times he would stop work at 3:00 p.m., to pick up his infant daughter, Ava and leave a group of lawyers working. He has been dramatically upset about the deprivation of visitation with his kids.

Living through a dissolution of one's marriage can test the faith of any human. Instead, Sam drew strength from his faith to sustain him during the difficult year of his divorce. He was devastated by the break-up of his marriage.

Sam and I were in Hamburg, Germany, for an extended business trip. I walked with him by a Jewish cemetery, and by the train station where Jews had been transported to the concentration camps. I felt the pain he was going through at this turbulent part of his life. As you may know, both of his parents survived interment at Nazi concentration camps. Because we were there on a Saturday, Sam sought out and went to the only remaining Jewish Synagogue in the area.  I was present at Sam's pre-trial detention hearing where, ironically, the prosecutor argued that his court-ordered trip to Hamburg proved "foreign business interests."  Actually, we went there only to take deposition on behalf of a U.S. Citizen and resident litigating against her German husband.

In life we have to accept the consequences of our actions. Sam has accepted the consequence in the time he has spent incarcerated. To sentence Sam to more time would not serve him, the community nor his family. The community has lost a tireless advocate. His children should not lose more time with their father than they already have.

Respectfully submitted,

A. J. Barranco, Jr.

LAW OFFICES
**BARRANCO, KIRCHER & VOGELSANG, P.A.**

# Exhibit 13

BRICCETTI, CALHOUN & LAWRENCE, LLP
ATTORNEYS AT LAW
81 MAIN STREET
SUITE 450
WHITE PLAINS, NEW YORK 10601

VINCENT L. BRICCETTI*
CLINTON W. CALHOUN, III**
KERRY A. LAWRENCE*

AUDREY E. STONE***

*ALSO ADMITTED IN CT
**ALSO ADMITTED IN VA & DC
***ALSO ADMITTED IN MA

(914) 946-5900

FAX (914) 946-5906

December 16, 2005

Honorable William J. Zloch
Chief United States District Judge
United States District Court
299 East Broward Boulevard, 202B
Ft. Lauderdale, FL 33301

     Re:    <u>Samuel I. Burstyn</u>

Dear Chief Judge Zloch:

     I am writing to the Court in connection with the upcoming sentencing of Samuel Burstyn.

     I am a criminal lawyer engaged primarily in representing individuals charged with or under investigation for committing federal crimes. I am a graduate of Columbia University and Fordham Law School. I served as a law clerk to a federal district judge in the Southern District of New York, went into private practice, and then spent five years as an Assistant United States Attorney in the SDNY. Thereafter, I spent two years at a national law firm and then started my own firm in White Plains. My partners are both long-time former prosecutors, and our practice concentrates in the "white collar" area. I have been a member of the SDNY Criminal Justice Act panel since 1993, and I am also on the Board of Directors of the Federal Defenders of New York, Inc. (holding the office of Treasurer), which provides the bulk of indigent defense services in the Southern and Eastern Districts of New York pursuant to 18 U.S.C. § 3006A(g)(2)(B). In addition, I have lectured at numerous professional conferences on various subjects, including criminal law and procedure, evidence, and the federal Sentencing Guidelines.

     I met Sam Burstyn in 2001. He and I represented co-defendants in the case of <u>United States v. Mordechai Samet, et al.</u>, a "white collar" RICO case charging numerous fraud offenses. In 2002, the case went to trial in the White Plains federal courthouse. Sam and I represented the

Honorable William J. Zloch
December 16, 2005
Page 2

only two defendants who actually went to trial, and as a result worked closely together both
before and during the trial. After seven weeks, a mistrial was declared during jury deliberations.
Several months later, the case was re-tried, this time for eight weeks, and a verdict was reached.

During these two trials, Sam was aggressive, flamboyant, charming, and infuriating to
everyone involved. I marveled at his ability to try the case during what had to have a been a truly
grueling experience for him – repeatedly flying back and forth to Miami, keeping his practice
going while absent from his office for long periods of time, attending to personal and family
matters, etc. Also, it is my understanding that his client was unable to pay him for the second
trial, so he remained in the case as appointed counsel, which I am sure was not in his financial
interest. Toward the end of the second trial, just when it looked like we might actually finish the
case, Sam came down with pneumonia and was hospitalized in Florida. As I recall, he never
asked for a mistrial, just a one week's adjournment. The adjournment was granted, Sam returned
to court with his trademark good humor intact, and the case proceeded to verdict, albeit with the
sound of Sam coughing and hacking in the background.

I was shocked and extremely disappointed to learn of Sam's arrest and later guilty plea. I
know nothing about the circumstances of his case, other than what I have read in the media and
in the "factual basis" for the plea which I obtained from Sam's attorney. I know he has pleaded
guilty and accepted responsibility for his actions. I know he's sick at heart for what he's done
and for the consequences all this has had on his family, friends, and professional colleagues.

Notwithstanding his guilty plea, I believe that Sam Burstyn is a person of fine character
and abilities. In the time we spent together, when he wasn't making me laugh, we talked often
about our respective families, faith, and backgrounds. He is devoted to his children and his
religious faith. When my father died, Sam comforted me with reference to a particular Old
Testament passage, and told me that once I had figured out the real meaning of the passage, I
would truly understand what my father's life meant to me and my family. I spent many hours
thinking about and researching that passage. Sam was right. And I will not soon forget his
erudition or insight.

I think I have some sense of how hard it is for a sentencing judge to do justice in any
criminal case, let alone a case like this. I ask that Your Honor take into consideration the entire
Sam Burstyn when imposing sentence and that the Court be as lenient as possible in this case.

Respectfully submitted,

Vincent L. Briccetti

# Exhibit 14

letter for Sam

January 10 2006

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re: Samuel I. Burstyn

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re: Samuel I. Burstyn

Dear Judge Zloch:

My name is Arianne Brown. I am 35, a native Floridian. I am an artist and invest in properties in the Miami Beach area. I am writing to you regarding my dear friend Samuel Burstyn.

Being raised by a single working mother, never knowing my father, I have always searched for a positive male role model. Over the last 15 years, my life has been truely enriched because of my unique friendship with Sam. He has acted as my mentor, guiding me through challenges both personal and professional. With respect and selflessness, he helped me to become the sucessful person I am today.

Over the past 4 years, my mother has been battling with terminal cancer. With Sam's strong sense of family values, he was not just a shoulder to cry on but a leader in sourcing the necessary options and alternatives. My mother passed on with the piece of mind that Sam would always be there to protect me.

I ask you from the bottom of my heart to consider my request to the court for leniancy regarding Samuel Burstyn. He has touched the lives of so many and could, if given a chance, touch the lives of so many more.

Sincerely,

Arianne Brown

Page 1

# Exhibit 15

**STOKES McMILLAN & MARACINI P.A.**

ATTORNEYS AT LAW
SUITE 1750 • ONE SOUTHEAST THIRD AVENUE
MIAMI, FLORIDA 33131

JUAN C. ANTÚNEZ
LL.M. IN ESTATE PLANNING

MICHELE A. MARACINI
LL.M. IN ESTATE PLANNING

JANE W. McMILLAN
LL.M. IN TAXATION
BOARD CERTIFIED IN TAXATION

PAUL M. STOKES
BOARD CERTIFIED IN WILLS, TRUSTS AND ESTATES

TELEPHONE (305) 379-4008
FACSIMILE (305) 379-4848
E-MAIL info@smpalaw.com

WRITER'S DIRECT E-MAIL:
PStokes@smpalaw.com

December 22, 2005

Hon. William J. Zloch
Chief United States District Judge
United States District Court for the
     Southern District of Florida
299 E. Broward Blvd.
Room 202B
Ft. Lauderdale, FL 33301

          Re:   Samuel I. Burstyn

Dear Judge Zloch:

     I am Sam Burstyn's estate planning attorney. The clients that
an estate planning lawyer is privileged to serve are quite special,
because they recognize their mortality and their responsibilities
to their families in light of that mortality. These clients make
their way to lawyers like me because they not only have thought of
these things seriously, they have also done their homework on who
specializes in such an area, and they are ready to spend a good sum
of money and considerable time and effort on something that will
yield them nothing in this life. Thus, when I first meet a new
client, I believe that I already know quite a bit about their
character and that what I already know about that character is very
good. Sam is no exception.

     My work with Sam not only confirms the initial assumptions I
make about new estate planning clients, that work also indicates
two extraordinary aspects of his character. The first concerns the
breadth of familial responsibility that he assumes. He recognizes
not only his responsibility to his immediate family, but he also
undertakes responsibility with respect to his extended family.
Within the scope of his active concern and leadership are his
widowed mother, his four children, only one of whom is in his

December 22, 2005
Page 2

majority, his former wife (who continues to live in the marital home with the younger children, with Sam, who is not remarried, living just a few houses away with their older son), the two of his three sisters who are disabled, one of whom has five children, the four children of his deceased brother, who include three nephews who are rabbinical students, and the deceased brother's widow.

The second extraordinary aspect of his character involves Sam's religious life. He is an observant Jew, with a special sense of the presence and activity of the Deity. From the beginning we fell into deep discussions about his faith and my own. I am a Christian (in the technical and not simply the cultural sense), a Presbyterian who has a similar sense of God's presence, not only in history and in the creation that we enjoy, but also in our very lives, a God to whom we are accountable, who demands justice and who confers grace. The God with whom both Sam and I are concerned is, without a doubt in my mind, dealing with Sam with special intensity in the matter that brings him before you. I mean this literally when I tell you that I pray that the decision you make about Sam will reflect an apt blend of justice and grace; justice and grace: contradictory ideas that find their perfect resolution and expression in this God whom Sam and I have discussed at length.

Because of Sam's family responsibility and because of his religious faith, I would most respectfully suggest that your mercy will not be lost on him. He will see whatever you decide to do as God's will in his life, and I believe that he will act accordingly.

Sincerely,

Paul M. Stokes

PMS/jm

K:\8014401\PMS18934.wpd

**STOKES McMILLAN & MARACINI P.A.**

# Exhibit 16

# NEISEN O. KASDIN

Writer's Direct Dial Number:  (305) 376-6062
Writer's E-Mail Address:  nkasdin@gunster.com

November 11, 2005

The Honorable William J. Zloch
Chief Judge
United States District Court
Southern District of Florida

Re:     Samuel Burstyn

Dear Judge Zloch:

I am writing this letter to provide the Court with my personal knowledge of Samuel Burstyn, his character, and contributions to our community.

I am a shareholder in the Miami office of Gunster, Yoakley & Stewart and a life-long resident of Miami-Dade County. I served as a City Commissioner (1991-1997) and Mayor (1997-2001) of the City of Miami Beach. Prior to my election in 1991, I served as chairman of the Miami Beach Community Development Corporation and as a member of the City of Miami Beach Planning Board.

Since leaving public office, I have served as chairman of the Urban Land Institute Southeast Florida/Caribbean District Council. I currently serve as chairman of the Beacon Council, Miami-Dade County's Economic Development Organization, and as a member of the board of the Regional Business Alliance, Greater Miami Chamber of Commerce, and the Wolfsonian/F.I.U.

I have known Sam for over 15 years, and I have worked with him on a variety of civic, community and religious causes. In all of my interactions with Sam, he demonstrated leadership, selflessness, generosity, intelligence and an unwavering commitment to advancing the greater good.

With respect to community involvement, I am reminded of Sam's volunteer service, while I was Mayor, as chairman of the selection committee for design consultants for the South Beach streetscape project, one of the most important elements of Miami Beach's city-wide capital improvements program. There were determined attempts to politicize the

# NEISEN O. KASDIN

The Honorable William J. Zloch
November 11, 2005
Page 2

selection process by certain bidders and their lobbyists. Sam resolutely protected the integrity of the selection process at the committee level. Thereafter, Sam remained involved through the ultimate award by the City Commission to assure the ultimate selection of the most qualified consultant.

I have also worked with Sam as a member of the Board of Directors of the New World Symphony. He was a significant contributor, both financially and intellectually, to the growth and development of that organization.

Finally, I am very familiar with Sam's generous support, again both through his financial contributions and personal time and effort, to benefit the Talmudic University. The Talmudic University, and its associated high school, promotes the teaching of Torah, the Old Testament. Its teachings focus on the basic moral precepts of Judeo-Christian religion and the intellectual aspects of the Old Testament as a tool for teaching people how to think and analyze issues in all aspects of life in a non-judgmental manner.

In all of my interaction with Sam, he demonstrated intelligence, generosity, selflessness and integrity. Please consider this in your deliberations.

Sincerely,

Neisen O. Kasdin

NOK/wpc:ns

MIAMI 421868.1

**Gunster, Yoakley & Stewart, P.A.**
ATTORNEYS AT LAW

# Exhibit 17

**STEARNS WEAVER MILLER**
**WEISSLER ALHADEFF & SITTERSON, P.A.**

Miami   ▪   Ft. Lauderdale   ▪   Tampa

Robert I. Weissler
Direct Line: (305) 789-3333
Fax: (305) 789-3395
Email: rweissler@swmwas.com

Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
(305) 789-3200

December 22, 2005

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re:    Samuel I. Burstyn

Dear Judge Zloch:

I write regarding the pending sentencing of my friend Samuel Burstyn.

Since 1970 I have been admitted to the Florida Bar, practicing since 1984 with this law firm. For my entire legal career I have been and continue to be engaged exclusively in real estate law. I currently serve, and have for many years served, as Chair of the firm's real estate department.

I have known Sam Burstyn and his family socially for approximately 18 years. Our contact came about through a shared love of basketball and as the result of having bought – purely independently of each other – adjacent family seats at the Miami Arena. I have watched Sam raise his children from infants to fine young adults. For all of those years I have known him as a decent, thoughtful, generous and caring person, as an excellent father and as a good friend to me, my family and many others in this community. The Sam Burstyn I have known all of these years is not the person I read about in connection with the matters bringing him to your Court as a defendant. I was shocked to learn that he might have been involved in criminal activity, more shocked to read of the magnitude of the accusations made against him in connection with his efforts to obtain a release pending trial and pleased to learn that the government had apparently retreated from some of the more extreme allegations raised when he was first charged.

While I am sure that Your Honor will be fair and just in meting out whatever punishment you deem appropriate in light of Sam's guilty plea, I would like to impress upon the Court that the shame Sam feels from having failed his children in this matter is a punishment more personally hurtful to Sam than any sentence Your Honor might choose to impose. Sam's children mean everything to him. I know that he is truly remorseful for his behavior – behavior which I believe to be an aberration based on everything I know about him and his values. His life has been unalterably damaged by the charges brought against him, his time of incarceration, his admission of guilt and his necessary abandonment of the practice of law. Before the Court imposes a sentence, he has been sentenced.

Hon. William J. Zloch
December 22, 2005
Page 2

In the end, Sam still has a great deal to offer to his family and this community and a significant prison sentence will deprive both the community and Sam's family of a talented man who can still do much good. I am hopeful that the Court will appreciate that notwithstanding Sam's recent lapse, which I do not condone, he has many positive and admirable qualities that should also be considered when the Court imposes a sentence. As a friend who knows him to be, in his core, a good and honorable man, I urge the Court to grant as much leniency as the law permits.

Respectfully,

ROBERT I. WEISSLER

RIW/ds

G:\w-riw\Burstyn-ltr.wpd

# Exhibit 18

PHILIP BLOOM
5255 Collins Avenue
Apt. 3J
Miami Beach, Florida 33140
(305) 866-8884

January 19, 2006

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida
301 North Miami Avenue
Miami, Florida 33128

Re:    Samuel I. Burstyn – Case No. 04-60279-CR-ZLOCH

Dear Judge Zloch:

Please consider this letter in support of Samuel Burstyn on his forthcoming
sentencing hearing before Your Honor.  I write this letter as a person very much
interested in justice as an attorney, former state court judge (assigned periodically to the
criminal division), and former state and federal prosecutor who considers letters of this
nature to be serious matters.  In view of my background of 50 years as an active
member of the legal community, I feel it is my duty to come forward to express
appropriate hopeful and meaningful thoughts about Mr. Burstyn at a time when he
needs such support.

Please note that I have neither investigated his case nor spoken to others about
the charges against Mr. Burstyn.  I have read only newspaper accounts including Mr.
Burstyn's plea.  I have no personal stake in the matter.  I have known Mr. Burstyn for at
least 20 years as an attorney, family man and acquaintance.  I have observed him in
both professional and social settings as a talented, caring, charitable and helpful person.
At times, he was a brilliant, confident and knowledgeable attorney.  At other times he
was warm and ingratiating with a focus on "doing good" for those with whom he came in
contact.  Many years ago I had conversations with Mr. Burstyn about life, religion, law,
among other philosophical and pragmatic topics, while we were climbing a small
mountain out west.  As a result, I found it hard to believe the substance of the charges
against Mr. Burstyn.  But when Mr. Burstyn pleaded, I felt that it was a strong start
which I believe will become a pattern for his rehabilitation as a useful citizen.  Mr.
Burstyn directly acknowledged his grave infirmities in this matter, agreed to pay his debt
to society, and thereafter expressed a desire to become a contributing member of our
community again.

Hon. William J. Zloch
January 19, 2006
Page 2

Almost everyone is entitled to "another chance".  Mr. Burstyn with his talent, his past charitable involvement, and caring attitude of helping others, is a very special individual who, I am certain, will make it back as a productive person of whom we can all be proud.

Thank you for permitting me to express these thoughts.

Respectfully yours,

Philip Bloom

MIAMI/4155112.1

# Exhibit 19



BERKOWITZ DICK POLLACK & BRANT
CERTIFIED PUBLIC ACCOUNTANTS & CONSULTANTS, LLP

*Please direct mail to Miami offices:*
200 South Biscayne Boulevard
Sixth Floor
Miami, Florida 33131-5310
Telephone: 305-379-7000
Toll Free: 800-999-1CPA (1272)
Fax: 305-379-8200

515 East Las Olas Boulevard
Fifteenth Floor
Fort Lauderdale, FL 33301-2281
Telephone: 954-712-7000
Toll Free: 800-999-1CPA (1272)
Fax: 954-712-7070

E-Mail:  berkowitz@bdpb.com
Direct Dial:        305-960-1217

*www.bdpb.com*

December 8, 2005

The Honorable William J. Zloch
Chief United Stated District Judge
United States District Court
Southern District of Florida

Dear Judge Zloch:

My name is Richard A. Berkowitz.  I am an attorney and CPA.  I have been practicing as a CPA in Miami for over 30 years and this year I am serving as President of the Florida Institute of Certified Public Accountants.  I have represented Samuel I. Burstyn as a CPA for over 20 years.  As Sam's CPA, I have had a long and continuous relationship with him regarding the financial aspects of his life.

Sam has always acted with honesty, integrity and with great respect for rule of law relating to his financial and tax obligations.  He has always acted responsibly, and complied on a consistent basis throughout the period I have represented him with all of the filing obligations required by the jurisdictions in which he has conducted business.  He has been a proactive member of the community contributing generously of his time and money to community organizations which accomplish positive contributions to our local community. I believe that Sam has been a strong contributing member to his profession, his community and as an advocate for his clients in his long and continuous practice of law.

However, I believe the true measure of a man is his commitment to family and the effort that he makes on behalf of his children, building their character to become positive members of the community.   When Sam's brother passed away unexpectedly and prematurely, Sam was thrust into a situation where he had to provide for his brother's 4 children.  Not only did Sam support them financially, he made his brother's family his own tirelessly and relentlessly spreading his wings to protect his brother's young children.  I am impressed with the commitment which he has devoted his time, effort and finances to his extended family.  That core character trait and the critical need for Sam to continue to

The Honorable William J. Zloch
December 8, 2005
Page 2

fulfill that role is what motivates me to write to you on his behalf and request leniency to allow Sam to attend to the needs and interests of his extended family.

    The punishment that has been exacted of Sam in losing his license, the acute embarrassment that he has suffered publicly, the burden that his actions have placed on his family are material and substantive reminders of what he did wrong. I believe the punishment he has suffered already achieved its purpose – he is contrite, he has apologized and he understands the nature of his transgression. I do not believe that additional incarceration will be in and of itself greater punishment than what he has already received, nor will it achieve any greater recognition in his mind of what he did wrong. In fact it will be punitive because of the suffering that it will impose on his extended family. I implore you to be lenient on behalf of his family and those members in the community that will benefit from his active involvement in their lives as opposed to the waste that will result from his extended incarceration.

    Thank you very much for your time and consideration.

               Very truly yours,

               RICHARD A. BERKOWITZ

# Exhibit 20

# Esther Burstyn
4147 N. Meridian Avenue
Miami Beach, Florida 33140
(305) 720-8887

December 27, 2005

Esther Burstyn
4147 N. Meridian Avenue
Miami Beach, Florida 33140

Dear Judge Zloch:

      Sam Burstyn is not only my uncle - he has been a father to me and my three younger brothers since my father's sudden passing in 1998.
      My childhood memories of Sam are as that of a loving and devoted uncle as any child may have.  I always knew him to be a responsible and well respected member of my family.  My grandparents both holocaust survivors, were both ill and disabled for as many years as I can remember them. Sam and my father were responsible for their care.  It was only after my own father's sudden and unexpected passing that I became fully aware of the degree and extent of family devotion and loyalty that Sam gave.  It was then I realized that this was way out of the ordinary and not all common.  Sam took full responsibility of my family, my brothers who were only eight, twelve and sixteen at the time – a family that was in shock and devastated by the sudden loss of their husband and father – and helped us to pull ourselves together and function productively once again. Sam, in addition to looking after his own family's welfare, made sure that my siblings and I were taken care of whether it is financial or emotional.  My uncle made sure we had medical care and health insurance which we lost due to my father's death, he coordinated an educational plan for each child, encouraging us to succeed in our religious as well as our secular studies. My uncle also took on the financial plan that would enable my family to continue living in our home and pay our bills. The most incredible thing my uncle did for us bears no price tag or tangible cost  it was the gift of acceptance. My uncle accepted us like his own children never made us feel like just "nieces and nephews" .He made himself available to us whenever we needed him while making us believe we were the most important  people  he could be dealing with.

During this time my uncle suffered an immense amount of grief as well as an insurmountable amount of stress from not only losing his own father and only brother within three months of each other but also the financial and emotional burdens of his "extended" family. This added stress caused much tension in his personal life as well. Due to this tension Sams marriage and home life started crumbling, his world was literally falling apart around him. Sams emotional stress exacerbated his already ailing health, his high blood pressure and severe back pain to name a few of his health issues. In addition to his own medical issues Sam was dealing with his childrens multiple psychiatric problems as well. It was at around this time that Sams poor choices in life started taking place.. Ironically, after his divorce was settled and Sam was putting his life back together he was suddenly arrested and detained for seven months.

The impact to me and my siblings has been complete devastation. Sam has been our complete support system , during his pre trial detention my two younger brothers were having extreme behavior difficulties at home and in school related to depression similar to what happened after the loss of my father, and my brother and I (both students) underwent severe financial and emotional stress. I f my uncle would g-d forbid be incarcerated our family would probably not be able to keep our home, health insurance, afford our tuition, and other expenses of life. While considering your decision please consider the entire scope of my uncle's life, few if any people shoulder the religious faith, family responsibility and dedication to community as Sam does. It would be a great shame to deny his family and his community all that he does for them.

Very Truly Yours,

Esther Burstyn

# Exhibit 21

December 20, 2005

Jacob Burstyn
3315 Claran Rd.
Baltimore, Md. 21215
(410) 358-2287

Dear Judge Zloch:

My name is Jacob Burstyn. I am just shy of my twenty-fifth birthday. My wife Devorah and I have been fortunately blessed with two daughters, Esther Malka and Yehudis. Ever since I was very young I always aspired to become a Rabbi. My father, Rabbi Jeremiah Burstyn may he rest in peace was my role model. My parents were very encouraging even though this is something that requires many years of preparation and schooling for a job that has terrible hours besides being "on call" 24/7, many responsibilities and a miniscule salary if any. Of course, being a public servant, serving one's community, is one of the most satisfying and most worthy work that exist. Many friends of mine with similar dreams and aspirations had the great challenge of trying to overcome family pressure and lack of acceptance. Thank G-d I did not have these challenges. I attended Jewish day schools in Miami Beach and after a year of high school attended the Ner Israel Rabbinical College of Maryland. After five years, I left to finish my Bachelor's in Arts at the Maimonadies Rabbinical College of Canada, studied for a period in Jerusalem and then again in Miami Beach for three years. I have been back in the Ner Israel Rabbinical College for a year and a half continuing my studies. I hope to finish my Master in Talmudic Law in the near future and eventually be a rabbi with a Ph.D. who will serve the community to the best of my ability.

When my father, a great public servant of South Florida, passed away on March 19, 1997, I thought my dreams would be no more than just that, dreams. There would be many responsibilities that I would need to accept, and I felt I had an obligation to my family to do this. If I would be able to study more, if I would be able to be a Rabbi, it would be at an unknown later date. The same ambition that drove me to pursue the rabbinate would now drive me to abandon it. Divine providence had other ideas. My uncle, Samuel I. Burstyn,

affectionately called Sam or Sammy, another public servant, a champion of public needs was there.  He was a messenger of G-d.  He was a savior.  I was assured that I needn't worry or have to get involved at in any father's affairs.  There would be no family responsibilities or financial burdens.  Sam would bear it all.  The only thing I had to do was study.  All I had to do was focus my talents, strengths and time to my studies.  Whether it was the Old Testament, the Talmud of Jewish Law, I immensely enjoyed probing the depths of these ancient works.  There was no money of gift that I could give him to repay this for me.  I decided that the way I would repay him is by ensuring that if he was accepting my responsibilities I had an obligation to really work hard, to really grow.  I would not, could not fool around when someone else "paying the tab".  Sam was, as he always is a larger man.  He wants to help not only himself, not only his immediate family, not only his extended family, but the entire greater community.  It is well known that he donates large sums of funds to charities.  He is one of the founders of the Talmudic University of Florida, besides a substantial donor to the local hospital and a myriad of other worthy charities.  It was and still is a common occurrence of prominent people to speak very highly and respectively of him.  This is for a very good reason.  I have never before met a man who has such a sense of responsibility for so many people as Sam.  I think that it was for this reason that Sam became a defense attorney.  He felt a responsibility for the weak, the ones in trouble.  Using his expertise in law he would help save the innocent.  To me it would be totally against his nature to be a prosecuting attorney, trying to prove that someone is guilty.  No, not Sam.  He is the one trying to prove that someone is innocent.  He lived by the dictum, innocent until proven guilty.  Let us not obligate someone who may be exempt even if the repercussions are to sometimes exempt someone who is obligated.  Part of the job of a defense attorney is after a person is convicted to try and beseech mercy and help from the Judge.  No person is perfect as the verse says (Ecclesiastes 7:20), "there is no righteous man that has not sinned."  At the same time no judicial system can be perfect.  All I am hoping is that the man who countless of times begged for mercy for someone else should also receive the mercy he so much deserves.

Very Truly Yours,
Jacob Burstyn

# Exhibit 22

LAW OFFICES

### ROBERT D. HERTZBERG, P.A.

BANK OF AMERICA TOWER AT INTERNATIONAL PLACE

100 SOUTHEAST SECOND STREET

SUITE 3550

MIAMI, FLORIDA 33131

TELEPHONE (305) 371-6060
TELECOPIER (305) 358-5917

November 8, 2005

Honorable William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re:     The United States of America vs. Samuel Burstyn

Dear Judge Zloch:

This letter is written on behalf of Samuel Burstyn who is scheduled to be sentenced before Your Honor.

I have known Samuel Burstyn for in excess of twenty-five (25) years in a number of capacities:  attorney; family member; neighbor and temple member.

Within the past several years, I have had a contested divorce matter with Sam as opposing counsel in the Circuit Court for Dade County, Florida. Sam was a committed advocate for his client, and zealously represented him. Ultimately, a fair and equitable settlement was reached. Sam was professional at all times and was courteous and responsive in moving the matter to an amicable conclusion.

I have had a better opportunity to observe Sam as a family member and neighbor as he has lived next door, and recently across the street from me for approximately the past fifteen (15) years. Sam is the proud father of four (4) children and I have observed his constant involvement with his children. Regularly, Sam can be seen walking, playing and just having fun with his kids. In addition, I have had a number of conversations with Sam over the years about commitment to our respective children and our hopes for their life pursuits, including education, relationships and happiness. Sam is extremely connected to his children and has been a caring, dedicated and wonderful father for them.

I am aware that Sam has further helped his extended family both emotionally, spiritually and financially as a result of the death of his brother.

I am currently the president of Temple Beth Sholom in Miami Beach, Florida and have been a board member and activist in the temple since the 1990's. Until the last several years, Sam and his children would regularly attend temple events, holidays and services. Sam and I have had numerous discussions about the importance of religion and spirituality for our respective families.

On a personal note, I am disappointed in Sam and hurt by his being a defendant in a criminal proceeding before Your Honor and the upset and impact that the proceeding has had and will have upon his family.

On behalf of Sam and his family, I respectfully suggest that this Court be sympathetic and merciful to Sam for the mistake that he has made.

Respectfully submitted,

ROBERT D. HERTZBERG

RDH/smt

# Exhibit 23



ATTORNEYS AT LAW

Miguel M. de la O
A. Jacqueline del Cristo-Minges
Charles Duke Ferguson
Daniel L. Leyton
David Everett Marko
David A. Ostrow

OF COUNSEL

Neal R. Sonnett

November 22, 2005

The Honorable William Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

  **RE:**   <u>**Sentencing of Samuel I. Burstyn**</u>

Dear Honorable Sir:

  My name is Miguel M. de la O.  I have been a member in good standing of the
Florida Bar since 1989.  I began my career at the firm of Steel Hector & Davis.  I worked
with Sonnett Sale & Kuehne, and Neal R. Sonnett P.A. before establishing my own firm,
de la O & Marko.  I have been appointed by the Florida Supreme Court to the Florida
Board of Bar Examiners and by the Florida Bar to a Grievance Committee for the 11th
Judicial Circuit.

  I have known Samuel I. Burstyn since 1995.  He shared office space with Neal R.
Sonnett, as did my firm.  Sam asked my firm to assist him in various civil matters in
which he was involved.  As a result, we often collaborated on cases and over time
became friends.

  Far more prominent attorneys than I will attest to Sam's legal skills.  I prefer to
focus on Sam Burstyn as a family man and a friend.  When my first child was born, Sam
took a keen interest in mentoring me as a father.  I do not know if Sam was actively
mentoring me, or even saw the relationship in such terms.  Nevertheless, Sam was
aware I was raised by a single mom, that I had not met my father until I was in my 20s,
and that I had no relationship with him even after that first meeting.  Sam knew I lacked
a first-hand father role model, and he – again, I don't know whether intentionally or by
default – filled that role without ever being condescending and without embarrassing
me.  Sam would take time out of his day, while we were meeting on serious legal
matters, to talk to me about my child and to impart the experience he had gained over

Page 2 of 2
November 22, 2005

the years.  These were not one or two superficial conversations immediately after my first child was born.  Rather, this was an ongoing dialog that lasted years.  When my second child was born, the topic of how to best raise multiple children became the focus of our discussions.

It is difficult to describe the tone and tact Sam used to guiding my development as a father, but he struck the correct one and – in me – he had a receptive student. Through his efforts, I not only gained valuable wisdom, but I also observed the affirmative efforts needed to parent children well.  As with all his cases, Sam tackled parenting with zeal.  He imparted that zeal to me, made me a far better father, and I am forever grateful.

This Court has a difficult task, one I do not envy despite the fact I hope to one day be a Judge.  I, of course, cannot approach Sam's case impartially.  With my personal biases acknowledged, I ask that the Court extend Sam all the leniency available to Your Honor.  No person is either all good, or all bad.  Regardless of the acts which brought Sam before Your Honor, of which I am well-aware, there are other attributes which warrant leniency.  I ask only that the Court focus on those good qualities, which Sam possesses in abundance, in making your sentencing decision.

Very truly yours,

**DE LA O & MARKO**

Miguel M. de la O
delao@delao-marko.com

# Exhibit 24

Page 1 of 4

To Whom This May Concern,

I write this letter on behalf of my brother, Samuel Burstyn. Sam is 12 years older than me. I am the youngest of 5 children.

I am married, and have 2 children. During the course of my marriage of 21 years, I have encountered some difficulties - I have had some health problems, and my husband had experienced financial hardship in his business.

Sam has never refused us assistance or support - be it financial or otherwise - during the course of our difficulties. He has generously and willingly offered us help.

Our father had been ill and disabled for a number of years prior to his passing in 1997. His comfort and care were of paramount importance to Sam - as well as to the rest of our family. But Sam went one step further. Being that I was in a position to care for my father and

Page 2 & 4

tend to certain aspects of his health-related care, and being that I was not financially secure, Sam took it upon himself to fully support me and my family financially during the course of the years that I took care of our father. Additionally, Sam provided health insurance (and continues to do so) for me and my family — which enabled us to obtain quality medical care over the years. Health insurance is considered to be somewhat of a luxury these days, due to its high cost. This was a tremendous help to us.

Sam helped to secure loans for us in our business related needs, at times when our credit did not permit us to obtain these loans independently. I might add that oftentimes I did not request the above mentioned assistance; Sam offered it.

My father was in his late 50's when I was born, and in his 80's when I was in my 20's. A father is usually in a position to assist his

Page 3 of 4

Children when they encounter difficulties. However, in our family's case, there was a complete reversal of roles — we (my siblings and I) were in a situation where we needed to care for our father — whose needs extended even beyond his health care. Our parents resources were being depleted due to our father's prolonged health care needs — he had been disabled and bedridden for approximately 12 years. During this time, Sam covered all of our parents living expenses (maintanance and upkeep of their apartment) as well as those medical expenses which were not paid by the insurance — for example, private duty nurses, physical therapy, medical equipment, and the like. My father adored Sam, and was very proud of his son's "standing up to the call of duty", with regard to family related obligations and responsibilities. Sam took on a fatherly role in the family.

Page 4 of 4

My father (who was a devoutly orthodox religious man) oftentimes blessed Sam for his generosity and unfaltering assistance. My father was aware of my personal difficulties which I endured during the time I cared for him, and he knew that I was taking care of him at the same time I was caring for my two young children. He knew that Sam was helping me, and I recall my father saying - in appreciation for what I was doing for him -

"Whoever helps Shari should be blessed". I hope that my father's blessings to Sam are fullfilled in that Sam be absolved and cleared of all charges posed against him at this time.

If you wish to contact me or my husband with regard to any of the information I have provided herein, please do not hesitate to do so, at any time. We can be reached at the following numbers:

305-652-7264 or 305-654-8877.

Sincerely, Shari Burstyn Jakobowitz
(Sam's Sister)

TO THE HONORABLE JUDGE,

I HOPE THIS LETTER FINDS YOUR HONOR WELL.

MY NAME IS GERTRUDE SHAFER, SISTER TO MR. SAMUEL I. BURSTYN.  WE WERE 5
CHILDREN IN OUR FAMILY UNTIL OUR BROTHER, JERRY PASSED AWAY 7 1/2 YEARS
AGO.

MY PARENTS WERE BOTH HOLOCAUST SURVIVORS, BOTH LIVED THRU THE HORRIFIC
EFFECTS OF HITLER AND HIS NAZI REGIME.  POLAND WAS INVADED IN 1939 FORCING
MY FATHER AND MOTHER (AGE 17) INTO SLAVE LABOR.  DAILY BEATINGS AND SEVERE
PHYSICAL ABUSE WERE THE NORM.  SOUP (80% WATER) AND A HALF OF A PIECE OF
BREAD WAS THE DAILY RATION OF FOOD.  DISEASE (TYPHUS) AND MALNUTRITION
WERE RAMPANT.

IN 1943, MY FATHER AND MOTHER WERE AMONG THE "FORTUNATE" ONES TO ESCAPE
THE SLAVE LABOR CAMP, RUNNING FOR THEIR LIVES UNDER THE "RAIN" OF BULLETS
COMING AT THEM FROM ALL DIRECTIONS.

BREATHLESS, BAREFOOT AND BEREFT THEY MADE IT INTO THE WOODS WHERE THEY
MANAGED TO REMAIN IN HIDING FOR ONE AND ONE HALF YEARS.  ONE AND A HALF
YEARS LIVING LIKE ANIMALS, HIDING IN THE WOODS, LIVING UNDERGROUND.  FALL,
WINTER, SPRING, SUMMER AND AGAIN FALL, WINTER AND SPRING.  THE SEASONS
CAME AND WENT. THEY LIVED IN CONSTANT FEAR AND GREAT TREPIDATION.  THE
POSSIBILITY TO BE FOUND AND KILLED WAS AT ANY MOMENT.  MANY ESCAPEES WERE
FOUND IN THE WOODS AND KILLED, BY THE GRACE OF G-D, THEY WERE NOT FOUND.
BREAD WAS A RARITY AND POTATO PEELS WERE A DELICACY.  OH HOW HAPPY THEY
WERE WHEN IT RAINED AND SNOWED! THEY WERE NOW ABLE TO SHOWER AND HAVE
A DRINK.

16 PEOPLE LIVED IN A GRAVE. A GRAVE FOR THE LIVING.  THEIR HIDEOUT WAS
COVERED WITH TREES AND BRANCHES. EVERY DAY THEY HEARD DOGS (SNIFFING
DOGS) ROAMING THE WOODS... WITH GUNSHOTS SOON TO FOLLOW.  SOON AFTER,
THE WORD WAS OUT ABOUT WHO WAS KILLED THE NIGHT BEFORE.

LIFE IN THE WOODS WAS GETTING DANGEROUS.  EVERY HOUR SEEMED LIKE A DAY
AND EVERY DAY LASTED FOREVER. FORTUNATELY THEY HAD EACH OTHER AND
TOGETHER THEY HELD ON TO LIFE.

FINALLY, IN 1945, THEY WERE FOUND BY THE RUSSIAN ARMY AND TAKEN TO "SAFETY".
THEY WERE TRANSPORTED TO DP CAMPS. AN ATTEMPT WAS MADE TO BECOME
"HUMAN" AGAIN AND TO START A NEW LIFE. A NEW LIFE WITHOUT PARENTS,
BROTHERS AND SISTERS, ALL OF WHOM WERE MURDERED.
QUITE AN ORDEAL FOR TWO YOUNG ADULTS!

 IN 1950, THEY WERE ALLOWED INTO THE UNITED STATES.  THEY SETTLED IN BOSTON,
MASS.  IT WAS QUITE DIFFICULT FOR THEM NOW IN A NEW LAND WITH A NEW
LANGUAGE AND NO FAMILY.

THEY HAD TO GET THEMSELVES TOGETHER, BURY THEIR EMOTIONS AND BRACE
THEMSELVES FOR A NEW FUTURE.

YOUNG AND UNEDUCATED THEY STRUGGLED TO EARN A LIVING, THERE WAS NOT
MUCH THEY COULD DO.  MY FATHER WORKED VERY HARD AS A PAINTER, A
WALLPAPER HANGER AND ANY OTHER HANDYMAN JOB HE COULD GET.  MY MOTHER
HELPED HIM ALONG, SHE ALSO PAINTED - WITH A TEAR STAINED FACE.  SHE COULD

NOT HIDE HER EMOTIONS SO WELL.  SHE WAS YOUNG AND IN GREAT EMOTIONAL PAIN.  HER PAIN WAS VERY VISIBLE.  WE ALL CRIED WITH HER.  ONE DOES NOT USUALLY GROW UP WITH PARENTS CRYING. WE WERE SO WORRIED FOR THEM, WE FELT SO BAD FOR THEM.  WE GREW UP WITH SUCH FEAR, NOT QUITE UNDERSTANDING WHAT WAS GOING IN.  OUR PARENTS WERE ALSO IN CONSTANT FEAR, THINKING THAT AT ANY MOMENT SOMEONE COULD BREAK INTO OUR HOME AND TAKE THEIR CHILDREN AWAY.  THEY WERE VERY CARING AND LOVING AND VERY PROTECTIVE OF US.  WE WERE WATCHED CONSTANTLY AND ALWAYS HAD TO BE"SAFE" NEAR OUR HOME. THIS FEAR PUT A GREAT PRESSURE ON US.  WE DID NOT WANT TO HURT OUR PARENTS IN ANY WAY AND YET WE COULD NOT HANDLE IT.

AFTER A WHILE, MY FATHER'S ARTHRITIS (WHICH WAS A RESULT OF SLEEPING IN THE DAMP WOODS...) GOT WORSE AND HE COULD NOT WORK PHYSICALLY.  IN ORDER TO SUPPORT THE GROWING FAMILY, MY PARENTS TOOK CARE OF ELDERLY PEOPLE IN OUR HOME! WE GREW UP WITH OTHER PEOPLE IN OUR HOME.  THESE PEOPLE REQUIRED A LOT OF ATTENTION, EMOTIONALLY AND PHYSICALLY.  MY PARENTS COOKED AND CLEANED FOR THEM.  AS CHILDREN WE TRIED TO HELP AS MUCH AS POSSIBLE.  WE HAD A LOT OF RESPONSIBILITY.  NEEDLESS TO SAY, IT WAS A VERY DIFFICULT "HOME" SITUATION.

 IT IS NO WONDER THAT AT THE AGE OF 15 SAMUEL LEFT TO AN OUT OF TOWN SCHOOL (YESHIVA). HE WAS BATTLING WITH HIS FAITH WHILE BEING PAINED WITH THE SADNESS OF HIS HOME LIFE.  HE HAD TO GET AWAY AND HE HAD TO BETTER HIMSELF.  SINCE THE AGE OF 5 HE ASPIRED TO BE A LAWYER.  HE MEANT IT!  HE SAW SO MANY INJUSTICES .  HE ALWAYS WANTED TO HELP OTHERS.  (I ONCE MENTIONED TO HIM THAT SOMEONE COMMENTED THAT SAMUEL WORKED ON THEIR CASE FOR 2 YEARS AND WOULD NOT TAKE A PENNY!  WELL, SAMUEL SAID, "IT'S NOT ABOUT MONEY, I NEVER BECAME A LAWYER FOR THE MONEY.  IT'S THE PRINCIPLE.  IT'S THE OPPORTUNITY TO HELP PEOPLE, THAT'S WHY I LOVE BEING A LAWYER...") I WAS SO IMPRESSED.

EVENTUALLY, ON HIS OWN, HE MADE ALL THE NECESSARY ARRANGEMENTS TO GO TO THE UNIVERSITY OF MIAMI.  HE GOT SCHOLARSHIPS WITH LOTS OF FINANCIAL AID.  ALWAYS THINKING OF OTHERS, HE CHOSE THE U. OF MIAMI, KNOWING THAT OUR PARENTS WERE PLANNING TO MOVE THERE BECAUSE OF OUR FATHER'S ARTHRITIS.  HE ALSO KNEW THAT HIS PARENTS ALWAYS WANTED HIM NEARBY TO KEEP THE FAMILY TOGETHER.

SAMUEL PUT HIMSELF THRU SCHOOL STUDYING HARD AND WORKING MANY PART TIME JOBS.  IT WAS AMAZING HOW HE ALWAYS THOUGHT OF EVERYONE AND ALWAYS BROUGHT GIFTS FOR THE FAMILY.  AT SUCH A YOUNG AGE OF 20 HE WAS ALREADY HELPING OTHERS!

AS A FAMILY, WE CELEBRATED ALL THE HOLIDAYS TOGETHER, IT WAS VERY IMPORTANT TO SAMUEL THAT OUR FAMILY SHOULD BE CLOSE.  WHENEVER HE CALLED HE WOULD ASK, "HOW IS MOM AND DAD?" "DO THEY NEED ANYTHING?,  IF THEY DO, PLEASE LET ME KNOW...." SUCH DEDICATION AND DEVOTION.  IT IS NO WONDER THAT MY PARENTS LOVED AND RESPECTED HIM SO MUCH. HE DID NOT REQUEST IT , HE EARNED IT.
 HE CARRIES SO MANY BURDENS AND RESPONSIBILITIES ON HIS SHOULDERS AND YET ONE WOULD NEVER KNOW IT.  HE NEVER BRAGS OR BOASTS ABOUT ALL THE THINGS HE DOES FOR SO MANY PEOPLE.  WITH SAMUEL IT IS," HEY, DON'T MENTION IT".  HE NEVER WANTS A THANK YOU OR A COMPLIMENT. GIVING, COMES SO NATURAL TO HIM.  HE FEELS THAT WHATEVER HE HAS  IS TO ENABLE HIM TO HELP OTHERS.

AS TIME WENT BY, PROBLEMS SET IN AND OUR FAMILY WAS SUFFERING.  OUR OLDER
SISTER GOT ILL.  THIS EFFECTED SAMUEL VERY MUCH.  HE IS SO SO CLOSE WITH
HER.  HIS LOVE AND ADMIRATION FOR HER WAS FROM A VERY YOUNG AGE.  HE
IDOLIZED HIM.  THIS DEVASTATED HIM.  HE IS ALWAYS THERE FOR HER AND HE
SUPPORTS HER TO THIS DAY FINANCIALLY AND MOST OF ALL EMOTIONALLY. SHE
JUST HAS TO SEE HIM AND SHE IS PUT AT EASE..  HE IS THE ONLY ONE THAT SHE
FEELS COMFORTABLE ENOUGH WITH TO CONFIDE IN.  SHE RELIES TOTALLY ON HIM.
DUE TO HER ILLNESS, SAMUEL IS THE ONLY ONE THAT SHE WILL TRUST AND FEEL
SAFE WITH- SHE NEEDS TO BE WITH HIM.. SAMUEL HAS ALWAYS GIVEN HIS OLDER
SISTER THE RESPECT SHE DESERVES.

IN 1998, OUR OLDER BROTHER, JERRY, DIED SUDDENLY.  THIS WAS JUST 4 MONTHS
AFTER OUR FATHER DIED! OUR FATHER WAS BEDRIDDEN FOR 15 YEARS!! OUR
MOTHER SINGLEHANDEDLY NURSED HIM, NEVER TAKING ANY OUTSIDE HELP. MOTHER
BATHED HIM, FED HIM AND KEPT HIM ALERT ALL THESE YEARS BY STAYING BY HIS
SIDE.

SAMUEL, AGAIN, STEPPED IN MAKING SURE MOM AND DAD HAD ALL THEIR NEEDS
TAKEN CARE OF; RENT, FOOD, AND ALL MEDICAL EXPENSES.  THE RULE IN MR.
BURSTYN'S OFFICE WAS: *ANY CALL FROM MY PARENTS, SISTERS OR BROTHER ARE
TO BE PUT THRU IMMEDIATELY..."*  HIS TOTAL IMMERSION IN THE FAMILY AND THEIR
NEEDS IS SO UNUSUAL, NEVER EVER REFUSING ANYONE.

DURING ONE OF THE HOSPITALIZATIONS OF MY FATHER, IN THE LAST FEW MONTHS
OF HIS LIFE, MY FATHER'S HEART STOPPED BEATING IN THE MIDDLE OF THE NIGHT.
THERE WAS INSTANT PANIC.  THE DOCTORS WORKED ON HIM AND THANK G-D HE
CAME TO...  WELL, AT 7 AM THE FOLLOWING MORNING, SAMUEL CALLED HIS BROTHER
JERRY FROM COLORADO (HE WAS ON VACATION) AND ASKED HOW IS DAD?  WHY DO
YOU ASK NOW? SAMUEL TOLD JERRY THAT AT 1 AM HE WOKE UP STARTLED FROM HIS
SLEEP.  HE IMMEDIATELY WENT TO CHECK UP ON THE CHILDREN AND TO CHECK OUT
THE HOUSE.  EVERYTHING WAS FINE.  HE COULD NOT FALL BACK ASLEEP.  HE HAD A
VERY UNEASY FEELING.  WELL, SURE ENOUGH 1AM IN COLORADO WAS 3AM IN
FLORIDA, THE EXACT TIME OF HIS DAD'S HEART ATTACK.   SAMUEL IS VERY CLOSE TO
HIS FAMILY, IN MORE WAYS THAN ONE! (HE TOOK THE NEXT PLANE TO FLA. TO BE
WITH HIS DAD...)

JERRY'S DEATH WAS A HORRENDOUS BLOW TO OUR FAMILY! WORDS CANNOT
DESCRIBE THE STATURE OF THIS MAN..  THE CLOSENESS THAT HE HAD WITH
EVERYONE IN THE FAMILY AND IN THE COMMUNITY WAS SO UNIQUE.

WELL, MARCH 19, 1998 CHANGED OUR LIVES AND ESPECIALLY THE LIFE OF MR.
BURSTYN. HIS ONLY BROTHER AND CONFIDANT WAS GONE.  BROKEN AND
DISHEARTENED HE IMMEDIATELY JUMPED IN TO TAKE ALL THE RESPONSIBILITY FOR
THE FAMILY.  HE TOOK ON THE ROLE AS "FATHER" TO THE 4 ORPHANED CHILDREN.  HE
ASSUMED THE FINANCIAL RESPONSIBILITY AND HE MADE SURE THAT THE CHILDREN
CONTINUED WITH THEIR EDUCATION.  NOT AN EASY UNDERTAKING!  SAMUEL DID NOT
PASS THE RESPONSIBILITY ON TO SOMEONE ELSE NOR DID HE CHOOSE TO LOOK
AWAY.  HE REALLY DID THE IMPOSSIBLE.

HE WAS DOING ALL THIS WHILE HE HAD HIS OWN PERSONAL FAMILY STRUGGLES,
 PRESSURE OF HIS CAREER AND TRYING TO  MAINTAIN HIS OFFICE.
SIMULTANEOUSLY, WORRYING ABOUT HIS WIDOWED MOTHER AND SISTER WHO WERE
BOTH IN AN EMOTIONAL STATE OF SHOCK - LITERALLY.

IT IS NO WONDER THAT ALL THESE PRESSURES FINALLY TOOK A TOLL ON MY
BROTHER. HOW MUCH CAN ONE PERSON DEAL WITH?  AS IT WAS HE WAS DOING

MUCH MORE THAN THE AVERAGE BROTHER AND SON DOES. HE WAS CARRYING A VERY HEAVY BURDEN AND KEPT IT ALL SILENTLY WITHIN HIMSELF.

ONCE AGAIN HE WAS STRUGGLING WITH FAITH WHILE BEING PAINED BY LIFE. SADLY, SAMUEL BROKE DOWN. HE COULD JUST NOT COPE ANY LONGER. HAVING BURIED HIS LOVING FATHER AND ONLY BROTHER WITHIN 4 MONTHS OF EACH OTHER IT WAS ALL JUST TOO MUCH. IT WAS A HORRIBLE TIME FOR HIM FILLED WITH MUCH PAIN AND GRIEF. HE HAD TO RESORT TO DRINKING IN AN ATTEMPT TO HOLD ON TO LIFE. THIS WENT ON FOR A FEW YEARS. OH HOW WE PRAYED THAT G-D SHOULD GIVE HIM STRENGTH AND THAT HE SHOULD GET THRU THIS DIFFICULT TIME. FINALLY, HE WAS GETTING BACK TO HIMSELF FOR A FEW YEARS - ONLY TO RELAPSE AGAIN.

THIS TIME ? MARITAL ISSUES AS WELL AS HEALTH ISSUES WITH HIS CHILDREN. WHAT WAS ONCE A BEAUTIFUL FAMILY WAS NOW STARTING TO CRUMBLE. THE YEARS 2002 -2004 WERE A REAL STRUGGLE. SUCH DISHARMONY AND STRIFE. ONCE AGAIN, MY PAINED BROTHER HAD TO RESORT TO DRINKING AND WHATEVER IT TOOK TO COPE WITH THE STRESS AND AGONY. ULTIMATELY HE GOT DIVORCED. A REAL BLOW TO HIM AND TO HIS FAMILY.

SAMUEL ALWAYS WANTED TO HELP OTHERS. HIS CHILDHOOD GOAL! HE WAS ALWAYS THERE FOR EVERYONE AND IN THE INTERIM HE FORGOT ABOUT HIMSELF! WELL, BEING A MAN OF STRONG CHARACTER, SAMUEL WAS STARTING TO PULL HIMSELF TOGETHER. AMAZINGLY, HE WAS GETTING OVER THIS DEVASTATING BLOW. HE WAS GETTING CLOSER AND CLOSER WITH THE CHILDREN AND DEALING WITH THEIR HEALTH ISSUES. WE ALL SIGHED A BREATH OF RELIEF. THERE WAS LIGHT AT THE END OF THE TUNNEL. WE KNEW HE COULD DO IT AND WE KNEW HE WOULD. OUR OPTIMISM KEPT US GOING FOR HIM AND FOR OURSELVES.

THIS WAS ALL VERY ENCOURAGING FOR US, UNTIL THE UNFORTUNATE ARREST! WHAT A SHOCK! THIS COULD NOT BE FOR REAL? HIS VERY FIRST CALL WAS TO HIS 83 YEAR OLD MOTHER! MOM I AM ALRIGHT, PLEASE DON'T WORRY ABOUT ME. MOM, G-D WILLING I'LL SEE YOU SOON. IN THE MIDST OF HIS AGONY, HE STILL SHOWED SUCH CONCERN FOR HIS MOTHER. INTERESTINGLY ENOUGH, SAMUEL STAYED STRONG. HE SHOWED SUCH STRENGTH AND FAITH FOR HIS CHILDREN, HIS MOTHER AND SISTERS. HE BECAME A CHANGED MAN. HE PRAYED. HE REALIZED HIS MISTAKES. HE HAS BECOME EVEN MORE LOVING AND CARING. HE IS NOW MORE AT PEACE WITH HIMSELF. HE HAS ACCEPTED SO MUCH OUT OF FAITH, SOMETHING HE WAS NEVER ABLE TO DO. I APPLAUD THIS MAN FOR WORKING ON HIMSELF AND TRYING TO OVERCOME ALL OF HIS HARDSHIPS AND STRUGGLES.

SAMUEL IS OPENLY REMORSEFUL AND ACKNOWLEDGES AND HAS CONFESSED HIS ERRORS. HE WENT OVERBOARD HELPING SOMEONE HE KNEW AS AN ADOLESCENT. WITHOUT QUESTION SAMUEL'S LOYALTY TO THIS DESPERATE "FRIEND" WAS LEGALLY WRONG AND HORRIBLY MISGUIDED. IT OCCURRED WHILE SAMUEL WAS LIVING IN HOTELS AND APARTMENTS, IN RELAPSE, WHILE BEING VICIOUSLY ATTACKED BY HIS FORMER WIFE'S ATTORNEYS AND FIGHTING TO SEE HIS CHILDREN. I DO NOT DOUBT THAT IF MY BROTHER HAD HIS WITS ABOUT HIM HE NEVER WOULD HAVE CROSSED THE LINE. HE DID NOT SET OUT TO COMMIT A CRIME! HE DID NOT SEEK OR RECEIVE A PENNY FOR HELPING THIS FORMER "FRIEND" BUY DIAMONDS FROM A DIAMOND DEALER. SAMUEL DOES NOT TRY TO IN ANY WAY MINIMIZE OR JUSTIFY WHAT HE DID. IT SEEMS TO ME THOUGH THAT ONE IS JUDGED WITHIN THE CONTEXT OF HIS CONDUCT.

I PRAY WITH ALL MY HEART AND SOUL THAT MY BROTHER, SAMUEL, A MOST UNIQUE AND UNUSUAL INDIVIDUAL WI LL BE UNDERSTOOD BY THE JUDGE AND GIVEN A NEW LEASE ON LIFE. I HOPE THAT THE HONORABLE JUDGE WILL SEE THE TALENTS AND

WISDOM THAT THIS MAN POSSESSES AND ALLOW HIM THE OPPORTUNITY TO BE OF SERVICE TO THE LEGAL PROFESSION AND TO THE COMMUNITY AT LARGE.

WITH GREAT RESPECT AND ADMIRATION TO THE HONORABLE JUDGE,

SINCERELY YOURS,

GERTRUDE SHAFER

DECEMBER 26, 2005

Dear Judge Zloch,

I am writing this letter on behalf of Sam Burstyn. I have known Sam for 30 years, my daughter was married to Sams late brother Rabbi Jeremiah Burstyn. Eight years ago my daughter was tragically widowed with four small children. After my son in laws death my daughter and grandchildren suffered tremendous grief and loss, Sam was there to help them through it all. Sam continues to support my grandchildren and great grandchildren with all their educational and financial needs. It is very rare these days to find a man who would undertake such a task and I am grateful that he did. Even though we are "only related" through marriage I feel especially close with Sam because of his kindness, generosity and good spirit. I request of you to show kindness in your decision as Sam has shown kindness with all of his.

Very truly yours,

Frank Greenberg

January 7, 2005

Sholom Jacobowitz

Dear Judge Zloch:

I would like to state that I was not asked to write this letter on behalf of my uncle, Sam Burstyn, but rather, I requested the opportunity to write. At first, I thought, how much weight or significance could a letter from a teenage kid have? After all, I am not a sophisticated professional, or director of any corporation. I'm just a kid. But as a kid, I feel I have the ability to express very openly and clearly what I know and love about my uncle.

Sam did all the things an uncle may be expected to do with his nephew. As I was growing up, he took me to ball games, bought me stuff, etc. As I got older, Sam always expressed interest in my future plans. He always understood me. He was always there for me.

I am presently studying in school in New Jersey, and I just wanted to write this letter to show support of my uncle, Sam Burstyn, even if it is only a small way of giving something back to him for all that he has done for me and all that he has meant to me over the years.

Sincerely,

Sholom Jacobowitz

January 4, 2006

Jack Jacobowitz
1102 N.E. 176 Terrace
North Miami Beach, Fl. 33162

Dear Judge Zloch:

I write this letter in support of my brother-in-law Sam Burstyn.  I married Sam's youngest sister, Shari, in 1984, so I know Sam for quite some time.

As an "in-law", I have the ability to observe family interactions from a unique perspective.  I have observed Sam's interactions with his siblings, and have been impressed with the warmth and closeness they share.  This is not always the case in many families.  And even less common is finding this kind of closeness with someone who joins the family through marriage (i.e. a brother-in-law).  Yet Sam warmly welcomed me to the family and made me feel comfortable
from the start.  In fact, he treated me more like a brother than a brother-in-law.

I always felt that I could talk to Sam about anything.  I have oftentimes confided in Sam about matters related to my employment.  I work in the restaurant business, which has its shares of ups and downs – as is expected of a seasonal business I have, on a number of occasions, requested financial assistance and advice from Sam, and he has willingly and eagerly provided both.

I have also observed over the years the loyalty and devotion which Sam has shown to his parents – particularly to his elderly father (my father-in-law) – who has since passed away. I am equally impressed by the love and concern he shows his mother (my mother-in-law).

Perhaps most striking and noteworthy is the way he interacts with his brother's children. Sam lost his brother several years ago, and has taken full responsibility for the well-being of these children, no less than his own. When I speak to these children – who are, indeed, my niece and nephews – they speak of him in a fatherly context. Sam also maintains a very warm and close relationship with his brother's widow – and her extended family, this is also quite unusual.

Sam is the type of person who would never refuse anyone's request for help. As both a relative and a friend, I ask that you judge him favorably at this time, and not refuse him his request for leniency.

Sincerely,

Jack Jacobowitz
(Sam's Brother-in-law)

To the Honorable Judge,                                      December 26, 2oo

    I, Joseph Shafer, am the nephew of Mr. Sam Burstyn. I would like to be as brief as I can, explaining to the Judge how much I admire my Uncle Sam, and what a great role he has in the life of my own as well as my family.

    Every year, my family and I fly down to Miami for the passover holiday, to visit my elderly Grandmother, a holocaust survivor, as well as my Uncles, aunts and cousins. If not for my uncle Sam's devotion and selflesness towards my Grandmother, I dought that my Grandmother would have made it this far in life. My uncle Sam has always taken complete responsibility for all of the financial and medical expenses that my Grandmother has. My uncle Sam also took care of all the financial and medical expenses that my Grandfather (also a holocaust survivor) had; who was bedridden for fifteen years. I will never be able to repay my Uncle Sam, who first handedly kept him alive and well for so long, thus giving me such a great privilege of getting to know my Grandfather who taught me so much. At least now I still have my Grandmother who I love so much. My Uncle Jerry, of blessed memory, died eight years ago. The pain and suffering my Grandmother had then, can clearly be seen in her eyes today. It would be very painful for me and my family to see her go through any more pain and suffering if she were to be seperated from her son again. My whole family is dependent on Uncle Sam to keep my Grandmother alive and well, therefore, when I heard the tradgic news that my Uncle Sam might not be there for her, it sent a cold shiver through my body and caused a great tumult among my family. I remember ever since I was a little boy watching my Uncle Sam, how he took care of my Grandparent's with such devotion and care, and how he was alway's there for them no matter how busy he was. My Uncle Sam has made an everlasting impression, since then, on me.

    Everytime our family arrives in Miami, we have a car waiting for us which my uncle Sam had set aside for us to use throughout our stay in Miami. He does not stop trying to help us in any way he can with a loving smile and warmth that he expresses upon us, even after we tell him that we don't need any more assistance. My family will never forget

the night we arrived in Miami, and had already checked into our apartment, that we realized we did not have enough mattresess to sleep on that night. We all knew at once that the next step would be to call Uncle Sam, who within minutes brought over air mattresess directly to our door. Not only in Miami did we have to come onto Uncle Sam, but also in New York (where we live). Uncle Sam has over and over again pulled us through some very pressing times.

My uncle Sam's children, my cousin's, have a reflection of Sam in them. Their kindness, care, and warmth that they act towards me, clearly indicate's what type of father is raising them. My Uncle Sam put's tremendous effort into raising his children to be of good character and to go in righteous ways. He is the most important person in their lives. If Sam were to be in a situation that he cannot be there for his children on a constant basis it would have a very negative and detrimental effect on his children.

My Uncle Sam is like a teacher to me. He has set me straight in so many way's teaching me such virtues of life. I am a better person today because of my uncle Sam. When I first heard of the situation my Uncle Sam was in, I wanted to fly down to Miami to relate to anyone that could make a difference, just how special my Uncle Sam is to me and how much we need him to be with us. Instead I have decided to write to your honor directly, hoping that my words would find a place in your heart.

I would like to thank your honor for taking the time to read this letter, and for understanding the importance of this letter. Looking very much forward to be together once again this year with my Grandmother and Uncle Sam for the passover holiday.

Yours Truly,
Joseph Shafer

November 27, 2005

Dear Judge Zloch,

I am writing this letter to express my admiration and gratitude to my uncle Samuel Burstyn. When I was only 13 years old my father suddenly passed away at the age of 43 leaving my mother to raise four young children by herself. As a result of my father sudden death there was much anxiety in our family regarding our future. We did not know what to expect and what would happen. My uncle Sam, as he is affectionately called not only took upon himself the responsibility of my fathers affairs but guided me and my siblings about all aspects of life from our education needs to our health needs and beyond. Every matter in our life was tended to with love and patience. So many families crumble and basically fall apart when a family member passes away, thanks to my uncle Sam's dedication and loyalty to me, my siblings and my grandmother our family has become productive members of society and has stayed in close and loving contact with all our family. It is for this reason your honor that I ask you not to detain my uncle any further so many people rely and depend on him for their daily survival. Detaining him further would cause unnecessary trauma to many who have already have suffered so much.

Thank You,

Joseph Burstyn

(305)469-6543

# Exhibit 25

Dear Honorable Judge Zloch

My name is Alfredo Buitrago j.
I was Mr Burstyn's roomate at F.D.C miami
while he was detained there awaiting to be release
out on bond.
Your honor I'm writing this letter to give you a
little bit of information about how Mr Burstyn
helped so many inmates out giving the best
legal advise he could give them at that mom
ent. He always went out of his way to help
anyone he could. He treated everyone with
lots of respect and love. Despite of the high
maximun security facility he still remained
positive and friendly with everyone including
Federal correctional officers. Because of the
buildings high security proceedures Mr Burstyn
access to his legal aid was limited and when
he would be allowed to be with his legal aids
and when that accured it was on the same
time he would get his medecine and he
would then miss out on getting his daily medecine
and his right to practice his religion was also
limited.
It was very difficult for mr Burstyn to get
his food because again of the schedule
he would be allowed to have with his lawyers

Your honor I decided to write you this friendley letter in regards to Mr Burstyn Because I had nothing to hide about who this man is. He is one of the most nicest persons I have ever known in my entier life.

I'm doing very well now in the free world do to Mr Burstyns assitence in helping me get my Drivers license back and a good job. This man just came out of no where and made a few Phone calls and changes my whole life around. I'm now a man man and soon to became a father and a true family man like God wants us to be. I'm not writing this letter so that you can feel pitty for him I did it because I wanted you to know of how it was when Mr Burstyn was there detained with us.

The entier building in cluding federal officers and staff believed he shouldn't have been in there. Do to the way he behaved and treated everyone.

Your honor I will pray that on February 4 2006 at Mr Burstyns sentencing may God give you the wisdom, Power and Knowledge to make the write choices that will affect Mr Burstyn his entie family, friends and community.

Thank you for you time

May God Bless you always     Respectfully
                             submitted

                             Alfred Burkes

Esther F. Ridenhour
5135 Beechwood Road
Delray Beach, Fl. 33484
561-495-1985

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Dear Hon. Zloch:

Over the past fifteen years, Sam Burstyn has been a partner in several real estate projects with CMC Group, Inc. I have been Controller for CMC Group, Inc. for over fourteen years.

The first time I met Sam was at an opening celebration for one of our projects. Sam was with his wife and his two young children. My first impression of Sam was that he was very proud of his family and wanted them to feel like they were part of this beautiful new project. He wanted them to share his excitement and to be a part of something that was important to him. It was heart warming to see a father so attentive to his children.

I have had many conversations with Sam over time, and almost all of them have stemmed from matters of business, either partnership issues or legal consultation. Sam has unfailingly given me excellent advice and has always been a source of strength and dependability. Over time, from those conversations, I have become lucky enough to call Sam Burstyn my friend.

When I think about who Sam Burstyn is, I first and foremost go back to my initial impression. He is a man, who above all else, cherishes his family. I remember the eulogy Sam gave at his brother, Jerry's, funeral. Sam was grief stricken and stunned by the loss of his younger brother, but he immediately gave comfort to Jerry's friends and family. He asked that we all make Jerry's life matter, by having his death compel us to make positive changes in our own lives.

I don't remember Sam's exact words but, the way he turned his grief into a positive reinforcement of all that is good, moved me. It inspired me.

What has transpired over the last year has been hard for a lot of Sam's friends to comprehend, primarily because of Sam's passion for the law. Sam didn't just excel as a lawyer, he truly loves the law. To Sam, every nuance of the written word, and the integrity of its interpretation, matters.

I never saw Sam Burstyn in a court room and am sad that I never will.

Sam has lost many things over the last year. I can't imagine any greater punishment for Sam, than that he was unable to care for his family last year. Nor can I imagine a more profound shame, than that he has betrayed the law he so esteems.

I humbly ask Your Honor to consider the time Sam has served, and his personal and professional losses, a just and final sentence for his actions.

Sincerely

Esther F. Ridenhour



**The Comprehensive Companies**

A Financial Services Organization

Comprehensive
Benefit
Planning, Inc.

Comprehensive
Financial
Planning, Inc.

Comprehensive
Underwriters
Inc.

Comprehensive
Insurance
Brokers, Inc.

Ronald G. Stone
President

January 20, 2006

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re:   Samuel l. Burstyn

Dear Judge Zloch:

Sam Burstyn is one of my very closest friends. He is like a brother to me. Our relationship spans 36 years originating when we were undergraduate student leaders at the University of Miami. Sam was President of Student Government while I was President of the Interfraternity Council. Although we were from extremely different backgrounds and political and social philosophies, our mutual commitment to our student constituencies and our love of alma mater was the original glue which formed our bond which has remained strong, and grown, over these many years.

It is impossible for me to adequately express my disappointment and dismay over this mess in which Sam finds himself, by his own doing. The incredibly poor judgment he used in befriending and getting deeply involved with people he knew to be living unscrupulous lives has put in jeopardy all the professional, and personal, stature he has gained by the brilliant application of his immense talents since the start of his legal career. The loss of personal and professional stature, which has already occurred, is far more punishment than any further incarceration he may be required to suffer.

Judge, I wrote to you once before on this matter, several months ago, when you were considering bond for Sam. At that time I was willing to put at risk my personal assets to guarantee Sam's bond. I am not a poor man, but I am far from a wealthy man. Yet my confidence in Sam and his commitment to do the right thing for his family, his community and, yes, the law, in spite of the judgment he applied in these unfortunate relationships, is so strong that I will stand up for him, with unwavering support, in an effort to persuade you of his superb character in hopes that you can bring yourself to allow him to get on with rehabilitating his reputation by continuing the contributions he has always made to others, both family and community. In so doing I put at risk, like my assets previously, my own reputation.

2103 Coral Way
Suite 200
Iiami, Florida 33145
Ph.:(305) 858-2260
Fax: (305) 858-8124



**The Comprehensive Companies**

A Financial Services Organization

Page 2

So be it.  Sam is worth any risk, and he will NOT, again, disappoint any of us, certainly including you, just as he has never disappointed his many family members who depend upon him for their emotional and financial sustenance.  In addition to his own four children, he supports his aged mother, a concentration camp survivor, and the children of his deceased brother, who died eight years ago of a heart attack at age 40.  Sam's deep commitment to his faith and his family are well know to all who have ever been associated with him.

For twenty four years I have served the University of Miami as a member of its Board of Trustees, and for fifteen years as a Director of the New World Symphony.  Many times I have turned to Sam to assist, financially and in other ways, these jewels of our community.  Never has he turned me down nor flinched in his acceptance.

Your Honor, the damage has been done to Sam.  In your careful deliberations regarding his sentencing, please consider the family, friends and community who need the return of the REAL Sam Burstyn to whom we have all looked so often for wisdom and support.

Thank you for hearing my feelings.

Very sincerely submitted,

Ronald G. Stone

January 13, 2006

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re: Samuel I Burstyn

Dear Judge Zloch,

I am writing you today in regards to Mr. Samuel Burstyn. My name is Stan Romero. I am a Miami native. I am a working class father of two, who was introduced to Mr. Burstyn through a mutual friend, Barbara Becker. I was very surprised by how much common respect and courtesy that prevailed from the beginning of our relationship four years ago. It was very astonishing to me coming from a man of his stature. I have had the pleasure of also working for him. He was gracious enough to provide me the opportunity to exercise my design skills through landscaping his property. I was aware that he could bring in bigger more professional companies that could do the job in a more timely fashion, but he took the chance on me. He had faith in my vision.

I personally look up to Mr. Burstyn as seasoned man of life, especially in the realm of his education and fatherhood. He has always taken the time to sit and discuss and educate me on any inquiries and any aspect of life that I had. He has always impressed on me the importance of maintaining a close and loving relationship with my sons, as fatherhood was really the only thing we had in common. Several times I have knocked on his door and clearly could see it was not appropriate time, but it never stopped him from taking a moment out of his hectic day to spend with me. He became a mentor to me in our relationship. I knew better then approach with any legal or business affairs, as I am sure he was inundated with such requests all the time. Instead, to me, he was a sage, brought into my life as a blessing and teacher. Although we are men of different religious upbringings, we, through our friendship, found a common faith. We spent most of our time recognizing Gods glory.

One particular afternoon I came to his property to finish up some loose ends, my children happen to be with me due to my schedule. I was unsure and nervous how he would react at me having my sons with me at work. But I needed to finish. He came out and to my surprise the introduction lead to a wonderful afternoon together. He invited my family in and we shared a meal and enlightening conversation. I was so proud to have a friend of such wisdom that would joyfully take this time and spend with us as if we were his own. It seems that he took great joy in listening to my children and answering their questions. He clearly has a passion to guide and educate the younger generations.

Mr. Burstyn is a very important figure in my family's life. My sons often ask when they can visit with him again. I believe that his previous incarceration was a blessed experience for him. He has proven to me, to be a loving man with an open heart eager to educate. If a man such as myself could benefit from his teachings I can honestly say that Mr. Burstyn has a lot of goodness yet to offer. So if the court could please show mercy

towards my friend, the mentor, the father, the lawyer, the person, Samuel Burstyn it would make a difference in a lot of young men's lives.

*Thank you!*

Stan S. Romero

COLUMBIA UNIVERSITY

*College of Physicians
and Surgeons*

Family Medicine
64 Nagle Avenue
New York, NY 10040
212.544.1880 Tel
212.544.1870 Fax

January 13, 2006

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

**RE: Samuel Burstyn**

Dear Judge Zloch,

The following is on behalf of Samuel Burstyn, whom, despite infrequent contacts, I have known for over twenty-five years through my family. Although I am unfamiliar with the specifics regarding the matter at hand, I believe that I can offer some insight regarding his character.

Overall, I must say that I have always found Sam's integrity, warmth, and genuineness to be of the highest level. He has shared a love for antiques and art with our family, second only to his devotion to his family. It should be noted that his spirit appeared to have been impacted greatly by his failed marriage a few years ago. He has since been punishing himself for this marital situation, and I can only imagine the additional impact his ongoing legal issues have had on someone of such high personal standards.

Accordingly, I believe that this is a situation that warrants leniency, not so much for the benefit of Sam, but for the welfare of his children with whom he is so closely involved. If you should have any questions, please do not hesitate to contact me.

Respectfully,

Clifford D. Stark, D.O.
Assistant Clinical Professor of Medicine
Columbia University College of Physicians and Surgeons
212-877-3416
cstark@pol.net

**Columbia University Medical Center**

Robert Mosberg
One Dowling Ct
Old Westbury, NY 11568

January 12, 2006

Hon. William J. Zloch
Chief United States District Judge
Southern District of Florida

Re: Samuel I. Burstyn

Dear Judge Zloch:

I have known Sam Burstyn for more than twenty years, being introduced to him through mutual friends.  I have acted as a Stock Broker and Financial Advisor to him during that time.

In my dealings with Sam over the years he has been intelligent, extremely honest, and always fair.  His concern and devotion to his family and friends was always evident in our dealings and discussion.

It is my hope that your Honor may find that leniency is warranted in imposing sentence upon him.  Sam has penitently and fully expressed remorse, morally and legally, recognizing the grievous failure in his recent conduct.

Sincerely,

Robert Mosberg

Date 1-06-06

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re: Samuel I. Burstyn

Dear Judge Zloch:

The following is written on behalf of Mr. Samuel Burstyn who will be appearing before you shortly for sentencing. I am a retired child psychologist, father of a son with a history of learning disability, who is presently on the faculty of the Columbia University School of Medicine. He is a dual boarded physician, affiliated with the Olympic Organization and the International Gymnastic Association. I believe that his respect and admiration for Mr. Burstyn and the encouragement he provided, was an influencing factor. I am also an avid art and antique collector and share this ongoing passion with Sam. I was originally introduced to Sam by my godson, a then fledging attorney in the mid seventies. Sam was instrumental in guiding him toward a respected career. We have remained friends ever since.

I have also been acquainted with each of the Burstyn's four delightful children from birth. Sam's devotion to these children is unparalleled. The admiration they have for their father is a joy to view. The recent dissolution of Sam's marriage continues to be especially painful for him This is further amplified by the impact it is having upon their children. It may be significant to relate that during this period which was approximately three or so years ago I noticed that Sam seemed to be confused and a bit apathetic. This was a far contrast from Sam's usual self-confident demeanor. I had never known him to be as such. Many times I thought of suggesting intervention but was very reluctant to do so. He indicated that he would be o.k. and I had hoped that it would be so.

I find the events leading to the present situation to be baffling and so incongruous with my perception of Sam, whom I believe I know well. I find him to be a remarkably warm, loving and engaging person. He is a highly sensitive person who is most ethical, honest and fair. I have observed numerous instances of kindness, compassion and generosity. Sam is well-liked by all, friends and strangers. I cannot see how further confinement would be productive. He is still in the process of overcoming the consequences of the previous isolation. The detrimental effect upon the bright and productive future of the four children should not be overlooked. Accordingly, I respectfully beg that you see fit to avert further hardship.

Most Respectfully Yours,

F. Richard Stark

Dr. F. Richard Stark
11008 Spring House Ct.
Potomac, Maryland 20854   Tel. 301-983-9621     Fax. 301-983-9621



OASIS
CHIROPRACTIC CENTER

January 5, 2006

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re: Samuel Burstyn

Dear Judge Zloch:

Thank you for taking the time to read this letter. My name is Myles Starkman. I am a
Doctor of Chiropractic and have been practicing in Miami since 1980.

My father was a County Court and then Federal Administrative judge. He told me that
much of his job was about separating fluff and fiction from the facts, and then making the
best decision he could. He also taught me to tell the truth and speak from the heart. The
purpose of this letter is to help a long-time friend and patient, Sam Burstyn, by sharing
with you the kind of man I know him to be, and asking for leniency on his behalf. I will
leave out the fluff and fiction, but I cannot avoid a strong bias for Sam- he has been a
patient and friend for fifteen years.

When I opened an office on Miami Beach in 1990, Sam was one of my first patients. He
was already interested in "alternative" healthcare and immediately understood the
benefits of spinal care and grasped the philosophical concepts of chiropractic. He was
what I would consider an ideal patient, and over time our professional relationship also
became a personal friendship.

He was intelligent, articulate, spiritual, philosophical, and passionate about life and his
work. I found him intense, but compassionate, caring, and always willing to help others.
He was a great advocate for me, and was always referring, or at the very least
encouraging people to check out chiropractic. One time I stopped by his office for lunch.
At his insistence we went to every employee's office to check the ergonomics of their
worksite and to talk about their health. Sam also has an incredible business sense and is
able to analyze situations and come up with solutions. He often gave me ideas on how to
build or improve my practice, and encouraged me to follow through. He was very
generous with his time and energy.

One quality of Sam's I admire was his dedication to balance in life. He was passionate
and committed to work, and even more so to his family. He always made time to be with
his children, and cared about them greatly. I saw many instances of him working his
schedule around his children's. I was always impressed with his devotion to his children
and their success. His daughter, without telling him, interviewed and got an internship at

my office.  On his next visit, Sam's joy at Alana's action was obvious.  He shared he was so happy that she sought employment in a place where she could learn about healing and compassion and that she applied here on her own, without asking him to "put in a good word".  Happily, I often observed this loving, private side of Sam, because many only saw the assertive, legal, business side of him.

Sam is also active in the community.  Sam felt it important to be involved in the arts and civic matters; it was a duty not to be avoided.  He was involved with the symphony, among other things, and frequently encouraged me to go, and get involved.

These are just a few of my experiences with Sam.  He has been, and continues to be a great mentor and friend.  I know Sam to be an incredible human being, with much to offer his family, friends, and community.  His behavior in this matter was not typical at all, and I know he has experienced incredible shame, embarrassment, pain and loss as a result.  I also know he feels great remorse for his actions.   Your Honor, I truly hope you will rule with leniency in this case.


Sincerely,

Dr. Myles Starkman

# Orso, Inc.

January 2, 2006

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re: Samuel L. Burstyn

Dear Judge Zloch,

I would like to introduce myself. My name is Donato Masucci. I was born in Italy and moved to the United States in 1980. I started a small construction business in 1982 and am presently still operating said company. I met Sam when I was doing work on Sunset Island II while working on a project. We discussed doing some renovations in his home (located in the same neighborhood). I worked on many projects in his home. During this time, we became good friends.

I do not know Sam as a lawyer, but can tell you that as a person, he taught me to work hard and to be honest. He told me that if I did those things, that I would succeed and people would respect me.

As an immigrant/US Citizen, I believe that when someone has remorse and wants forgiveness, they should be given another chance. I hope that you will allow leniency for Sam in this situation.

Thank you for the opportunity to write you a letter on Sam's behalf.

Yours truly,

Donato Masucci
President/Building Contractor

DM/cd

ORSO, INC. -- 390 NE 167 Street -- North Miami Beach -- Florida 33162
Phone 786 428 0563 Fax 786 428 0564
CBC#059495

Melissa Boe
P.O. Box 140093
Coral Gables, Florida, 33114


Honorable William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida


Reference: Mr. Samuel I. Burstyn

31 December, 2005


Dear Judge Zloch,


As a long-time friend of Samuel Burstyn, I am motivated to write to you in an effort to
give you insight into the character of the man I have come to know, trust and respect over nearly
two decades. While my initial introduction to Sam had to do with providing my business related
services to his family, I felt instantly welcome in his home. Within an hour of my having first met
him, Sam entrusted important family possessions into my care for repair and removal from his
home. In my work as art and antiquities conservator, the state of trust which I must cultivate with
a new customer does not always occur upon the first meeting, and the manner in which I felt
comfortable and that I was respected as a professional and was trusted with important and
irreplacable family heirlooms, was a significant event for me. Over time, I had many more
occasions to be a visitor into his home, and had the great pleasure of getting to know his wife,
Angela, his children, Daniel, Alana, Sean and little Ava, as well as his extended family at many
large family gatherings and celebrations.

During the many years of my friendship with Sam and his family I would frequently see
references to Sam in the media regarding the legal profession in which he devoted such a large
number of days, weeks and months to. Those of us in the community who know Sam know that
although he has a billiant mind and can thoroughly explore, understand and immerse himself into
every aspect of law and the matters concerning law and advocacy, and indeed, worked hard to
become a very well known attorney and advocate, his first and true love and devotion is to his
children. The requirements of his demanding profession and the long hours and travel away from
his family were gradually tending to pull him away from the demands of the job, and instead,
moving toward allowing him to spend more time in the effort to raise his children. I see this
period as being the happiest I remember him; moving away from the demands of the courtroom
and criminal defendants, and applying his fatherly wisdom and sweat efforts to the challenges of
raising teenagers in South Florida. Indeed, I believe even Sam would tell aquaintances that his

most satisfying accomplishments and happiest memories are the times such as rock climbing out West with his son Sean, or events such as his efforts to join in the newer, youth-oriented winter sports with his sons, and just prior to completing an out-of-control crash into a huge snow drift hearing his sons yell 'Go for it dad'. With Sam, it is never about the money, the glorification of professional accomplishments, or accolades in the media, it is about the rare and fleeting *moments* which a parent can share and treasure with his children. These are the types of things we talk about. In fact, one who visits Sam's home might be amazed at the sheer number of people who call or stop by unannounced for advice on any number of life situations; things which range from kids, relationship problems, sports questions. I have wondered many times how in the world Sam is able to listen so patiently and graciously to people who seem to constantly seek his advice and support, and I have mentioned to him before that I don't know how he does it and still finds time to have a personal life. And while I do not profess to know all of the aspects of Sam's personal life and his important role as the head of his extended family, particularly since the passing of his beloved brother Jerry, I do know he carries the weight of many people's emotional, physical and financial needs on his shoulders. I also know only in limited realm that Sam immerses himself in the family faith and provides good counsel to many who seek help in that reference. In fact, I do not know of a time that I have ever heard of someone who asks Sam for a good reference, extra work or an 'emergency' loan that he has said no. These are aspects of Sam's generosity and character that do not make newspaper headlines or draw any attention from the media, and in fact, I know that Sam would loathe any of these very personal tasks which he finds so important to his life being mentioned even in this context.

Certainly I understand that Samuel Burstyn is a well known figure in the South Florida community, and he has indeed given time, effort and financial resources to many public and private institutions. I believe that had I not had the opportunity to get to know him and his family, media coverage of men in high-profile positions such as his tend to blend into a melange of the typical well-meaning, well-heeled philanthropists who throw big parties and spearhead large fund-raising events in the effort to acquire good press and big contributions in their name. It would be wrong to lump Sam into such a group of men and women who use media exposure to advance their careers or stature in the community, and in fact, I would say he is just about the polar opposite of such a person. Instead of attending lavish soirees and mingling with political types, Sam would likely more often be found driving his kids to Disney World for a quick, spontaneous vacation, or taking the kids to a Hurricanes, Heat or Marlins game: true community participation on a more human level.

In the vein of his complete desire for the involvement of every aspect of his children's growth and well-being, and their immersion into the South Florida community, I can not ask strongly enough for the Court to grant leniency to Samuel Burstyn. His presence in their lives on a daily basis is the most important role his life requires in these times, and in the near future, and I personally feel that he has already surrendered such a precious amount of that limited commodity to the community as a result of his many months of incarceration, more sacrifice of his children's emotional and mental well-being is not prudent or wise for their future paths in our community, and their healthy growth. While I understand the nature of the judicial system and the judgments of punishment which must be meted out, it surely seems as though much consideration should be given to the nature of the acceptance of guilt and the manner in which the one who is to be judged

has resolved to right the course of one's path and journey in this life, life which we are all so fortunate to experience. Having no background in law myself, but rather, possessing a strong interest in legal matters as an American citizen who respects the law and our judicial system, I am near daily bombarded through the media of the horrible nature of crimes and the people who perpetrate all manner of such offenses, including those people with no remorse for their actions. I strongly believe that decisons on what shall be the sentences given to those of us citizens who are judged to have gone astray from the laws of our society should be given in accordance with the thoughtful consideration of how the one to be sentenced understands, accepts and resolves to make right the error of ways. I am astonished and quite honestly, afraid, often, when I strain to understand the appalling, and seemingly light sentences which are given to career criminals with dark intentions and willingness to continue on that path, with possible endangerment to members of society, and compare that to months of confinement for a fine man such as Samuel Burstyn; a man who has enriched and improved the lives of so many people. I know that a man in your position, Judge Zloch, must also struggle mightily with weighing and balancing all of the issues which factor into the serious act of sentencing a fellow citizen to any level of sentence, even a level of probationary time, and that difficult responsibility must tax your soul and your intellect. I do understand though that you are a fair and thoughtful Judge, and I simply ask that you take these thoughts of my understanding and friendship with Samuel Burstyn as being a person of great character and strength and generosity, as a factor in your decision making as to how Sam will be able to move forward in what remains of his life, with his children and their paths in life. I truly feel that any additonal loss of his presence in their daily lives would be too great a loss, and a rationale for that outcome can be made when considering the larger context of Sam's productive and resourceful lifetime, his many contributions to the community at large, and his desire to correct his path and move forward in a new posture.

I thank you for the opportunity to have offered these thoughts and reflections of a person in whom I have always relied upon for trust and superior judgment in all matters.

Respectfully,

Melissa Boe

# MASSIMO VALENTINI

December 30, 2005

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

      **Re:**   **Samuel I. Burstyn**

Dear Judge Zloch:

My name is Massimo Valentiní. I am and have been employed by CMC Group Inc., a Real Estate Development company for the past 13 years. I met Mr. Samuel Burstyn approximately 12 years ago when he was a partner in one of our Development projects, the Bristol Tower Condominium.

In early 1994, I was asked to assist Mr. Burstyn in the design and development of his residence in Miami Beach. During the course of that time Mr. Burstyn and I developed a close relationship. Today I am proud to call him a friend.

Sam comes from a very close, tight knit, religious family. Religion & family unity are elements Sam has implemented in raising his own children. He is very devoted to his four children. Sam approaches his friendships with loyalty, patience and generosity. On many occasions, Sam has been insightful and kind in providing me guidance in my relationship with my son during his difficult teenage years. Thanks to Sam's intuitive advice, today my relationship with my now 21 year old son is not only that of Father/Son, but as friends as well.

Sam has acknowledged his mistakes in these matters and has been punished both personally and professionally. In light of these punishments he has received already, I hope that Your Honor may find grounds for Leniency in this case. I know that Sam is responsible not only for his immediate family and mother, but also for the family of his deceased brother. Any further incarceration will punish these people as well.

Thank you for your time and consideration.

Sincerely,

Massimo Valentini

5326 Southwest 33 Avenue, Hollywood, FL 33312 • 954-983-7511

Andrea Frederique
801 Meridian Ave Apt. 2G
Miami Beach, FL. 33139

December 21, 2005

Hon. William J. Zloch
Chief United States District Court
United States District Court
Southern District of Florida

Re: Samuel I. Burstyn

Dear Judge Zloch:

I have known Mr. Burstyn through my friend and employer Barbara Becker, since he helped her through her divorce.

I see Mr. Burstyn as a wise man, who you can count on as a friend whenever you need him. Whenever I needed his advice he was right there. He is a kind, hard working, and reliable man. He is dedicated to his family and a blessing to society and his community.

With kindest regards,

Andrea Frederique

Barbara Becker
PO Box 190 818
Miami Beach, FL 33119

December 19, 2005

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re:    Samuel I. Burstyn

Dear Judge Zloch:

I have known Sam since he represented me during my divorce proceedings.  I find him to
be a kind, lovely friend who helped me in my time of need.

He is a great friend and mentor to my kids.

I can seek advice from him at anytime knowing he will give me great honest answers.

He is a real benefit to society and I am glad to have him in my life.


With kindest regards,

Barbara Becker

# Ken Gorin

November 30th, 2005

The Honorable William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re:  Samuel I. Burstyn

Dear Judge Zloch,

Please allow me to introduce myself.  My name is Ken Gorin and I am a personal friend of Sam Burstyn.  I have known Sam for over ten years. We both have children and have enjoyed many of life's celebrations together. Sam has always impressed me with his honesty, sensitivity, integrity and devotion to his family.  He also has given generously of his time to many community activities.

When each of my daughters was a Bat Mitzvah, Sam always demonstrated his strong religious beliefs. He used the opportunity of one of the most important milestones in each of their lives to teach them life's important lessons. By doing so, he affected our family's life in a most positive way which will never be forgotten.

I respectfully request leniency from the court in their decision.  The time that Sam has been away from his family certainly has been enough punishment. In my humble opinion, any further time away from his family will not be in any ones best interest.

Sincerely,

Ken Gorin

KG/laf

430 Grand Bay Drive     # 302     Key Biscayne, FL 33149

MARIANA A. GONZALEZ

November 22, 2005

**Hon. William J. Zloch**
**Chief United States District Judge**
**United States District Court**
**Southern District of Florida**

Re:   <u>Samuel I. Burstyn</u>

Dear Judge Zloch:

I am 51 years old, married with two children and living in Bogota, Colombia. I have known Sam since 1982. We met him and his wife at my parents' home in Key Biscayne then. My father considered him a friend as well as counsel. Sam did all the legal work for a guardianship plan when my then 23 old brother, Alex, suffered an accident, which left him in coma and later severely handicapped. Through the years Sam always kept abreast of everything that was affecting my brother and family, it was a long recuperation process.

I knew Sam as a family man, a doting husband and father. We attended his oldest son's Bar Mitzbah; our daughter Isabela is about Daniel's age. With the passage of time my father's friendship with Sam solidified and dad would tell us what a superb lawyer and businessman he had become, and yet he remained the same kind person always. In early 2001, we were still living in Miami and a business partner performed an "involuntary transfer of assets" and in effect took my husband's intellectual property.

My father had recently passed away but nontheless my husband and I sought Sam out as legal counsel. He was there for us and took the case, telling us that he would see it through but only with the greatest dignity as backstabbing is something he does not tolerate. It took time but the US patent was returned to my husband, and it could not have been a more dignified process. The former partner who attempted to steal Jorge's life's work was an attorney and Sam and his legal team proceeded through final hearing despite our inability to pay regular fees.

We returned to live in Colombia so that a product could be developed with the patent. It has taken years but the project has been successful and if the marketing efforts are as successful then many thousands of new jobs will be provided in an area that until now has been besieged by unemployment and the drug trade. This has given hope to many. (Please see www.CISukkarSA.com.)

CRA 1ª ESTE # 74-14    T6 – APTO 501  BOGOTA, COLOMBIA
PHONE: 571-210-0807 • FAX: 571-210-2602

Sam is a person beyond any pettiness and people either like him or dislike him tremendously.  If I were to count the true friends we have, the fingers of one hand would suffice, and Sam is amongst those.

Please, Judge Zloch, consider our request for leniency for Samuel I. Burstyn.  He has suffered enough and his contributions to the good of the community and to all are far greater than any error he may have committed.  Ours is not a nation that condones torture and that is just what excessive punishment is.  Many know of Sam's brilliance in a court of law; we know of his kindness and humanity and how much he has to give and the blows that life deals us only accentuate these traits.  Your Honor, please give Sam the opportunity to contribute, rather than keep him apart from his family and the world for any prolonged period of time.

 I thank you for your kind consideration to my plea.


Sincerely,


Mariana A. Gonzalez

MAG

# Exhibit 26



*Michael Hursey, P.A.*

ATTORNEY AT LAW
5220 SOUTH UNIVERSITY DRIVE
SUITE C-110
FORT LAUDERDALE, FLORIDA 33328

Member of FL & IL Bars

(954) 252.7458
FAX (954) 252.3353
mhpalaw@bellsouth.net

January 26, 2006

Honorable William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida
299 East Broward Boulevard
Fort Lauderdale, Florida 33301

Re:   Samuel I. Burstyn

Dear Judge Zloch,

I write you to give you some thoughts to consider before you pass sentence on my friend and colleague, Sam Burstyn. As a former Assistant U.S. Attorney, and a current defense attorney, I have seen many individuals that pass through the court system. Sam is an example of not only a great lawyer, but a great human being.

I, as well as mutual colleagues that Sam and I have, know him as an honest, hard-working, and generous person. On several occasions, Sam would, on his own initiative, send me court opinions and legal articles on cases he knew I was litigating. I could always call him and bounce ideas around about legal strategies to use.

On a personal note, Sam gave me access to his home in an area where I would vacation with my family. He shared this with others, as well. This is typical of his general caring and sharing attitude.

I have met with him several times in person since the instant case was brought. From my personal observation, after having known Sam for 14

years, I can see that he is sincerely contrite. One of the first things he told me at the first such meeting, was revealing. He said how embarrassed he was not for himself, but for the negative publicity it brought upon the legal profession in general.

I would ask that you take these comments into account when you fashion his sentence. You have available to you several options that could comprise a just sentence under the circumstances, that would not include any further incarceration. If you could extend mercy to Sam, this would illustrate that our system can individualize a sentence for someone like Sam who still has so much to offer.

Thank you.

Sincerely,

*Michael Hursey*

MICHAEL HURSEY, Esq.

MH: ss

January 25, 2006

Honorable William J. Zloch
Chief United States District Judge
USDC – Southern District of Florida
Room 202B
299 E. Broward Boulevard
Ft. Lauderdale, Florida 33301

Re.    Samuel I. Burstyn

Dear Judge Zloch:

My name is Robert Kent Burlington and I reside in Coral Gables, Florida.  I am an attorney with the law firm of Burlington, Weil, Schwiep, Kaplan & Blonsky, P.A., located in Miami, Florida.  I have practiced law in Florida for more than twenty-seven years.  I graduated from the University of Miami School of Law in 1978 and joined the law firm of Greenberg, Traurig, Askew et al.  I was a partner with that firm where I practiced for ten years before starting my own firm in 1988. Our practice concentrates on general business and complex commercial litigation.

I first met Sam Burstyn while I was an undergraduate at the University of Miami.  In 1971 the University of Miami was, unlike today, widely perceived as a "party" college.  Indeed, the student bookstore sold tee shirts with the unflattering boast: "Sun Tan-U."  At that time, most 18 and 19 year old college students at UM were more focused on fun and freedom than with serious matters such as studying, developing a sense of community, or committing to a course of conduct to improve

Honorable William J. Zlock
January 25, 2006
Page 2

themselves, the quality of education, or the quality of students at the university. Sam Burstyn, however, was atypical of the vast majority of UM students. He was a serious student and he was serious about establishing a productive and beneficial relationship with the President of the university, Dr. Henry King Stanford, because Sam wanted to participate and contribute to Dr. Stanford's mission to improve the quality and reputation of the university.

Sam was outspoken about the duty of students to help re-shape the image of the university. He sought to stimulate and lead the student body to recognize their stake in a shared common purpose with the university. In contrast to the vast majority of undergraduate students at that time, Sam Burstyn was community minded, responsible, focused, and willing to provide leadership, even at the expense of his popularity among his fellow students. Through his leadership and position on the governing student organization, a discernible change in the attitudes and values of the student body was palpable. This dynamic coincided with the early beginnings of a multi-decade transformation of "Sun Tan-U" to the outstanding university we are blessed to have in our community today. With full credit to Dr. Stanford and his successor, Tad Foote, the birth of a willing and more enlightened student body can be traced to Sam Burstyn. The vision he shared with

Honorable William J. Zlock
January 25, 2006
Page 3

Dr. Henry King Stanford was, as I look back, quite remarkable, given his youth and the times.

When Sam Burstyn and I met again decades later it was as adversaries. He possessed the same focus, clarity of thinking, and determination as I remembered about him from college. In more recent matters in which I opposed him and his clients on behalf of my clients, Sam was typically tenacious, thoroughly prepared, exceptionally bright, and always ethical. Despite the magnitude of animosity between our respective clients and the enormity of the dollars at issue, I never had to send or ask for confirming letters to memorialize any of my dealings with Sam Burstyn. He had integrity and never once abused my trust. As in college, we did not become friends in a social sense, but I do consider and value him as a friend in the professional sense and I would welcome a social friendship with him, notwithstanding what has transpired.

I recently contacted Sam and asked if he would permit me to write a letter on his behalf. I think he was shocked by my request because he was unaware that I thought so highly of him. While Sam Burstyn committed a wrong, a crime, he is not a wrongdoer or a criminal as an overall person. Sam's wrongdoing is not representative of a course of conduct and it should not be the sole measuring stick used to define him as a person.

Honorable William J. Zlock
January 25, 2006
Page 4

I wish to share my observations and feelings about Sam Burstyn as a parent. Sam's son, Sean Burstyn, is a very close friend of my oldest son. Both boys are fifteen years old and tenth graders at Gulliver High School. Sean Burstyn has traveled with our family and spent many weekends in our home. Our son has spent many weekends at Sean Burstyn's home, even after Sam was arrested. I would not have permitted those visits if I was at all uncertain that my experience with Sam were not reflective of the true person.

Sean Burstyn is the most welcomed of our son's many wonderful friends. He is an exceptional young man, mature beyond his years, thoughtful, polite, respectful, and kind. My wife and I admire him and wish that our oldest son would spend even more time with him because he is such a positive influence on our son.

Before becoming a lawyer, I was a school teacher. As a teacher I was exposed to hundreds of teenagers. As a former teacher and now as a parent, I know that teenagers do not simply become wonderful young adults on their own. Sean Burstyn is the embodiment of the values and teachings of his parents. I want Your Honor to know that Sam Burstyn has excelled and succeeded as a parent, as evidenced by Sean and Sam's other children. Being a great parent is an enormous part of Sam as a whole person.

Honorable William J. Zlock
January 25, 2006
Page 5

One of the things I admire about Sam as a parent is that he and his former wife have done exceptionally well in fostering their children's love, affection, and respect for the other parent, notwithstanding the dissolution of their marriage. Most divorcing couples fail in this regard. I consider this another reflection of good character, especially during times of personal challenge, and it is part of Sam Burstyn as a whole person.

None of the foregoing excuses the conduct that brings the occasion of this letter. But there is much good in this person and his transgression does not fairly define the man. I hope that Your Honor will employ a broad measure of the man and thereby gauge him as a complete person. I accept that Sam's wrongful conduct is one aspect of that measurement. But his many accomplishments and contributions are the truer and more telling traits of the whole person than is the out of character conduct that brings him before the court.

Because Sam's family has suffered as a result of his conduct, Sam has doubly suffered. Moreover, the nature of his incarceration (pre-trial detainee with fewer basic privileges than accorded post-trial detainees) made the impact and duration of his incarceration greater than the actual time. I visited Sam on two occasions while he was imprisoned and I saw his pain and angst. I also saw his genuine remorse and it is unmistakable. I sincerely believe that a lengthy

Honorable William J. Zlock
January 25, 2006
Page 6

additional incarceration will not serve the community or the justice system in any discernible way.

I respectfully urge Your Honor to be as lenient as you are permitted to be in delivering a sentence appropriate to the wrong, but which is tempered by the good person he truly is and will continue to become. Thank you for taking the time to consider my views.

Very truly yours,

Robert K. Burlington



ROY BLACK
HOWARD M. SREBNICK
SCOTT A. KORNSPAN
LARRY A. STUMPF
MARIA NEYRA
JACKIE PERCZEK
MARK A.J. SHAPIRO

**BLACK SREBNICK KORNSPAN &STUMPF**
═══P.A.═══

CHRISTINE M. NG
JARED LOPEZ
KATHLEEN P. PHILLIPS
AARON ANTHON
MARCOS BEATON, JR.
MATTHEW P. O'BRIEN

E-Mail: *Srebnick@RoyBlack.com*

January 24, 2006

The Honorable William J. Zloch
Chief United States District Judge
299 East Broward Boulevard, Room 202B
Fort Lauderdale, Florida 33301

     **RE:  U.S.A. v. Samuel I. Burstyn**
            **Case No.: 04-Cr-60279**

Dear Chief Judge Zloch:

     Although I have practiced as a criminal trial attorney in this district for 13-plus years, including three as an assistant federal public defender, I have never had occasion to appear before you.  Nor did we meet when I served as a law clerk to U.S. District Judge Edward Davis from 1990-91. So this letter to you, on behalf of Sam Burstyn, is my opportunity to introduce myself to you while giving you my observations of Sam over nearly twenty years.

     I met Sam during the summer of 1987, after my first year of law school at Georgetown.  I was clerking in Miami for a criminal attorney for whom Sam had also clerked.  During that summer, I was asked to research and write a brief to the U.S. Court of Appeals for the Seventh Circuit.  Sam was also involved, so I spent many hours brainstorming legal issues with him.  He challenged me to think and inspired me to be creative.  It was readily apparent that Sam possessed an outstanding legal mind and a contagious passion for the law.

     Sam encouraged me to apply for a judicial clerkship, as he had done upon graduation from law school.  Perhaps my own youthful enthusiasm reminded Sam of what had first attracted him to our profession.  He suggested that I pursue both a trial court and appellate clerkship and told

Chief Judge Zloch
January 24, 2006
Page 2

me about U.S. Circuit Judge Irving Goldberg, whom Sam had met while clerking and before whom Sam had argued *pro bono* the First Amendment case of *Grosz v. City of Miami Beach*, 721 F.2d 729 (11th Cir. 1983). Thanks in no small measure to Sam's mentoring and advice, I was privileged to spend more than a year as Judge Goldberg's law clerk, following my clerkship with Judge Davis.

As an assistant federal public defender, I was assigned a case in which Sam represented a co-defendant. I took pride in standing beside him for the first time as a colleague of the defense bar, relishing the opportunity to strategize the case with him. Sam proved to be the courtroom's most aggressive advocate, the prosecutor's most intimidating adversary, and his client's most loyal champion.

Over the years, Sam and I crossed paths in the courtroom, but more often we would spend a leisurely Sunday afternoon quizzing each other on developments in the law. We also shared personal reflections about family, religion and friendship. By then, Sam had achieved enormous financial success in real estate and could make much more money over a power lunch with brokers and bankers than over candy bars with inmates at the FDC. I sensed that Sam continued to take on new cases and trials, not for the money, but rather for the exhilaration of the courtroom and his continued passion for the profession he chose. It is tragic, if not ironic, that Sam's own fate will now be decided in a courtroom where he must face the law to which he has been so devoted.

Perhaps Sam's zeal got the better of him. It happens to lawyers now and again, defense attorneys and prosecutors alike. Sam's financial health was so secure that I cannot imagine that he would break the law for a few more dollars. Instead, I suspect that Sam became too emotionally attached to his clients and took that one step too far in his representation.

I know that he and his children will suffer greatly by any absence occasioned by a sentence of incarceration. But Sam is also agonizing – albeit silently – that he must relinquish his law license and abandon the profession that has defined him since I first met him.

Black, Srebnick, Kornspan & Stumpf, P.A.

Chief Judge Zloch
January 24, 2006
Page 3


     I too am suffering, because the trial lawyer I looked up to and admired when I was a young eager beaver student has fallen.  I wish I had known of Sam's vulnerabilities, so that I could have offered my friendship and support then.  Perhaps I could have made a difference in his life, as he made in mine.

                Yours faithfully,

                Howard M. Srebnick

Black, Srebnick, Kornspan & Stumpf, P.A.



Kluger Peretz
Kaplan & Berlin

**Reply to**
ALAN J. KLUGER
DIRECT DIAL: 305.341.3121
akluger@kpkb.com

January 24, 2006

Honorable William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida
299 E. Broward Boulevard
Fort Lauderdale, FL 33301

   **Re: Samuel I. Burstyn**

Dear Judge Zloch:

  My name is Alan J. Kluger and I am the Senior Founding Partner of Kluger Peretz Kaplan & Berlin. As Your Honor is aware, I regularly appear in the District Courts in South Florida. I know that the sentencing process is a task that requires both wisdom and fairness. I am writing this letter on behalf of Sam Burstyn to assist you in your difficult task.

  I have known Sam since 1972. I was a first year law student at the University of Miami and Sam was the President of the Undergraduate Student Body of the University of Miami. We have become friends; were at one time law partners; have worked together on many community issues; have raised money for many charities; and he is my daughter's godfather. I know him as well as anybody.

  I am sure that in this sentencing process you see defendants who have a newfound commitment to their community and their families. I suspect it must be transparent when their newfound dedications are exposed. That is not the case with Sam Burstyn. Sam has been active in raising money for and helping to build some of our finest educational and religious institutions in South Florida. In particular, he has been actively involved in the University of Miami, both undergraduate and law schools, as well as the financial sponsoring of their athletic and educational programs. Sam is a deeply committed and an active Jew.

  I have personally worked with him in *pro bono* cases involving First Amendment issues.

  The municipalities of Miami Beach and Bal Harbor initially sought to deny the right of Jewish worshipers to congregate in Miami Beach and to deny the building of a Hannukah menorah

Honorable William J. Zloch
January 24, 2006
Page 2

in Bal Harbor.  In each of those instances, as well as the many others, Sam was candid and fair with all sides involved in the dispute.

In the Jewish faith, one's place in the world to come and how one is judged is based not on acceptance or non-acceptance of the Creator but rather by the scorecard that you create during your lifetime.  Sam was raised in a religious home and takes very seriously the notion that life has a scorecard and he has always taken it upon himself to do good deeds, not just to do them when asked but to initiate them and complete them on his own.

The community was deprived of Sam's generosity and assistance during his pre-trial detention.  If Sam  is sentenced to a term of imprisonment, the community will once again be deprived of his generosity and assistance.

I shall not attempt to pass upon the charges to which Sam has pled guilty.  I am sure that you will review them carefully.  What I do know, however, is that this conduct is so outside the boundaries of who Sam is that leniency is warranted.  In speaking to Sam, I know that he acknowledges the shame that this matter has brought upon him and his family.  He will spend the rest of his life to ensure that his reputation is rehabilitated.  You can start that process immediately by tempering your sentence with the compassion that Sam has demonstrated to so many people for so many years.

Respectfully submitted,

KLUGER, PERETZ, KAPLAN & BERLIN, P.L.

By: _____
Alan J. Kluger, P.A.

AJK:ab

{W:\PERSONAL\letter/M0279515 v.1; 1/24/2006  02:54 PM}

The Miami Center • 201 S. Biscayne Blvd. • Seventeenth Floor • Miami, FL 33131 • Ph: (305) 379-9000 • Fax: (305) 379-3428
2385 NW Executive Center Drive • Suite 300 • Boca Raton, FL 33431 • Ph: (561) 961-1830 • Fax: (561) 961-1831 • www.kpkb.com

Charles C. Harper
8520 S.W. 89th Avenue
Miami, Florida 33173

January 19, 2006

Honorable William J. Zloch
Chief Judge
United States District Court
Southern District of Florida
299 E. Broward Blvd.
Fort Lauderdale, Florida 33301

Re: Mr. Samuel I. Burstyn

Dear Judge Zloch:

I am writing to you in connection with the sentencing of Mr. Samuel I. Burstyn that is
scheduled for February 3, 2006.

I am a member of The Florida and District of Columbia Bar Associations.  I began my
legal career as a staff attorney with the United States Securities and Exchange
Commission in 1974 and worked my way up to the position of Associate Regional
Administrator in charge of the Commission's Miami Branch Office. I was in charge of
the office for fourteen years.   I retired from the Commission after over twenty years of
service and became the Associate General Counsel of a national securities brokerage
firm.  For the past five years I have worked as a consultant on matters involving
securities fraud, securities broker dealers and investment advisers.

I met Sam Burstyn over twenty years ago.  Sam was counsel, with another lawyer, to Mr.
George Mead, the "M" of ESM Government Securities, a U.S. government securities
dealer that was located in Fort Lauderdale, Florida.  The firm collapsed in 1985 when it
was disclosed that it was insolvent and had over $300,000,000 in losses that were
concealed from its customers and regulators. Mr. Mead's counsel were instrumental in
retaining special counsel that led to a reporting of the fraud to the regulators.  Over the
years since then, I saw Sam at professional gatherings but did not have an opportunity to
work with him until 2001.

In 2001 while I was associated with Lewis B. Freeman and Partners, Sam was retained to represent Lewis Freeman, the assignee for the benefit of creditors of a public company that collapsed when the internet bubble burst. Sam was counsel to the assignee in the lawsuit the assignee brought against the former officers of the company and certain "shadow directors". During the course of that litigation, I had occasion to work closely with Sam, travel to New York with him to discuss settlement with a major brokerage firm and to work on the successful mediation to settle the case. The case was complex and I had occasion to observe Sam in many different situations. Sam was properly aggressive and tenacious in representing his client. He developed and implemented a strategy that resulted in a successful settlement of the case for close to $5,000,000.

During the course of the litigation, Sam told me he was getting divorced. For someone who I regarded as being pretty tough, he was visibly and constantly upset over the situation. Letters from his wife's lawyer that someone else would see as "another lawyer letter" upset him greatly and he would spend time talking about it and explaining his side of the situation. He was very concerned about his children and on several occasions brought his daughter Ava (who was about five years old) to meetings involving the assignee's litigation that were held on Saturday. On another occasion he brought his son Sean (and I think Ava) and explained that Sean (who was about thirteen) was going to drive his go cart after the meeting. Sam would routinely take a break in a business meeting to talk to his children who were telephoning him. I had discussions with Sam about buying a DVD player and video games and toys so that his children would feel like his apartment was also their home. Sam was very concerned about the impact of the divorce on his children and his relationship with them. They were foremost in his mind at that time.

I attended Sean's Bar Mitzvah on Miami Beach and Sam was a proud father and good host. Sam as equally proud of his son Daniel, who was attending college in Salt Lake City, and his daughter Alana. Sam has also mentioned to me that his brother died suddenly in his early forties and he has supported his brother's family and been involved with his children since then.

I met with Sam recently and he is unquestionably ashamed of this criminal case. He is very concerned about the impact of this event on his family. The sudden and unexpected arrest and lengthy pre-trial incarceration together with the limited visitation that he had

with his children during that time was traumatic.

I respectfully request that the court consider the substantial impact that this case has already had on Sam when imposing a sentence. He has lost his license to practice law, he has lost his standing in the community, he was incarcerated pre-trial for many months and he has acknowledged his guilt. These negative events will follow Sam and influence the rest of his life.

Thank you very much for considering this letter.

Sincerely,

Charles C. Harper

# MOORES, LLP

16 JAN 05

Bill,

we met originally in the back yard of Mike O'Neils house when you tossed footballs to Mike, Jr. John and I. I saw you last at Mary's wedding.

All the best to you and your sound judgment in this matter. Sam is a good guy and realizes his transgressions. I hope the best for Sam and ask your leniency in judgment.

Best regards — it's been a while. —

Gerald W. Moore

333 N.E. 23rd Street
Miami, Florida 33137

Telephone: (305) 576-2122
Direct: (305) 672-4715
Facsimile: (305) 576-2123
gwm007@bellsouth.net

LAW OFFICES

# GERALD W. MOORE, P.A.

333 N.E. 23rd STREET
MIAMI, FLORIDA 33137

TELEPHONE: (305) 576-2122
FACSIMILE: (305) 576-2123

WRITER: Gerald W. Moore
gwm007@aol.com

January 17, 2006

Hon, William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

      Re:    Samuel I. Burstyn

Judge Zloch:

      I have known Sam Burstyn personally and professionally for more than twenty-two (22) years. Although I have not appeared with Sam in active litigation, I have referred matters to Sam. Sam has always zealously represented these clients.

      I've had occasion to be aware of Sam Burstyn's reputation. His reputation for candor, competence and fairness in matters civic and philanthropic is well established in this community, as is his reputation as a capable, if sometimes aggressive, attorney. His dedication to his profession, to the health and welfare of Miami Beach and, to his family all are well known and highly regarded.

      On a personal note, Sam acknowledges publicly and privately, his wrongful conduct in the matters pending before your Honor has brought great shame to not only his reputation but his family's as well. He fully understands a penalty is both inevitable and proper; and, completely repentant; he stands before the Court to receive the same.

      It is my hope your Honor may find leniency is warranted in imposing a fair sentence upon him. Sam has fully expressed remorse, morally and legally, recognizing the grievous failure in his recent conduct. Sam will and has suffered from these transgressions. While your Honor will impose a fair sentence, I stress Sam has much to contribute to this community.

Respectfully,

Gerald W. Moore

GWM:od

LAW OFFICES
# KENNETH J. KUKEC
PROFESSIONAL ASSOCIATION
One Biscayne Tower, Twenty-Sixth Floor
Two South Biscayne Boulevard
Miami, Florida 33131-1802
Telephone 305/358-2000
Facsimile 305/358-1233
E-Mail: kukec@bellsouth.net

January 17, 2006

Hon. William J. Zloch, Chief Judge
United States District Court

HAND-DELIVERY

Re: *United States v. Burstyn*, Case No. 04-60279-CR-Zloch

Dear Chief Judge Zloch:

I am an attorney practicing law here in the Southern District of Florida. I practice exclusively as a criminal defense lawyer, primarily in federal court, and have done so for approximately 20 years, ever since concluding my clerkship with the Honorable William J. Castagna in the Middle District of Florida. I have had the pleasure of appearing before Your Honor on a number of occasions.

I have known Sam Burstyn for most of the time I have been in practice. For nearly 10 years, until January 2005, Sam and I shared office space. We also became personal friends. During that time, Sam and I had the opportunity to work together regularly on criminal cases, either as co-counsel or as counsel for codefendants. Sam is one of the brightest and most-talented lawyers I have ever met. He graduated at the top of his class at the University of Miami law school and had the honor of clerking for (former Chief) Judge Gerald B. Tjoflat of the (then) Fifth Circuit Court of Appeals.

I have also found Sam to be one of the most ethical lawyers I know. Many lawyers boast of their reputation as "ethical," based only on their staying away from all ethical boundaries (often to the detriment of their clients) because they do not have a clear understanding of where those boundaries lie. Sam, on the other hand, always understood his ethical obligations and would, where necessary, go to the edge – as the best criminal defense lawyers must in meeting their sometimes-conflicting duties of candor to the court and zealously representing their clients. In doing so, Sam was sometimes misunderstood by other lawyers, particularly prosecutors, who did

Hon. William J. Zloch
January 17, 2006
Page Two

not fully comprehend his actions. Usually, however, by the end of a case, when the facts were more clear, Sam had won the respect of those attorneys.

I also saw firsthand how Sam won the respect of numerous judges, both here in the Southern District of Florida and in other jurisdictions – including the Honorable Clarence Cooper of the Northern District of Georgia, the Honorable Lacey Collier of the Northern District of Florida, the Honorable Raymond Dearie of the Eastern District of New York, and the Honorable Colleen McMahon of the Southern District of New York.

Despite the prestige of his professional accomplishments, it will always be Sam's personal qualities that stand out for me. Simply put, I know of no more devoted a father than Sam Burstyn. He treasures the time he spends with his children; they love and respect him. I admire how Sam also became a surrogate father for the children of his younger brother, Jerry, after Jerry's untimely death, which came within a year of the loss of Sam's father (a heroic Resistance fighter and Holocaust survivor during World War II). I have learned that, during this time, Sam was suffering from various personal problems – problems he bore stoically, without confiding in his colleagues and friends.

I understand, of course, that Sam has pled guilty to a serious crime. I do not wish to minimize that offense, and I know that Sam would not want me to try to do so. I ask only that you consider the whole man, not just the isolated conduct, and that you extend to Sam the leniency, Your Honor, that these circumstances merit.

Respectfully,

Kenneth J. Kukec

LAW OFFICES

# CINQUE & CINQUE, P.C.

845 THIRD AVENUE
NEW YORK, NEW YORK 10022

TELEPHONE:  (212) 759-5515
TELEFAX:  (212) 759-7737
E-MAIL: CINQUE845@aol.com

ROBERT W. CINQUE
JAMES P. CINQUE

MEMBERS OF NY & CA BARS

January 17, 2006

Honorable William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re: Samuel I. Burstyn

Dear Judge Zloch:

For the past 37 years I have been a practicing attorney having graduated from Fordham University and its law school. This is perhaps one of the difficult letters I shall ever write as it involves the fate of one of the finest and most decent human beings I have ever known, Sam Burstyn. I recognize the awesome nature of what will occur before you on February 3, 2006, and it is my fervent prayer that perhaps in some small way what I am about to say here will have some influence with you.

I have known Sam Burstyn for some 30 years now having met when we first collaborated in the representation of a client in the United States Court of Appeals for the Second Circuit. Sam was a relatively new lawyer at the time, and I was a junior partner at my law firm.

From the outset, I was always impressed with Sam's enthusiasm for the law and dedication in the representation of his clients. Over the years our relationship developed into close personal friendship and I was fortunate enough to watch Sam and Angie develop a family of four wonderful children to whom he was completely and selflessly dedicated. Attending the bar and bat mitzvahs of his children I was able to see first hand the deeply religious side of Sam, his wonderful interactions with his parents and siblings and his children. He did a terrific job of making this Jesuit trained Roman Catholic feel totally at home with the traditions of Judaism which Sam roundly embraced.

CINQUE & CINQUE, P. C.

Page Two
To: Hon. W. J. Zloch
Re: Samuel I. Burstyn
January 17, 2006

To this moment, I still find it virtually impossible to comprehend the very unfortunate circumstance in which Sam finds himself as he stands before you. His life is in shambles, he has already spent months incarcerated able to see his children on the most limited of bases, and of course he has lost his license to practice law.

Please understand when I say from the heart that the Sam Burstyn who comes before you is certainly not the person I have known for all these years. The conduct and events that have caused me to write you this letter on Sam's behalf are in my estimation, as incomprehensible as they are aberrational for the Sam Burstyn I have known and respected as a friend all these years.

I have thought and thought about the best way I might conclude this letter so as to best appeal to your sense of compassion and hopefully ameliorate to the greatest extent possible the impact on Sam and his family of what you are about to do today. Almost five hundred years ago William Shakespear expressed these thoughts far better than I ever could. If I may:

The quality of mercy is not strain'd,
It droppeth as the gentle rain from heaven
Upon the place beneath: it is twice bless'd;
It blesseth him that gives and him that takes;
'Tis mightiest in the mightiest; it becomes
The throned monarch better than his crown;
His scepter shows the force of temporal power,
The attribute to awe and majesty,
Wherein doth sit the dread and fear of kings;
But mercy is above this sceptered sway,
It is enthroned in the hearts of kings,
It is an attribute to God himself,
And earthly power doth then show likest God's
When mercy seasons justice.

CINQUE & CINQUE, P. C.

Page Three
To: Hon. W. J. Zloch
Re: Samuel I. Burstyn
January 17, 2006

      Please find it in your heart to season justice with mercy for my friend, Sam Burstyn.

                    Respectfully submitted,

RWC:kc                     ROBERT W. CINQUE



ELLIOTT M. PORTMAN
JOHN J. ROE, III
LESTER P. TAROFF
STEVEN TAITZ **
BRUCE T. WALLACE

CRAIG M. SANDLES **
VIRGINIA G. ALVAREZ

* ALSO ADMITTED IN FLORIDA
** ALSO ADMITTED IN CONNECTICUT
   AND THE DISTRICT OF COLUMBIA

COUNSEL
LINDA D. CALDER
PAULA WETSTEIN†

OF COUNSEL
CAMPION LALLY

RETIRED
EDWARD V. ESTEVE

†ALSO ADMITTED IN THE
DISTRICT OF COLUMBIA

January 14, 2006

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re:   Samuel I. Burstyn

Dear Honorable Sir:

I am an attorney presently practicing law in New York. I had come to know Sam Burstyn in or around May of 1986, as I became an associate with his law firm. I consequently worked for Sam until November of 1989 when I relocated to New York.

During the time I worked for Sam, it was generally he and myself and a law clerk who comprised the legal staff of his office. Needless to say we often times worked very closely together and I got the opportunity to know Sam on a professional and personal level.

I have found Sam to be one of the brightest people that I know. He is a great tactician and an aggressive advocate. I learned quite a lot while working for Sam.

I also found Sam to be a devoted father to his children. Without question, they were the primary focus of his life. I have also known Sam to be a generous member of the community.

I would ask that your Honor consider being lenient towards Sam at the time of sentencing. I am not fully aware of what Sam's transgressions were, but I can only assume that they were a result of his need to represent his clients in a zealous manner. Jail time would only serve to destroy his family bonds.

I thank you for your time and consideration. If I can be of any further assistance to the court, please do not hesitate to contact me.

Sincerely,

Steven Taitz

ST:sm

31 Oak Street, Suite 20, P.O. Box 352, Patchogue, NY 11772-0352
TEL: (631) 475-4400   •   FAX: (631) 475-9882   •   e-mail: the firm@roewallace.com

LAW OFFICES OF
# FREDERICK CHARLES SAKE
BAYPOINT OFFICE TOWER
4770 BISCAYNE BOULEVARD, SUITE 640
MIAMI, FLORIDA 33137

FREDERICK CHARLES SAKE

ABRAHAM A. GALBUT
OF COUNSEL

TELEPHONE (305) 673-3700
CABLE "LAWMIAMI"
e-mail LawMiami@aol.com

January 11, 2006

The Hon. William J. Zloch
United States District Court
Southern District of Florida
301 N. Miami Ave.
Miami, FL 33128                           In re: Samuel I. Burstyn

Dear Judge Zloch:

I have been a member of the Florida Bar since 1976, admitted to practice in the Southern District, 5th Circuit, 11th Circuit and the Supreme Court of the United States and have been in active civil and criminal practice for almost thirty years.

I first met Sam Burstyn in 1973 when we both were first year law students at the University of Miami. We became friends and were both proudly elected to the Law Review. Sam and I were honored to represent the University of Miami in the National Moot Court Competition. As a student, an intern and then throughout his legal career Sam demonstrated an outstanding legal mind and a willingness to always be of assistance to whomever and whenever he could.

Furthermore, through him I was introduced to his late brother Rabbi Jerry Burstyn who became my mentor and guide in all things religious and who led me to participate in the Talmudic University of Florida and who greatly assisted me in the painful loss of both my mother and my aunt due to prolonged illnesses.

Candidly, I do not know any of the facts or circumstances which brought Sam to this devastating point in his life; however, I heartily beseech you to show him all possible mercy in the sentencing process. I note that Sam has demonstrated his remorse for his actions and has taken responsibility for it. I know that he will live with the shame and regret for his behavior for the rest of his life and never be able to make up for it. Nevertheless, other than as purely punitive, a long period of incarceration will neither serve society nor Sam in any constructive way.

Thanking you for your time and consideration, I am,

Very truly yours,

Frederick Charles Sake, Esq.

January 7, 2006

**GARY RYAN HELFMAN**
**FLORDA BAR NUMBER: 0773034**
**3902 CAPTAINS WAY**
**JUPITER, FLORIDA, 33477**


To: The Honorable William J. Zloch
    Chief United States District Judge
    United States District Court
    Southern District of Florida

Re: Samuel I. Burstyn

**Dear Honorable Chief Judge Zloch:**


## INTRODUCTION AND ETHICAL DISCLOSURE

My name is Gary Helfman and I am a Florida Bar admitted attorney since 1988. I am further admitted to practice law within the Federal Courts of the Southern and Middle Districts within the State of Florida. Pursuant to the Rules of Professional conduct, I am disclosing to all parties that I have had a very strong legal relationship with this Court for approximately 10 years. I began my practice as an Admiralty/Maritime Lawyer in the 1980's. I practiced before this Court until 1998, when the death of my son Ryan from cancer caused me to cease practicing law. During my career as an Admiralty/Maritime Attorney, I either appeared and/or had this Court sign off on approximately 100 Admiralty cases in which this Court executed warrants of Arrest <u>in Rem</u>. During my career, I submitted cases as an associate at Alley, Maass, Rogers and Lindsey(Palm Beach) and then as a partner at Helfman and Mehr, P.A.( West Palm Beach). Throughout my entire legal career, this Court has **NEVER** questioned my integrity or honorability. I have earned this Court's respect and this letter is consistent with my past high ethics and morals before this Court. In fact, my reputation as an admiralty Attorney was so stellar and respected, that on many occasions, Law clerks for the Southern and Middle District would call me for advice on Admiralty cases. As such, I would request that this Court consider my letter on behalf of Mr. Burstyn, with the same confidence that this Court and many other Courts afforded me in the ten years prior to my son's death.

## WHY DO I WRITE THIS LETTER

I write this letter for two reasons:

1) The first is that I have had a business, legal, and personal relationship with Sam for approximately 20 years as his legal clerk, subsequent associate, friend, and mentor.

And

2) On my son Ryan's deathbed minutes before he died, I promised him that I would always protect his brothers and sisters; and that I would never lie and always do "the right thing" in life and stand up for those that could not do so.

## PAST AND PRESENT RELATIONSHIP WITH SAM

In 1986, I was introduced to Sam by the head of the University of Miami Executive Alumni Association Georgie Angones. The purpose of this introduction was to apply for a position as a Law School clerk for Sam's Law firm. Law students were lined out the door to have the privilege and honor to work for Mr. Burstyn. I was elated that after considering hundreds of resumes, that Sam chose me.

I joined Sam's Law firm thick into his representation of Rudy Arias, a defendant in the Miami River Cops Trial. During my extensive time spent with Mr. Burstyn and Mr. Arias, I accompanied Mr. Burstyn many times during his privileged attorney/client meetings. The Government's attempt to implicate Sam in a murder exemplifies their tenacity in their persistent desire to "bring down" Mr. Burstyn. At no time whatsoever did I EVER witness or overhear ANY inappropriate or unethical conduct committed by Sam. I was certainly dismayed at the accusations by the US Attorney's Office that Mr. Burstyn requested a "Hit" on a witness at the trial. What I can say is this: I believe that I was at the alleged "Hit meeting" and I confirm that IT DID NOT OCCUR. Additionally, Mr. Arias confided in me about almost every aspect of his case. I can positively state that at NO TIME did he ever insinuate or indicate any improper or unethical conduct on the part of Mr. Burstyn. In fact, quite the opposite is true of Sam's legal representation of Mr. Arias and his other clients.

I attended approximately 50 initial client/client meetings with Sam and with clients alone. What I can state for certain is that Sam Burstyn does NOT practice law for

money. While he does enjoy the publicity of representing high profile individuals, he is not motivated by the pursuit of money. How do I know this?? Because I was there.

## ACTIONS DO SPEAK LOUDER THAN WORDS

During many of the initial client consultations, defendants urged Mr. Burstyn to lie, hide money, submit false statements to the court, and assist in what basically is "House Counsel" for illegal activity. Mr. Burstyn's answer was ALWAYS the same: – " NO, GET OUT OF MY OFFICE"!!!. To illustrate my point of the high ethics of Sam Burstyn, I would estimate that the amount of legal fees that Sam turned down (by refusing to represent these unethical clients) was approximately FIVE MILLION DOLLARS. In short, Sam turned down MORE multi million dollar cases than he accepted. Certainly if Mr. Burstyn was solely motivated by greed or the pursuit of money, he would have taken these cases. Instead he had the integrity to kick these potential clients out of his office. I can say for absolutely certain that during my approximate three years of working for Sam that on over 50 occasions he was requested by clients to either lie or engage in unethical behavior. He simply refused to do so. I developed my own high moral standards as a result of Mr. Burstyn's conduct during my years of working for him. Once again, I would request that this Court give substantial weight to this letter, because this Court has granted me the highest privilege of earning your respect and admiration.

## WHAT DID I SEE IN MR. BURSTYN'S OFFICE ?

After a few months of working for Mr. Burstyn, I did indeed see unethical and vicious conduct. However the conduct was not committed by Mr. Burstyn but was **DIRECTED AT** Sam. From the beginning of my employment with Sam, it became very apparent to me that due to Mr. Burstyn's representation of Rudy Arias in the Miami River Cops Trial (and Mr. Burstyn's subsequent success in his representation of other clients), that the government began a campaign of surveillance and intimidation directed at Mr. Burstyn. Many times Mr. Burstyn had to have his office and phone lines" "swept" for "bugs". The Government's intimidation and hostility directed at Mr. Burstyn was quite clear to me. For instance, during the representation of many criminal defendants that Mr. Burstyn was representing, I noticed that the Federal and State prosecutors were relentlessly uncompromising, harsh, and antagonistic towards Mr. Burstyn. Examples of this included an unwillingness by the prosecution to negotiate pleas in good faith; presenting "superseding indictments" against defendants once they learned that Mr. Burstyn was representing the defendant, offering Co-defendants a light sentence but offering a harsh sentence to Mr. Burstyn's client for the identical charges; and finally culminating in Mr. Burstyn being charged with contempt of court because he

was late to a hearing due to the completely justifiable reason that his out of state plane flight was delayed.

## HAS AN INNOCENT MAN PLED GUILTY?? AND WHY WOULD HE DO SO??

I would proffer to this Court, that it would be hard pressed to find any other organization with such sweeping power and dominance than that of the United States Attorney Generals Office. Having known Sam for twenty years, I do know this: Sam Burstyn does not plead guilty to a crime unless he is guilty. Or does he?? Having had the privilege of spending a day in jail myself (due to the courtesy of my ex-wife) I can tell you that a day in jail feels and has the impact upon your psyche of a year in jail. Thus Sam has in reality, spent already 180 years in prison.

 Once the government had succeeded in its destruction of Mr. Burstyn's abilty to function normally(by incarcerating him for eight months), the rest of the case was easy. They had prevailed in beating him down to the point of total humiliation and exhaustion. What I am quite perplexed over is this: If Mr. Burstyn was such a flight risk prior to being convicted, (and noting now that he faces the potential to be sentenced to several years in prison and has not fled), isn't this proof of the government's desire to torture and wear down Mr. Burstyn's emotional cognition to the point where he could possibly plead guilty to a crime that he didn't commit?? As such did Sam plead guilty in order to emancipate himself from the mental slavery that was inflicted upon him by the U.S. Attorney's Office?? Mental torture works as well upon any human as effectively as physical torture.

 Want out Mr. Burstyn??? Just sign on the doted line......................................

## CONCLUSION/REQUEST TO THE COURT TO "DO THE RIGHT THING" AND IMPOSE THE APPROPRIATE SENTENCE

As stated in my introduction, the primary reason for writing this letter is to uphold my deathbed promise that I made to my son Ryan. As such, I have brought many facts and incidents to this Court that it may have never considered or had been brought to the Court's attention.

In analyzing what the appropriate sentence to impose upon Mr. Burstyn, I would respectfully like to proffer to this Court the fairest way to do such. It is common knowledge (as well as just "human nature") that once a judge is exposed to a defendant's indictment, it is almost impossible not to remove from one's mind and not consider the charges dismissed. As such, I am requesting that this Court in NO WAY consider the other charges that were dismissed. The easiest way to

accomplish this would be to imagine that you were "covering a hearing" for Judge Gonzalez or any other Judge. Under these circumstances, the Court would evaluate the sentence by reviewing an indictment containing one and only one charge—Title 18, Section 371. Under this scenario, I certainly believe that this Court would consider Mr. Burstyn's eight months in Federal prison as SUBSTANTIAL PUNISHMENT. As such, I am requesting this Court to sentence Sam **NOT** on the other charges dismissed, but instead "Do the right thing" and impose a "fair sentence". **The "fair sentence and "the right thing to do" is to sentence Mr. Burstyn to time served.**

Respectfully submitted,

Gary Helfman

LAW OFFICES
## CONRAD & SCHERER, LLP

REX CONRAD (1936-1999)
WILLIAM R. SCHERER, P.A.
LINDA SPAULDING WHITE, P.A.
RONALD A. FITZGERALD, P.A.
JAMES F. CARROLL
PAUL R. LARKIN, JR., P.A.
WILLIAM L. GARDINER III, P.A.
WILLIAM R. SCHERER III, P.A.
VANESSA A. REYNOLDS, P.A.
WILLIAM J. WICHMANN, P.A.
MARK W. CASTEEL, P.A.
JACK B. TUTER, P.A.
SUSAN H. APRILL, P.A.

JANINE KALAGHER McGUIRE
WENDY A. DELVECCHIO
SARA WALTERS
DAVID E. IRWIN
MATTHEW E. ISRAEL
DANIEL S. WEINGER
PETER C. LENART
MAXINE K. STREETER

OF COUNSEL
MARK J. LEEDS

EIGHTH FLOOR
633 SOUTH FEDERAL HIGHWAY
POST OFFICE BOX 14723
FORT LAUDERDALE, FLORIDA 33802
BROWARD (954) 462-5500
DADE (305) 944-0131
PALM BEACH (561) 736-0118
FACSIMILE (954) 463-9244
www.conradscherer.com

101 NORTH MONROE STREET
SUITE 803
TALLAHASSEE, FLORIDA 32301
TELEPHONE (850) 577-5297
FACSIMILE (850) 561-0462

PLEASE REPLY TO:     Fort Lauderdale
Direct Line (954) 847-3324

December 28, 2005

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida
Federal Courthouse
299 E. Broward Blvd.
Room 202B
Ft. Lauderdale, FL 33301

      Re:     Samuel I. Burstyn

Dear Judge Zloch:

      I am writing to you on behalf of Samuel Burstyn.  I have practiced civil litigation in the Southern District for the past 23 years, serving in private practice and some years ago as an Assistant United States Attorney in the civil division. I am currently a partner at Conrad & Scherer.

      I have known Sam Burstyn for nearly 20 years. For most of that time, I knew him by periodically serving as counsel in various cases with him where I observed him to be bright, congenial and effective as a practitioner. I always found him to be friendly and approachable but did not know him well.  I came to know him better in recent years when I began to share office space with him for a time prior to my joining Conrad & Scherer. At that time, I was in a period of transition in my career and Sam helped me out by offering me an opportunity to co-counsel with him on several cases and referring others to me. I found him to be analytical, vigorous and caring. I also observed that he is devoted to his children and his late brother's children and that they very much depend on him. I learned of his involvement in his synagogue and of his philanthropic endeavors, such as his hard work for the New World Symphony.

      I was, of course, shocked and saddened to learn earlier this year that Sam had been charged with criminal conduct and ultimately pled guilty. Nevertheless, I believe that Sam

Page 2

Burstyn has a great deal to offer and am sure that he will again do good works for the community and those close to him. I understand that Mr. Burstyn is scheduled to be sentenced by Your Honor in February.  It is my sincere hope that the Court will be lenient when sentence is imposed.

Respectfully,

Susan H. Aprill

DIANA L. BALLOU, ESQ.
12822 SW 115 TERRACE
MIAMI, FL 33186

December 21, 2005

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

**Re: Samuel I. Burstyn**

Dear Judge Zloch:

My name is Diana L. Ballou and I have only been practicing law in the State of Florida for the past 4 ½ years. In my short career, I had the pleasure of meeting Sam while working for Barranco, Kircher and Vogelsang, P.A. between April of 2002 and May of 2005. I was one of the main attorneys handling Sam's acrimonious divorce between 2002 and 2004. I was also very instrumental in the post- dissolution aspect of case. I also had the opportunity to work as co-counsel with Sam on another dissolution matter pending in the office.

Over the years I got to know Sam as well as his family. I met his ex-wife, his youngest daughter Ava, his oldest son, Daniel and his niece, Este. Sam was and is extremely dedicated to his family and his faith. He was involved in the everyday details of each of his children's lives and made sure to support them in whatever they needed. He never hesitated to interrupt work or an important meeting to take a call from Ava or take lunch with his son. Sam has a very energetic and honest personalty and is an extremely bright individual. He challenged me with every conversation and often enlightened me with intense knowledge of the Jewish faith. He was always eager to share stories of his past and his family- he truly loved life.

It broke my heart when I heard Sam had been arrested. I immediately thought of Ava and how difficult it would be for her to understand that she could not see her Daddy. Sam is the head of his family and a very active member of his community. His lost was immediately felt by all the lives he had touched. Even opposing counsel in his dissolution case called me to express her concern for Sam's well-being. It is that kind of impression that Sam makes on everyone he meets. His ability to connect with others and make a difference in his family and community should not be hindered by a lengthy sentence.

I know Sam is remorseful for what he did. It was huge lapse in judgment that I can promise will never occur again. I know that is extremely difficult for Sam to miss the daily on-goings of his family and his practice. I am sure that his time served has taught him lessons that he will never forget. Sam is the type of man that has a purpose in life- and he knows it. He is not floundering to understand why he is here and what he was meant to contribute- he knows it and tries to accomplish it in everything he does.

I respectfully request that Your Honor use all the discretion you have available, within legal and moral limits, to impose the shortest sentence possible on Sam. Our community and his family will all be extremely grateful and I'm sure his willingness and desire to give back to the community and mentor other young attorneys to practice within the legal and ethical boundaries of the law will be paramount.

Respectfully Submitted,

DIANA BALLOU, ESQ.

# *PATRICIA JEAN KYLE*

**Attorney at Law**

799 Brickell Plaza, Suite 606
Miami, Florida 33131
Tel: (305) 372-3325
FAX: (305) 372-1644
e-mail: patricia@kylecrimlaw.com

December 15, 2005

Hon. William J. Zloch
Chief United States District Judge
United States District Court
299 E. Broward Boulevard
Fort Lauderdale, Florida 33301

Re: Sentencing in United States v. Samuel Burstyn

Dear Judge Zloch:

It is difficult to write a "sentencing" letter for a man I have known, professionally and personally, for nearly 30 years. You will receive many letters addressing Sam's background and his many fine qualities, and I am certain that those letters will echo my sentiments. But the Sam Burstyn I know best is a man who loves the law. He loves its tradition, its courtesy, its majesty and its gentler ways while, at the same time, he recognizes its rigidity, its insensitivity, its narrowness and its prejudice. Sam always seemed to be able to distinguish and reconcile these disparities. Sam is emblematic of what the Roman poet Cicero (c. first century B.C.), one of the most prolific and thoughtful writers of ancient times, defined as a man of "humanity"—a man who acts with humane conduct toward others and with a sense of philanthropy, kindness, friendliness, gentleness, courteousness and clemency—albeit, at times with an overabundance of demonstrative effervescence.

The up-coming sentencing hearing, which I wish to attend, brings to my mind a favorite quote of my father's from Reinhold Niebuhr:

> Nothing that is worth doing can be achieved in our lifetime. Therefore we must be saved by hope. Nothing which is true or beautiful or good makes complete sense in any immediate context of history. Therefore we must be saved by faith. Nothing we do, however virtuous, can be accomplished alone. Therefore we must be saved by love. No virtuous

1

act is quite as virtuous from the standpoint of our friend or foe as it is from our own standpoint.  Therefore, we must be saved by the final form of love, which is forgiveness.

I ask and hope that you will have faith that Sam fully appreciates what he has done, and that you will punish him a gentle hand and with a sense of mercy and forgiveness.

Sincerely,

PATRICIA JEAN KYLE, ESQ.

## ADORNO & YOSS

### A LIMITED LIABILITY PARTNERSHIP
2525 PONCE DE LEON BOULEVARD, SUITE 400
MIAMI, FLORIDA 33134-6012
PHONE: (305) 460-1000, FAX: (305) 460-1422
WWW.ADORNO.COM

HENRY N. ADORNO

DIRECT LINE: (305) 460-1012
DIRECT FAX: (305) 460-1014
EMAIL: HNA@ADORNO.COM

December 14, 2005

Honorable William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

**Re:    Samuel I. Burstyn**

Dear Judge Zloch:

My name is Henry N. Adorno. I have been a member of The Florida Bar since 1973. I am writing on behalf of Samuel I. Burstyn, who is scheduled to be sentenced by this Court. I have known Mr. Burstyn, both professionally and socially, for over 15 years.

Mr. Burstyn and I have worked on several commercial litigation matters over the years. I have always found him to be a hardworking, honest, exceptionally qualified and ethical attorney. More importantly, I and my family have spent time with Mr. Burstyn and his lovely family. Our two youngest children are the same age and have played together. I cannot say enough about Sam as a father. He is a dedicated family man who has shown extraordinary devotion to his children and extended family.

I am saddened by these events. It is Sam's children that will suffer the most as a result of this most unfortunate situation. I would ask the court for leniency in this matter.

I have never written a letter such as this for anyone. It is unfortunate that I have to do so for a friend of mine; however, I do so willingly and in the hopes that it communicates to the court my support for a second chance for Mr. Burstyn.

Very truly yours,

*Henry Adorno*

**HNA/cas**

# Greenberg
# Traurig

Lucia A. Dougherty
Tel. (305) 579-0603
Fax (305) 961-5803
doughertyl@gtlaw.com

November 3, 2005

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re:    Samuel I. Burstyn

Dear Judge Zloch:

This letter is written in support of a lenient sentence for Sam Burstyn.  I have known
Sam for over 25 years.  I first met him when I was an assistant City Attorney for the
City of Miami Beach and he was representing individuals pro bono regarding
religious freedom.  Throughout the years when I was both City Attorney for the City
of Miami and Miami Beach, I dealt with him on many issues.  I have always found
him to be honorable and professional in every way.  I never had any reason to
question his ethics and I would hope that you would take into consideration his
years of service to the community when you make your sentencing determination.

Sincerely

Lucia A. Dougherty



LAW OFFICES OF THE

# PUBLIC DEFENDER

ELEVENTH JUDICIAL CIRCUIT OF FLORIDA
1320 N.W. 14ᵀᴴ STREET
MIAMI, FLORIDA 33125

**BENNETT H. BRUMMER**
PUBLIC DEFENDER

(305) 545-1600

November 1, 2005

Honorable William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re: Samuel I. Burstyn

Dear Judge Zloch:

I am writing to request that you show compassion in the sentencing of Samuel Burstyn.

I have been an elected official in Miami-Dade County since 1977, and have worked in the criminal justice field for more than 30 years. I manage an office with 200 lawyers. My staff of approximately 400 people handles more than 90,000 cases per year after arraignment.

I have known Sam Burstyn since he served as an appellate intern in my office during his third year of law school in 1975-76. I have known him in civic and commercial endeavors over that time. I have always found him to be professional and diligent.

From my understanding, this is not a case that calls for harsh treatment to protect public safety. To the contrary, Mr. Burstyn is an otherwise decent person and can be redeemed with a minimum of external sanction. I hope that you will seriously consider my evaluation of Sam Burstyn in your pursuit of justice in his case.

Sincerely,

Bennett H. Brummer

BHB/exa

**MOSCOWITZ**
**MOSCOWITZ &**
**MAGOLNICK, P.A.**

Mellon Financial Center
1111 Brickell Avenue
Suite 2050
Miami, Florida 33131

Telephone (305) 379-8300
Facsimile (305) 379-4404

October 31, 2005

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

      Re: Samuel I. Burstyn

Dear Judge Zloch:

      I am writing this letter on behalf of Sam Burstyn. I am an attorney practicing in Miami, and I have known Sam for over twenty years. He represented at least two clients that I prosecuted when I was in the United States Attorneys Office. Additionally two of his children have gone to high school with my daughters.

      I always found Sam a worthy adversary. While he was aggressive, I knew it was in the service of his clients. I came to know him in a different way during the time that he recently spent in the Federal Detention Center in Miami. There he befriended a client of mine, a young man who was being held for extradition to the Netherlands. Sam was unfailingly supportive, helpful and a genuine friend to a young man who really needed a friend. This was a time when he could have been forgiven for being totally selfish and self-absorbed, and he was not.

      My daughter is in tenth grade with Sam's son Sean. She reported to me how sad he was when Sam was being detained and how ecstatic he was the day that he was released.

      I hope the Court will take my comments into consideration when imposing sentence in this case.

                    Yours very truly,

                    Jane W. Moscowitz

# SEGREDO & WEISZ

## ATTORNEYS AT LAW

### A Partnership Including Professional Associations

Michel O. Weisz, P.A.
Frank J. Segredo, P.A.

Suite 1500
9350 South Dixie Highway
Miami, Florida 33156
Telephone: (305) 670-3820
Facsimile: (305) 670-8230

Honorable William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida
299 E. Broward Boulevard
Fort Lauderdale, FL 33301

Re: Samuel I. Burstyn

Dear Honorable Sir:

I am writing this letter on behalf of Samuel I. Burstyn. I am a practicing attorney in Miami-Dade County, having been admitted to the Florida Bar in 1982. I am also a member of the bar of the United States District Court for the Southern District of Florida, the United States Circuit Court of Appeals for the 11th Circuit and I continue to be a member of other appellate circuit courts. I also practice on a *pro hac vice* basis in numerous state and federal courts throughout the Eastern United States.

I met Sam while still a law student at the University of Miami in 1981. I was hired as a law clerk at his firm, and later worked for Sam from 1982 through 1986, as an associate.

After leaving to start my own practice in June of 1986, I have over the years maintained contact with Sam through friends, associates, and acquaintances.

To describe Sam as multi-faceted would be an understatement. In the years I worked with Sam, I marveled at the variety and numerosity of interests, contacts, and relationships he developed. Throughout my relationship with Sam, however, three coequal characteristics were constant. First, was his intellect. The second was his abiding and committed passion to obtaining the best possible result for his client. Third was commitment and devotion to family.

To those who ask me about Sam, I say unapologetically that Sam was a great teacher. Sam taught me that critical thinking and reading cases was not all there was to lawyering. Insight, attention to detail, creativity, flexibility and passion were the characteristics that distinguished great lawyers from good lawyers. No matter what task I was assigned, which

Honorable William J. Zloch
Page 2

      Re:    Samuel I. Burstyn

included a broad panoply of legal issues ranging from constitutional law, to criminal defense law, to civil law, to matrimonial law, to appellate law, Sam always challenged me to find solutions to tasks I thought were impossible. And as I struggled with each task, Sam devoted the time and interest necessary to guide and direct my efforts so that the end product was always the absolute best it could be.

      I believe Sam has much to offer. He has always freely given time, money and effort to help the underdog and the needy. This included free representation and even creating jobs for family and friends who needed money. His transgression has been admitted and acknowledged in open court. The personal cost to Sam is obvious. Whatever the imposed punishment may be, the potential remains for Sam to be a tremendous asset to the community, his family and others who can benefit from his generosity.

      Respectfully submitted,

      Michel Ociacovski Weisz

MOW/ccm

# Exhibit 27



January 8, 2006

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re: Samuel I. Burstyn

Dear Judge Zloch:

  Samuel Burstyn has been a patient in my office since 1990.  He suffers with chronic low
back pain and intermittent neck pain.  His treatment has consisted of chiropractic
adjustments, physical therapy and traction.  Physical, mental, and emotional stresses
aggravate and exacerbate his condition.

  Chiropractic care during Sam's incarceration was not allowed, and as a result he
experienced episodic back and neck pain.  Since his release he has been treated and
responded well to care.  It is my professional opinion further incarceration would once
again aggravate his condition.

Respectfully submitted,

Dr. Myles Starkman

# Exhibit 28

**GIVNER JAROSLAWICZ & CHEPENIK**
**ATTORNEYS AT LAW**

1177 Kane Concourse
Suite 232
Bay Harbor Islands, FL 33154
Phone (305) 867 6470
Fax (305) 867 6474

January 20, 2006

Hon. William J. Zloch
United States District Court
   for the Southern District of Florida
299 E Broward Blvd.
Ft Lauderdale, FL 33301

       Re:     Sentencing of Samuel Burstyn
               Case No. 04-60279-CR-ZLOCH
               <u>United States v. Samuel I. Burstyn</u>

Dear Judge Zloch:

       I am an attorney since 1988, originally from New York and now practicing in Florida since about 1992. I've been affiliated with a large, multinational law firm (Weil, Gotshal & Manges); I've spent nearly nine years of my legal career doing public-service work for a national not-for-profit group; and I am currently a partner in a small litigation boutique.

       I have known Samuel Burstyn since I moved to Miami in 1992. He was my first "opposing counsel" down here, representing an individual who was involved in a long, complex foreclosure action. Weil, Gotshal represented the lender. Although Sam had a unique "style" of practice that often frustrated the relatively straight-laced partners of our firm, he always conducted himself with integrity. Indeed, I believe it was his direct involvement – and his equally-unique way of earning the trust of all parties in the case – that ultimately helped the case settle relatively quickly.

       Less than one year after the matter settled, I left the firm to become Director of Legal Affairs for the Aleph Institute, a national, not for profit group that advocates for religious rights in institutional environments (e.g., prisons, the military and nursing homes). In that capacity, I crossed paths with Sam many times. On a professional level, he represented a number of people who ultimately required Aleph's services. I never got to see him at trial, but sometimes heard that his powerful personality and aggressive "style" had not endeared him to opposing counsel or the bench. Nevertheless, he was recognized as an outstanding advocate, and I never heard anyone ever intimate that Sam conducted himself with anything but the highest level of integrity. One knew that one could count on Sam to honor a commitment and do the right thing, even when a particular client left something to be desired.

       Although we never got close enough for me to call Sam a "friend," we did get to cross paths over the years in social situations, too. Sam often prayed at a local synagogue that I

Hon. William J. Zloch
Re: Sentencing of Samuel Burstyn
Page - 2 -

attended, the Shul of Bal Harbour.  I was privileged to attend his son's Bar Mitzvah and was
impressed with the obvious and close bond between Sam and his growing children.  Despite
the frantic schedule of a litigation and defense lawyer, Sam appeared to really be there for his
children.

I, as I am sure many others, was very surprised to hear about Sam's arrest, but I was
flabbergasted when I heard about the posturing that occurred with respect to any purported
"threat" posed by Sam's release pending trial, and that he was being held without bail.  I
understand that Sam has now pleaded guilty before this Court, accepting responsibility for his
actions.  I also understand that the Government has retreated significantly from its initial
claims.

Sam Burstyn is now relying upon the Court to fashion an appropriate and fair
sentence.  I respectfully submit that no useful purpose would be served by extended
imprisonment, whether for purposes of punishment or rehabilitation, for the protection and
safety of the community, or as a deterrent to others, or for any other reason.  There is no
question that the people who will suffer most will be his devoted family.

Accordingly, I do not find it difficult at all to submit my highest recommendation for
compassion and mercy for Samuel Burstyn.  Sam has done a lot of good in his life.  That life
is, of course, essentially over now, what with the loss of Sam's ability to practice law and the
shame that accompanies every stage of this proceeding.  Sam has unselfishly helped a number
of people who had nowhere else to turn.  I imagine Your Honor will have the opportunity at
sentencing to see a sampling of the wide range of people Sam has affected in a very positive
way.

Sam Burstyn deserves every consideration that this Court can provide.

Respectfully submitted,

Isaac M. Jaroslawicz

GIVNER JAROSLAWICZ & CHEPENIK
1177 KANE CONCOURSE, SUITE 232 · BAY HARBOR ISLANDS, FL 33154
PHONE 305-867-6470 · FAX 305-867-6474

MERIDIAN INTERNATIONAL GROUP, INC.
P.O. BOX 331990
MIAMI, FLORIDA 33133

PHONE: (305) 666-6399 • 1-(800) 897-3852 • FAX: (305) 668-4958

January 19, 2006

The Honorable William J. Zloch
United States District Judge
Federal Courthouse
299 East Broward Boulevard
Fort Lauderdale, FL    33301

Dear Judge Zloch:

Like many who believed we knew Sam Burstyn well, I was simply
aghast last fall when he conceded to activities and behavior so
wholly out of historical character. There is no denying the
truth -- which to his credit he finally admitted -- but it
leaves me incredulous, still, to know how far and hard his fall
from grace has been.

The Sam Burstyn I have known for more than 20 years is a
different man than the one who soon will stand before you to
hear and accept the Court's punishment for his crimes. That Sam
Burstyn is decent, caring, hardworking, conscientious, and
civic-minded. Blessed with enormous intellect, Sam had
accomplished much and faced what seemed to be a limitless,
productive future.

In my capacity as Miami-Dade's county manager some years ago, I
intersected with every kind of person imaginable across the
entire spectrum of the private sector. Sam was one of those few
individuals whose time and energies were often and productively
volunteered at my request, and whose wise counsel was virtually
without peer. He was a unique, if unrecognized and unrewarded,
asset to the citizens of our community.

I cannot begin to fathom the embarrassment and grief that Sam
Burstyn has brought on his family, his colleagues and most of
all himself. He must pay his debt to society for a life gone
horribly -- and to very many of us, inexplicably -- awry.

I would ask only that you view matters in the totality of Sam's life, the old one of decency and the future life some time from now when Sam can once again prove himself a contributing, decent member of society. I do believe strongly in redemption and reconciliation, and I urge you to make that opportunity available to him in the shortest possible time the Court deems appropriate.

Thank you for your consideration, and for your public service.

Sincerely,

Sergio Pereira

**CONCEPT ONE INTERNATIONAL, INC.**
**2655 LeJeune Road, Suite 516**
**Coral Gables, FL 33134**

January 19, 2006

Hon. William J. Zloch
Chief United States District Judge
United States District Court
Southern District of Florida

Re:   Samuel I. Burstyn

Dear Judge Zloch:

I came to Miami in the 1970s as an executive, and founded Concept One International, Inc. in 1987. Through the years, I have been active in numerous charitable and civic organizations, and founded the county's non-profit Community Gardens initiative in the 1980s to provide hands-on learning opportunities for young adults in racially polarized neighborhoods. I have served as a trustee of the University of Miami and president of the University of Miami's Citizens Board, whose mission is building bridges between the university and the larger community.

As a friend of Sam Burstyn for more than 25 years, I believe that it is important to consider Sam's long-standing role in the community, as well as his difficult family circumstances, in the upcoming sentencing decision. As I'm sure you know, Sam is a single parent with the responsibility of guiding and supporting four children. ranging from teenagers to young adults.

I met Sam in the mid 1970s as a result of being involved in an automobile accident that nearly claimed my life. I found Sam to be an effective and talented attorney, and called upon his professional services for advice and consulting a number of times over the years.  At the same time, Sam and I developed a personal friendship. I have been included in many Burstyn family functions and celebrations over the years, and I have seen Sam consistently demonstrate his deep-rooted family values. Now, his parental leadership is more important than ever for the positive development and growth of his four children.

A man with a long history of giving back to the community in time, effort and dollars, Sam is also dedicated to his faith. In my experience, whenever there has been a pressing issue in the Orthodox community, Sam has been called upon to play the role of Solomon. He has also been on call in the community to provide his learned counsel on timely issues involving artistic and philanthropic organizations.

Perhaps because of the overburdening pressure of a divorce and his health concerns, Sam lost sight of the ideals of his profession. In talking with Sam since then, I know that he feels a great deal of remorse about the impact of his actions on his family, colleagues and peers.

I have every confidence that given an opportunity to atone for his errors, Sam could emerge as a pillar of the community once again. None of us are perfect  and we have all made mistakes. Hopefully, we learn from them and move on to become better people.

Based on Sam's lifetime of civic accomplishments – and especially the needs of his four children – I believe a lenient sentencing decision would be in the best interest of our community.  On a personal note, I thank you for your consideration.

Sincerely,

Samuel Hollander

**David H. Gray**
**761 Arthur Godfrey Road**
**Miami Beach, Florida 33140**

January 17, 2006

Dear Judge Zloch,

My name is David Gray and I have lived in the Miami area for the last 30 years. I have known Sam for close to thirty years through my friendship with his late brother, Rabbi Jeremiah Burstyn. I am sure your honor has heard from many in the community about Sam's civic and philanthropic causes as well as his distinguished legal career. I am here to tell you about Sam's incredible devotion to his family as well as his extended family.

In March of 1998 my best friend of over 30 years suddenly passed away. I as well as the entire Jewish community of Miami was in a complete state of shock. After the funeral there were many health, financial and emotional problems regarding Sam's nieces and nephews that needed to be addressed. Sam alone took on the responsibility of addressing each and every issue within this shattered family. In most instances when a person dies friends and family initially respond to the grief and tragedy but as time moves on people continue with their lives and forget about the persons family. Sam not only helped during the "crisis" mode but continues to care years later, he continues to support his brothers widow and her four children until this very day.

While reviewing your decision please take into account the affect your decision will have on his family that has already experienced such tragedy.

Very truly yours,

David H. Gray

ישיבה וכולל בית משה חיים
**ALFRED AND SADYE SWIRE COLLEGE OF JUDAIC STUDIES**



**TALMUDIC UNIVERSITY**

HaRav Yochanan Zweig, shlita
Rosh HaYeshiva

Rabbi Yitzchak Zweig
President

Rabbi Yisroel Hili
Director, Administration
& Financial Aid

January 13, 2006

To Whom It May Concern:

I have known Sam Burstyn for thirty years. I know him to be a sensitive, caring and loyal person. He is devoted to his family, community and Jewish causes. Sam was an exceptionally good son to his father in terms his commitment of resources as well as his time and emotional involvement. His dedication to his mother is in no small measure representative of his love for her. She will be extremely devastated if he is not given every opportunity for leniency. His devotion to his siblings is unparalleled. This I know by first-hand knowledge.

I genuinely hope that Your Honor will use all compassion and mercy that is allowed within the judicial process to be as lenient as possible. On behalf of the family and the Jewish community,

Rabbi Yochanan Zweig

910 Alton Road
Miami Beach, FL 33139

Tel: (305) 534-7050
Fax: (305) 534-8444
1-888-TALMUDIC